IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

CURTIS W. McGHEE, JR,                           )
                                                )
                PLAINTIFF,                       )
        VS.                                      )
                                                )
POTTAWATTAMIE COUNTY, IOWA;      )
THE CITY OF                                      )
COUNCIL BLUFFS, IOWA;                    )
JOSEPH HRVOL; DAVID RICHTER;      )
MATTHEW WILBER; DANIEL LARSEN; )
LYLE BROWN;                                     )
and DAVID DAWSON,                          )
                                                )
                DEFENDANTS.                  )

## COMPLAINT AT LAW AND JURY DEMAND

_____Plaintiff, Curtis W. McGhee, Jr., complains against Defendants, Pottawattamie County, Iowa; The City of Council Bluffs, Iowa; Joseph Hrvol; David Richter; Matthew Wilber; Daniel Larsen; Lyle Brown; and David Dawson, as follows:

**The Parties**

_____1.      Curtis W. McGhee, Jr., ("McGhee")  is a citizen of Nebraska and currently resides in Omaha.  He is African American.

        2.      Pottawattamie County, Iowa ("Pottawattamie County")  is a municipal corporation organized under the laws of the State of Iowa.

        3.      The City of Council Bluffs, Iowa ("Council Bluffs")  is a municipal corporation organized under the laws of the State of Iowa.

        4.      Joseph Hrvol ("Hrvol")  is a citizen of Iowa currently residing in Pottawattamie County.  Mr. Hrvol was an Assistant County attorney in Pottawattamie County during 1977-78 and

was personally involved in the investigation and prosecution of McGhee for the murder of John Schweer.

5.      David Richter ("Richter") is a citizen of Iowa currently residing in Pottawattamie County.  Mr. Richter was the County Attorney for that county in 1977-78 and was personally involved in the investigation and prosecution of McGhee for the Schweer murder.

6.       Daniel Larsen ("Larsen") is a citizen of Iowa currently residing in Pottawattamie County.  Mr. Larsen was a detective in the Council Bluffs Police Department in 1977-78 and was personally involved in the investigation of the Schweer murder.

7.      Lyle Brown ("Brown") is a citizen of Iowa currently residing in Pottawattamie County.  Mr. Brown was a detective in the Council Bluffs Police Department in 1977-78 and was personally involved in the investigation of the Schweer murder.

8.      Hrvol, Richter, Larsen and Brown will be referred to collectively as the "1977 defendants."

9.      Matthew Wilber ("Wilber") is a citizen of Iowa currently residing in Pottawattamie County.  Mr. Wilber first took office as County Attorney for that county in January 2003 and currently serves in that office.  Mr. Wilber was personally involved in the investigation and prosecution of the Schweer murder in 2003.

10.      David Dawson ("Dawson") is a citizen of Iowa currently residing in Pottawattamie County.   Mr. Dawson is presently a Detective in the Council Bluffs Police Department and was personally involved in the investigation of the Schweer murder in 2003.

11.      Wilber and Dawson will be referred to collectively as the "2003 defendants."

**Jurisdiction and Venue**

12.     Jurisdiction is proper under 28 U.S.C. § 1331 and § 1343.  This  civil action arises

under the Constitution and laws of the United States.  Specifically, it arises under the Fourth, Fifth,

and Fourteenth Amendments to the U.S. Constitution, as well as 42 U.S.C. §1983.

13.     Jurisdiction is also proper under 28 U.S.C. § 1332, as the matter in controversy

exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.  There

is also jurisdiction on the pendent state law claims under 28 U.S.C. § 1367 (a).

14.     Venue is proper under 28 U.S.C. § 1391(b), in that a substantial part of the events or

omissions giving rise to the claim occurred within this district.

**Retired Police Captain John Schweer Found Dead**

15.     On or about July 5, 1977, John Schweer retired from the Council Bluffs, Iowa Police

Department as a Captain.

16.      On or about July 12, 1977, Schweer went to work as a night security guard for three

car dealerships in Council Bluffs: McIntyre Oldsmobile; Bluffs Toyota; and O'Neill Datsun.  The

three dealerships had common ownership and were located near the intersection of 32nd Avenue

(running East and West) and South 11th Street (running North and South) in Council Bluffs.

17.     McIntyre Oldsmobile was on the southeast corner of 11th Street and 32nd Avenue.  The

AWDI warehouse was directly across 32nd Avenue from McIntyre Oldsmobile on the northeast

corner of the intersection. O'Neill Datsun was to the east of the AWDI warehouse on the north side

of 32nd Avenue.

18.      At about 9:30 a.m. on Friday, July 22, 1977, Schweer's body was found on the

railroad tracks that ran north-south between the AWDI warehouse and O'Neill Datsun, about 150

3

yards north of 32nd Avenue.

19.     Schweer died of a shotgun wound to the right chest.

20.     Authorities concluded that the murder weapon was a 12 gauge shotgun.  A live 12 gauge shotgun shell was found at McIntyre Oldsmobile.  This was a green Remington paper shotgun shell containing #4 size shot.  The pellets found in Schweer's body were also #4.

21.     The live shell found at McIntyre Olds had paper wadding.  Similar paper wadding was also found at the murder scene.  Remington had stopped using paper wadding in about 1966, about 11 years before the Schweer murder.

**The 1977-78 Investigators**

22.     The murder of John Schweer was highly publicized in the local media and there was intense public pressure on the Council Bluffs Police Department and the Pottawattamie County Attorney's Office to arrest and convict someone for that crime.

23.     The murder of a retired police officer was of special significance to the Council Bluffs Police Department and the Pottawattamie County Attorney's Office.  For the first few days, virtually the entire Council Bluffs Police Department worked on the case.

24.     Defendants Brown and Larsen were detectives with the Council Bluffs Police Department at the time of the Schweer murder.  Brown and Larsen were the lead investigators working on the case from July 22, 1977 through the criminal trials in 1978.

25.     County Attorney Richter and Assistant County Attorney Hrvol worked closely with Brown, Larsen and the rest of the Council Bluffs Police Department during the investigation of the Schweer murder.  Both participated in witness interviews before any arrests were made.

26.     Richter and Hrvol had access to all of the reports generated during the Schweer

4

murder investigation.

**Early Leads**

27.     Early in the Schweer investigation, defendants learned that, on or about July 20, 1977

at 12:30 a.m., Schweer had written a note to McIntyre Oldsmobile employee David Edwards:

> "Dave: If you get a chance, talk to Tim O'Niel [O'Neill] at Datsun Mt [Motors]. Ask
> him if he would install or put in flood lights in the car lot on the West side of his
> building, where he keeps his trucks parked. I chased a man out of there last night.
> It appeared that he was trying to get in to one of the trucks. When I approached him
> he ran north West in to the weeds and I lost him. Lights would sure help in this area.
> Schweer.

28.     Defendants also learned early in the investigation that Schweer had a conversation

with Council Bluffs Police Officer Ron Cady at 3-4 a.m. on July 21, 1977 in which Schweer told

Cady that he had seen a man at O'Neill Datsun he thought was carrying a rifle or a car jack. Schweer

also told Cady that he thought the man and his dog were still in the area at the time of their

conversation.

29.     Schweer's body was found near the area where he had asked that O'Neill Datsun

install floodlights. There were high weeds nearby. The location of Schweer's vehicle with the lights

on and door open is consistent with his using the vehicle's lights as a substitute for those floodlights.

**Footprints and Dogprints**

30.     Plaster casts of footprints and dog prints were taken in the area around Schweer's

body.

31.     On or about July 23, 1977, Council Bluffs Police Officer Richard Moore ("Moore")

reported that he and Officer O.G. Chapin also found shoe and dog prints where 11th Street dead-

ended at I-29 to the west of where Schweer's body was found. Moore's police report states that

these shoe and dog prints were of the same type and shape as those found at the crime scene. Moore's report also states that a fit person could get from the murder scene and completely across I-29 in four minutes at this location.

**James Burke**

32.    On about July 25, 1977, Brown wrote a report of an interview with James Burke ("Burke"), an employee at the Northwestern Bell office located on the west side of 11th Street south of I-29 and about due west of where Schweer's body was found.

33.    Brown's report reflects that Burke told police  he had seen a man of average build running from the east to the west between the Northwestern Bell building and I-29 on July 19, 1977 at about 11:30 p.m.  The report states that Burke also said the man was wearing overalls, carrying a shotgun and had a dog with him.  Brown also wrote in his report that Burke said Schweer drove up to Burke that night in a red vehicle without license plates and asked him if he had seen a running man.  Defendants knew that Schweer drove cars from the dealerships to make his rounds.

34.    A July 28, 1977 report by Council Bluffs Police Sergeant Larry Williams reflects that he and County Attorney Richter reinterviewed Burke and obtained similar information to what Brown reported.

35.    Burke has stated that he told police that he saw the running man with the dog and shotgun on the night of the murder because he learned of the murder the next day and contacted police that same day.  Burke also has stated that his contact with Schweer in the red vehicle had occurred on an earlier night.

**The Suspect Charles Richard Gates**

36.    Detective Larsen thought of Charles Richard Gates ("Gates") when he heard that

6

a man with a dog had been seen in the area of the murder.

37.     Gates was a Caucasian male about 47 years of age at the time of the Schweer murder. Upon information and belief, Gates's sister, Marcella Oamek, was married to a Captain on the Council Bluffs Fire Department.

38.     Gates was known to carry a shotgun while walking his dogs.

39.     Council Bluffs police picked Gates up and photographed him.  A police report states that Gates was questioned by Council Bluffs officers a few days after the murder, but there is no report of the details of that interview.  The report that has been found states that officers "checked" Gates's residence, but there is no record of what that entailed or what was discovered.

40.     A July 28, 1977 police report reflects that Council Bluffs police along with County Attorney Richter interviewed David Waide ("Waide") who worked in the area of the murder.  The report states that Waide was shown a photograph of Gates and positively identified Gates as the man he had seen walking dogs in the area.  Police reported that Waide said he had last seen Gates on July 19, 1977.

41.     Another report dated July 28, 1977 reflects that Council Bluffs Police Officer L.L. Diamond and Assistant County Attorney Hrvol canvassed the neighborhood near the scene of the murder.  A Mrs. Shea told them that she had seen a man in overalls and a hat walking dogs.  The police report states that she gave a "perfect description of Gates, a previous suspect in case."  The report also states that a Mrs. Akins gave a statement that "concurs exactly" with the information provided by Mrs. Shea, and that she had seen the man as recently as July 22, 1977.

42.     James Burke was not shown a photograph of Charles Gates before the 1978 murder trials in the Schweer case.  Burke was not called as a witness at the 1978 trials.

7

43.   Detective Larsen did a background check of Charles Gates and wrote a report regarding this work on August 12, 1977.  Larsen visited an Omaha neighborhood where Gates had once lived.  According to Larsen's report, former neighbors of Gates described him as a "spooky type individual."  He constantly walked his three dogs which "appeared as though they could have been extremely mean."  Larsen reported that the neighbors said he was "strictly a loner" who was never seen with other people.

44.   A former landlord of Gates told Larsen that he had found a ball of chewing gum twice the size of a softball in the house after Gates vacated the premises.  There was also an old refrigerator in the backyard.  A window had been installed in the refrigerator door and Christmas lights and a child's chair could be seen inside the appliance.  A coffee pot had been screwed on top. Larsen's report states that the landlord said the refrigerator "looked like some sort of an outer space gadget."

45.   Larsen's report also indicates that Gates drove a white car that had been painted to look like a police vehicle.  The fenders had been painted black.  There were Strongheart brand dog food emblems on the front car doors along with the words "Iowa Environmental Security Commission."  The car had a roof rack which had been outfitted with a set of "top lights consisting of backup or turn signal type lights made for larger type trucks" which gave the appearance of lights on a police car.

46.   Larsen also learned that Gates had been a suspect in the 1963 homicide of a female co-worker at a printing company in Omaha.  Larsen's report states that he reviewed Omaha Police Department reports in that 1963 case and that "in the report indications are made that GATES acted in a very suspicious manner while employed at the printing company and that his actions towards

8

women indicated something of an unnatural form."

47.    In 2003, Council Bluffs police reviewed the Omaha Police Department's records regarding the 1963 murder.  There was a report in that 1963 file regarding a records check on Gates "which indicated 'Safe Keeping' in connection with Assault with Gun (Mental) dated 6-22-55." Larsen's August 12, 1977 report indicated that he had reviewed the same Omaha police report regarding the 1963 homicide.

48.    Larsen also wrote in his August 12, 1977 report that

> "suspect, GATES, Charles R. had been given a polygraph examination by Confidential Polygraph Service, Omaha, Nebraska and it was the written opinion contained as an addendum to this report under heading 'Test Results' that suspect GATES was not truthful in his denial of owning a shotgun or having shot John Schweer."

The written polygraph report has never been disclosed.

49.    An astrologer volunteered to help the County Attorney's Office after learning that a reward was being offered for help in solving the Schweer murder case.  She met with Larsen, Hrvol and Richter in the County Attorney's Office.  Larsen's police report reflects that she was given the date of birth of Gates, "one suspect in the matter," to do an astrological chart.

50.    In his August 12, 1977 report, Larsen recommended further investigation of Gates, including where he had lived and worked.  Larsen also recommended that local mental institutions be contacted.  There is no record that any of this was done.

51.    There is no document generated during the investigation of the Schweer murder which indicates that any search was conducted for a shotgun at Gates's home, his automobile or at any other place where Gates might have kept a shotgun.  There is also no document generated during

the investigation of the Schweer murder which indicates why such a search was not done.

52.    There is no document generated during the investigation of the Schweer murder which indicates that any attempt was made to compare the footprints taken at the murder scene with Gates or any other suspect.

53.    There is no document generated during the investigation of the Schweer murder which indicates that any attempt was made to compare the dogprints taken at the murder scene with Gates's dogs.

54.    There is no document generated during the investigation of the Schweer murder which stated any reason for eliminating Gates as a suspect.

**The Suspect Gates Is Abandoned in Favor of a North Omaha Teen "Car Theft Ring"**

55.    On or about September 1, 1977, two cars were stolen from dealerships in Fremont, Nebraska:  A 1977 Cadillac De Ville from Sid Dillon Oldsmobile and a 1976 Lincoln from Diers Ford.

56.    The suspects were three African American youths driving a black Oldsmobile Cutlass Supreme with Douglas County, Nebraska license plates.  Police believed that the thieves visited the dealerships during business hours; took the keys from the cars and replaced them with "dummy" keys to cover the thefts; and then returned after hours to steal the cars.

57.    On or about September 5, 1977, the Nebraska State Patrol contacted the Council Bluffs police with information on the car thefts in Fremont, Nebraska.

58.    Larsen checked Council Bluffs Police Department records and found that a black Cutlass was reported stolen from Bluffs Toyota shortly before Schweer started working as a night watchman.

10

**The Fremont Cars Are Recovered**

59.     The Lincoln automobile stolen from Fremont was found abandoned in Omaha on or about September 5, 1977.  A T-shirt was found in the car with "Contact Band" written on the front and "Jones" on the back.

60.     On or about September 9, 1977, Lincoln, Nebraska police stopped three African American teenagers in the Cadillac stolen from Fremont's Sid Dillon Oldmobile.  They were Kevin Mack, 16; Roderick Jones, 17; and Candice Pride, 16, all of Omaha.

61.     Jones told police in Lincoln that he was in the Contact Band and that the T-shirt found in the Lincoln was his.

**Kevin Hughes, a/k/a "Kevin Mack," among Others**

62.     "Kevin Mack" was really Kevin Hughes ("Hughes") *[he will be referred to as Kevin Hughes in this complaint]*.  Although he was only 16 years of age, Kevin Hughes had used several aliases.  These included Kevin Mack, Kevin George, Kevin Jackson, Ronald Jackson and Jerome Jackson.  He used these aliases because of his long criminal record under his real name of Kevin Hughes.

63.     Hughes denied that he stole the Cadillac he was caught driving.  He told Fremont police that Terry Harrington ("Harrington"), Anthony Houston ("Houston") and a person named "Cub" had stolen the cars in Fremont.  Hughes was reported to have said that these three individuals also stole the black Cutlass from Council Bluffs and another Lincoln from Metro Motors in Omaha.  Hughes told police that he was driving the Cadillac with Houston's permission.  He also indicated to police that the other sets of keys found in the Cadillac belonged to the real car thieves, not him.

11

64.     Defendants later learned that Curtis McGhee's nickname was "Cub."

65.     The Council Bluffs Police Department was notified of the arrests in Lincoln and advised that Hughes may have information on the Schweer murder.  Detectives Larsen and Brown traveled to Lincoln to interview Hughes in connection with the Schweer case.

66.     The 1977 Defendants were desperate to charge and convict someone for the murder of retired Police Captain Schweer.  They needed a witness to do it, and Hughes was a perfect candidate because he was young, poor, African American and in trouble.

67.     The 1977 Defendants told Hughes they knew he was involved in the car theft ring, and that they knew that he and his fellow car thieves were responsible for the Schweer murder.  They told him that he would be charged with the murder unless he could give them someone else.  They told him that he would not be charged with the murder if he did so.

68.     Defendants also told Hughes that there was a $5,000 reward for information leading to the arrest and conviction of Schweer's killers.

69.     Hughes also had other legal problems, including not only the Fremont thefts and his possession of the stolen Cadillac in Lincoln, but also multiple burglary and robbery charges in Omaha.  Defendants told Hughes that they could help him with those charges if he worked with them on the Schweer case.

70.     Hughes was very afraid of being charged with the murder of John Schweer. He was willing to say whatever defendants wanted him to say to avoid a murder charge.  He was also motivated by defendants' offers of a $5,000 reward and help with his legal problems.

71.     Hughes proceeded to tell a series of lies to save himself from murder charges in the Schweer case and to obtain reward money and leniency for his own crimes.

**Hughes First Lies That a "Light-skinned Man" Murdered Schweer**

72.      First, Hughes told Larsen and Brown that he saw a Dennis Jackson and a "light-skinned man" at a car wash in Omaha.  The "light-skinned man" was later identified as Steven Frazier ("Frazier").  Hughes said that Frazier told him he had stolen his Lincoln Continental from McIntyre Oldsmobile and had to kill the security guard to get it.  Hughes gave a written statement to Larsen and Brown containing this story.

73.      Larsen and Brown knew that Hughes was lying.  No Lincoln was stolen from McIntyre Oldsmobile on the night of the murder.  They told Hughes that they knew he was lying, and that this made him a stronger suspect for the murder himself.

74.      The other defendants were also aware of Hughes's false "light-skinned man" story.

**Hughes Lies about Arnold Kelly Murdering Schweer**

75.      Hughes also lied to investigators that Arnold Kelly ("Kelly") was involved in the Schweer murder.  Subsequent police investigation determined that Kelly was enrolled in the Job Corps in Kansas City at the time of Schweer's murder and could not have been involved.  The 1977 defendants were also aware of Hughes's false allegation against Kelly.

**Hughes next Lies That Harrington and Others Told Him They Killed Schweer**

76.      Police officers and prosecutors in the area all wanted to solve the murder of retired police captain John Schweer.  Those interviewing Hughes in connection with his car thefts and other crimes knew that Hughes had accused Harrington, McGhee and Houston of stealing the black Cutlass from one of the Council Bluffs dealerships where Schweer worked.  They pressed Hughes to accuse the same 3 teenagers of the Schweer murder.

77.      Initially, Hughes told investigators that he did not think they were capable of killing

13

someone.  But he eventually relented under their pressure.  An Omaha Police Department report indicates that Hughes said that he personally was not involved, but Harrington and others told him that they had killed Schweer.  Omaha police officers told Hughes that they thought he was lying and he admitted that he was lying.

78.    The defendants were aware of this Hughes story as well as his admission that it was false.

## Defendants Use Hughes to Frame McGhee and Harrington

79.    Hughes then told Omaha police on or about September 30, 1977 that he was present on the night of the murder.  But his story was confused, and they brought him to Council Bluffs to meet with the 1977 defendants at the scene of the crime.

80.    The 1977 defendants knew that Hughes was a liar.  But they were desperate to give the appearance of solving the Schweer case.  They "worked with" Hughes to create a case against Harrington and McGhee by editing Hughes's story to eliminate the lies that were demonstrably false and by providing him with details of the crime to make him seem more credible.

81.    Hughes has admitted under oath that the story he told against Harrington and McGhee was false, and that he gave this false testimony due to defendants' threats of murder charges, offers of reward money and promises to help him with his other criminal charges.  Hughes would not have agreed to implicate himself in the Schweer murder had the 1977 defendants not assured him that he would not be charged with murder if he did so.

82.    Hughes has also admitted that the 1977 defendants fed him many of the "facts" in his story against Harrington and McGhee.  He has admitted that the 1977 defendants brought him to the crime scene several times to better construct his false story, and that they talked to him "too many

14

times to count" to put that story together.

**Hughes Lied That Anthony Houston Was One of the Murderers**

83.     In his September 30, 1977 statement to Omaha police, Hughes said that he went to McIntyre Oldsmobile on the murder night with his cousin, Anthony Houston, as well as Harrington and McGhee.

84.     The 1977 defendants were aware of Hughes's statement about Houston's involvement to Omaha police. Hrvol, Larsen and Brown went to the Nebraska State Patrol headquarters in Lincoln, Nebraska to interview Anthony Houston. Houston told them that he was in the Douglas County jail at the time of the murder. Defendants contacted the Douglas County jail and confirmed that Houston was telling the truth.

85.     Defendants told Hughes that Houston could not have been present for the Schweer murder. Hughes adopted their suggestion and dropped Houston from his story. From that point on, his story was that only Harrington and McGhee were with him on the murder night.

**The Murder Weapon**

86.     Hughes first said that Schweer was killed with a pistol. Defendants told Hughes that Schweer was killed with a shotgun. Then Hughes said the murder weapon was a 20 gauge pump shotgun. Defendants told Hughes that it was a 12 gauge, and that they found a 12 gauge shell at McIntyre Oldsmobile near a Toronado parked in front of the new car showroom at McIntyre Oldsmobile. Hughes then changed his story to say that a 12 gauge shotgun was used, and that they intended to steal the Toronado on the night of the murder.

87.     The 12 gauge shotgun used to kill Schweer was never found. Neither Harrington nor McGhee was ever found in possession of a 12 gauge shotgun.

15

88.    In October 1977, Omaha police searched Harrington's mother's home with Harrington's voluntary permission and found a .410 shotgun and some shells that Harrington admitted were his.  Defendants knew that Schweer was not killed with a .410.

**Hughes's Account of the Murder Itself**

89.    After dropping Houston from his account, the story concocted by Hughes and the 1977 defendants was that Hughes, Harrington and McGhee drove around the area of the Council Bluffs car dealerships three times that night and saw no one.

90.    Hughes further stated that they parked Harrington's green 1970 Olds 98 on the west side of 11th Street south of where that street intersects 32nd Avenue.  The McIntyre Oldsmobile new car showroom was directly to the east of where Hughes said they parked, on the other side of 11th Street.

91.    The McIntyre showroom faced 32nd Avenue.  The Toronado that they were allegedly there to steal was parked in front of the showroom, only about 50 yards away from where Hughes said they parked their car.

92.    According to Hughes's story, Harrington had the keys to the Toronado.  All Harrington had to do was cross 11th Street, walk over to the Toronado and drive away.

93.    According to Hughes's story, he stayed at the car while Harrington took a shotgun from the trunk and, with McGhee in tow, went on foot to get the Toronado.

94.    In his initial story in which he was present for the crime, Hughes had said that he was sitting in the backseat of the car listening to music while his colleagues went to get the Toronado.  At the 1978 trials, he said he was sitting on the car, smoking cigarettes and listening to music during the crime.

95.    In the first statement that Hughes gave in which he said he was present for the murder, Hughes said that he heard a shot and then saw Harrington, McGhee and Houston come running back to the car from behind McIntyre Oldsmobile.  He left Houston out after the 1977 defendants told him that Houston was in jail on the night of the murder.

96.    Schweer was not shot behind McIntyre Oldsmobile.  His body was found on the railroad tracks by O'Neill Datsun, about 150 yards to the north of 32nd Avenue and well over 200 yards from where the Toronado was parked at McIntyre Oldsmobile.

97.    Defendants fixed this problem.  They tailored Hughes's false statement so that it fit where Schweer's body was found.  They had Hughes change his story to be that, when Harrington and McGhee left the car, they headed more toward where Schweer's body was found than toward the "target Toronado" parked in front of McIntyre Oldsmobile.

98.    They also had Hughes say that, after the shot, he saw Harrington and McGhee running back to the car from behind the AWDI warehouse that sat directly across from McIntyre Oldsmobile on the north side of 32nd Avenue.  The 1977 defendants made this change because a person might run west from the murder scene on the north side of the AWDI warehouse and then south on 11th Street to return to the location where Hughes said the Olds 98 was parked.

99.    Defendants knew this made no sense.  There was no reason for Harrington and McGhee to have gone to where Schweer was murdered when all they had to do was cross 11th Street to steal the "target" Toronado.

100.    Schweer's Toyota Land Cruiser was found at O'Neill Datsun near where his body was found with the lights on and the door open.  If Schweer had startled Harrington and McGhee while they were trying to steal the Toronado, Schweer would likely have had to drive his Toyota Land

17

Cruiser right by the car where Hughes was sitting.

101.    In none of Hughes's statements did he ever say that he saw or heard Schweer or his vehicle during Harrington and McGhee's alleged attempt to steal the Toronado.

102.    In none of Hughes's statements did he ever say that Harrington or McGhee told him that Schweer had come upon them during their alleged attempt to steal the Toronado.

**Harrington's Jacket**

103.    In a September 30, 1977 statement to Omaha police, Hughes said that Harrington put his *tan* leather jacket over the shotgun before heading off to steal the Toronado.  Defendants were aware of this statement during their work on the Schweer murder case and it was incorporated in their story.

104.    In the October 1977 search of Harrington's mother's home where Harrington resided, Omaha police found and seized a reddish maroon, vinyl jacket.  Omaha police later gave it to Council Bluffs police.

105.    Hughes never identified the jacket seized by Omaha police as the jacket he saw Harrington put over the shotgun on the night of the murder.

106.     At some point after October 26, 1977, Council Bluffs police gave the jacket that Omaha police seized from Harrington to the Iowa Bureau of Investigation laboratory to be tested for gunpowder residue.  This was more than three months after the murder.

107.    Michael Petersen, the Iowa Bureau of Investigation technician who examined the jacket, found no evidence that the jacket had been wrapped around a shotgun at the time of its firing.

108.    Debris from the surface of the jacket and its pockets were examined under a microscope.  Two particles were tested and Petersen concluded that they were of unburned,

18

smokeless gunpowder.

109.    The particles were destroyed by the testing.  Neither Harrington nor McGhee could have their own testing done to confirm or deny these results.

110.    Petersen's 1977 report described the particles as "form unrecognizable."  He has testified under oath that different types of gunpowder are used in shotguns, rifles and pistols, and that he could not say whether the particles were consistent with shotgun, rifle or pistol gunpowder.

111.    No attempt was made to compare the particles with the specific powder in the 12 gauge shell found at McIntyre Oldsmobile after the murder, or with any gunpowder found on the victim.

112.    Defendants made no attempt to rule out that the particles of gunpowder were related to Harrington's use of his .410.  Defendants knew that Schweer was not killed with a .410.

113.    The only "evidence" that tied these alleged flakes of gunpowder from Harrington's jacket to the Schweer murder was the false testimony of known liar Kevin Hughes.

114.    Hughes has testified under oath that he made up the story about Harrington and McGhee shooting John Schweer, including the part about Harrington putting his jacket over the shotgun.

**Defendants Created "Corroboration" of Part of Hughes's Story: 24th and Pratt**

115.    Defendants knew that they needed other witnesses to "corroborate" at least some of the false story they manufactured with Hughes.  They knew that Hughes had severe credibility problems and, under the Iowa Code at that time, a person could not be convicted solely on the basis of an accomplice's testimony.

116.    Defendants amended Hughes's account to insert other persons into the story and then

threatened and pressured those persons - other frightened teenagers - with charges of murder and other crimes to induce them to give false testimony to "corroborate" Hughes.

117.    This effort began with where Hughes said that Harrington and McGhee picked him up in Omaha before the murder.  Initially, Hughes told authorities that he was watching television with Candice Pride at her house on the night of the murder.  He said that he was alone when Harrington, McGhee and Houston picked him up for the trip to Council Bluffs.

118.    Defendants changed Hughes's story to be that Harrington and McGhee picked him up at a parking lot at 24th and Pratt in Omaha that night with others present so that those teens could testify that they saw Harrington and McGhee pick Hughes up.

119.    In a November 16, 1977 taped statement to County Attorney Richter with Hrvol, Larsen and Brown present, Hughes said that he was with Candice Pride, Roderick Jones and some others when Harrington and McGhee picked him up at 24th and Pratt.  He later added that Clyde Jacobs was there, too.

120.    Hughes was also willing to accept the 1977 defendants' coaching on the time he was picked up.  In his November 16, 1977 statement, he said Harrington and McGhee picked him up around 11 p.m.

121.    After being charged, Harrington presented an alibi defense that he was at an Ohio Players concert at Peony Park in Omaha at the time that Hughes said he was picked up at 24th and Pratt.  Harrington's witnesses included his high school football coach, Carl Wright, who saw Harrington at the concert.

122.    The 1977 defendants attempted to intimidate two of these witnesses, Thea Scott and Carl Wright, because their testimony conflicted with the false story they had concocted to convict

20

McGhee and Harrington.

123.     They also had Hughes move back the time that he was picked up at 24th and Pratt to meet Harrington's alibi.  Hughes testified at Harrington's trial that Harrington and McGhee picked him up around midnight, not at 11 p.m. as he had said in his November 16, 1977 statement.  Hughes testified at Harrington's trial that Hrvol had told him about Harrington's alibi defense and that time was important.  Hughes further testified that he knew the later he made the pick-up, the worse for Harrington and the better for him.

**Roderick Jones**

124.     Roderick Jones ("Jones") was a 17 year-old African American living in north Omaha in 1977.  He had been caught riding in the stolen Cadillac with Hughes and Pride in Lincoln, Nebraska.  He was in the Contact Band musical group, and his band T-shirt was found in the Lincoln automobile stolen from Fremont.

125.     Larsen wrote a report on October 17, 1977 indicating that Jones admitted being with Hughes on several occasions where the key-switch system was used to steal cars from dealerships.

126.     Detective Brown told Jones that they knew that Harrington, Hughes and McGhee had killed Schweer.  Brown told Jones to say that he saw Harrington, Hughes and McGhee together on the night of the murder.  If he did not, they would charge him with stealing cars and with the Schweer murder.

127.     Jones was frightened and agreed to lie and tell the story the police wanted because of these threats.  The other 1977 defendants were aware of these threats and made similar threats to Jones to procure his testimony against Harrington and McGhee.

128.     Brown put Jones in a room with Hughes at the Omaha Police Headquarters so they

could get their stories straight. In his taped statement after speaking with Hughes, Jones said that everything he knew came from Hughes. He said he was at 24th and Pratt with Hughes and Clyde Jacobs. At the 1978 criminal trials, he said that Candy Pride was also there because defendants had also added her to their list of "corroborating" witnesses by that time.

129.    Jones also said in this taped statement that Harrington and McGhee picked Hughes up at 24th and Pratt on a night in the last part of July. At McGhee's 1978 trial, Jones testified it was sometime in the middle of July. At the Harrington trial, Jones was more specific and said that he saw Harrington and McGhee pick up Hughes at 24th and Pratt on the evening of July 21, 1978.

130.    Jones was also flexible to suit the 1977 defendants' needs on the time that Harrington and McGhee allegedly picked Hughes up at 24th and Pratt. In his original statement, he said it was around 11:30. At McGhee's 1978 trial, he testified it was around 11 or 12. At Harrington's trial, he said he was at the same Peony Park concert as Harrington, and that he saw Harrington and McGhee pick Hughes up at 24th and Pratt at around 12 or 12:30.

131.    There is no record of Jones telling anyone that he was at the Peony Park concert before he gave this testimony at Harrington's trial. Defendants coached Jones to say he was at that concert so they could claim Harrington could have been at the concert and still have picked up Hughes at 24th and Pratt.

132.    In exchange for his false testimony at the McGhee and Harrington trials, Jones was not charged with his involvement in any car thefts or murder.

133.    Jones has stated that he lied in 1978 due to the defendants' threats to charge him with the Schweer murder and car thefts.

22

**Clyde Jacobs**

134.    Clyde Jacobs ("Jacobs") was a 17 year old African American living in north Omaha. Larsen, Brown and Hrvol came to Omaha several times and brought him to Council Bluffs for questioning, sometimes with Roderick Jones and Candy Pride so they could get their stories straight. They told Jacobs that they knew he was in the car theft ring and that he would be charged with Schweer's murder if he did not say what they told him to say.

135.    Jacobs was young and scared.  He was stealing cars with Hughes and Jones.  He agreed to testify falsely to what these defendants told him to say because of these threats.  All of the 1977 defendants were aware of the threats made to Jacobs to secure his false testimony and made similar threats to Jacobs themselves.

136.    In his original statement, Jacobs had said that Harrington and "another colored guy" picked up Hughes.  He did not name McGhee.

137.    With defendants' coaching, Jacobs testified at McGhee's trial that McGhee was with Harrington when Hughes was picked up at 24th and Pratt.

138.    At McGhee's trial, Jacobs testified that Harrington and McGhee picked Hughes up at "12 something."  At the Harrington trial, he said they picked him up at 24th and Pratt at "11 something."  Like Jones, Jacobs first mentioned that he had been at the Peony Park concert at the Harrington trial.

139.    In return for his false testimony, Jacobs was not charged with car theft or murder.

140.    Jacobs has admitted under oath that his 1978 testimony was false.

**Candice Pride**

141.    Candice Pride was a 16 year-old African American living in north Omaha.  Hughes

23

was her boyfriend in the fall of 1977.  Hughes told her that she needed to corroborate his false story implicating Harrington and McGhee or he would be charged with murder.

142.    Larsen and Brown came to take Pride's statement in October 1977.  They knew that Hughes's story was false, and that Pride's "corroboration" of that story would also be false.  But they reminded  her that she was caught in the stolen Cadillac in Lincoln with Hughes and Jones, and they also told her that her boyfriend Hughes would be charged with murder unless she said that she saw him with Harrington and Hughes at 24th and Pratt.  Pride did not want Hughes to go to the penitentiary, so she went along with the false story that the defendants had put together with Hughes.

143.    Larsen and Brown prepared a statement which Pride signed on or about October 13, 1977.  It sets forth that there was a night in the latter weeks of July 1977 when she, Jones, Hughes and others were at the parking lot at 24th and Pratt when Harrington and McGhee picked up Hughes.

144.    The other 1977 defendants were aware that Hughes's story was false and that Pride's "corroboration" was also false.

145.    In an April 18, 1978 statement to McGhee's lawyer before his trial, Pride stated that she did not think she was in Omaha in July 1977; that she was not socializing with Hughes in July 1977; and that she did not see Harrington and McGhee pick up Hughes that night.

146.     At the McGhee trial, however, the 1977 defendants pressured Pride to repeat the story they wanted her to tell.  She acquiesced and testified that she was with Jones, Hughes and Jacobs at 24th and Pratt on a night in late July 1977 when Harrington and McGhee picked Hughes up.

147.    The 1977 defendants also molded Pride's testimony on the time that Harrington and McGhee allegedly picked Hughes up.  Larsen's October 17, 1977 police report states that Hughes

24

told him that Candy Pride was at 24th and Pratt when Harrington and McGee picked him up at around 10:45 p.m.   That was too early to fit the 1977 defendants' story.  At McGhee's trial, they had her say that Harrington and McGhee picked Hughes up at 11 or 11:30.  That was too early for the Harrington trial because of his Peony Park alibi defense.   So defendants had Pride testify at Harrington's trial that Harrington and McGhee picked Hughes up at 12.

148.    In exchange for her false testimony, the 1977 defendants did not charge Pride with car theft or any other crime.

149.    Pride has admitted under oath that her statements about seeing Harrington and McGhee pick Hughes up at 24th and Pratt were false.

**Linda Lee**

150.    According to the Hughes story, he had Harrington and McGhee drop him off at his girlfriend Linda Lee's ("Lee") house when they returned to Omaha after the murder.  Linda Lee was an 18 year-old African American living in north Omaha.  The story was that Hughes got to Lee's about 1:30 a.m. Hughes stayed a few minutes and Linda Lee saw Harrington's car when he left.

151.    Hughes told Lee that she had to corroborate his false story to save him from murder charges.

152.    Larsen and Brown knew that Hughes's story was false, including the part about his visiting Linda Lee that night.  But they needed her to corroborate Hughes so they could get a conviction in the Schweer case.  When they interviewed Lee in October 1977, they told her that her boyfriend Hughes would be charged with murder unless she corroborated his story.  They prepared a statement for her that Hughes came to her house after midnight one evening "during the later part of July."  They included in the statement that Lee saw Terry Harrington and another African

25

American guy in Harrington's car waiting for Hughes that night. Lee wanted to protect her boyfriend Hughes and adopted the false statement.

153. The other 1977 defendants were aware that Hughes's story was false and that Lee's corroboration was also false.

154. At McGhee's trial, Lee testified that Hughes came over to her house after midnight on one occasion in July 1977. She could not say if it was early, middle or late July. She could not say if Hughes came over before or after 1 a.m.

155. At Harrington's trial, she testified that Hughes came over after midnight twice on the same night in July 1977. The first time was "past midnight" and the second was around 2 a.m. She did not know what day this happened. The 1977 defendants had Lee add a second visit to meet Harrington's alibi defense.

156. Lee has admitted that these statements about a Hughes visit or visits to her house were false.

**The Hughes Story Doesn't Fit the Evidence of When the Murder Occurred**

157. Defendants learned in the first few days after the murder that two workers at Tanksley Trucking heard a loud noise like an —80 firecracker between 3 and 3:30 a.m. on July 22, 1977. Tanksley Trucking was located less than 200 yards from where Schweer's body was found.

158. Defendants also knew that the medical examiner's report placed the time of Schweer's injury at 4 a.m. and the time of his death at 4 a.m.

159. Defendants also had access to the pathologist, Dr. A.L. Sciortino, who did Schweer's autopsy. Dr. Sciortino testified that Schweer died between 15 minutes and an hour after being shot. He further testified that it was "very possible" that Schweer died at 4 a.m. as stated in the medical

examiner's report.

160.  The story that the 1977 defendants concocted with Hughes and the "corroborating witnesses" did not fit with the murder taking place between 3 and 4 a.m.

**Mcghee Is Arrested, Taken to Pottawattamie County and Charged with Murder as an Adult**

161.    On or about November 17, 1977, a preliminary information charging McGhee with the Schweer murder was signed by Brown.  County Attorney Richter and Assistant County Attorney Hrvol approved the decision to arrest McGhee.  McGhee was arrested in Omaha, Nebraska that same day.

162.    McGhee was extradited to Pottawattamie County, Iowa on or about December 22, 1977 and was incarcerated in the county jail.

163.    On or about December 23, 1977, McGhee's case was transferred to juvenile court. On or about January 20, 1978, the Pottawattamie County juvenile court referred McGhee's case to the County Attorney's Office for further proceedings in the criminal court.

164.    On or about February 17, 1978, a True Information was filed charging McGhee with first degree murder.  The only "evidence" described in this document that implicated McGhee in the murder were the minutes of testimony setting forth the Hughes story.

**Defendants Hide Gates to Convict Mcghee and Harrington with Hughes's Lies**

165.    The 1977 defendants knew that their whole case against Harrington and McGhee was the coerced and coached statement of Hughes.  No other witness placed McGhee or Harrington at the murder scene that night.  They also knew that the physical evidence could only be linked to Harrington and McGhee by Hughes.

166.    The 1977 defendants also knew that Hughes had severe credibility problems despite

27

their work with him and that a jury might reject his story if there was an alternative suspect.

167.    The 1977 defendants were concerned that Harrington and McGhee would avoid conviction by using defendants' own reports about Charles Richard Gates to persuade the jury that there was reasonable doubt whether Harrington and McGhee had done the crime.

168.    The 1977 defendants concealed at least eight Council Bluffs Police Department reports from Harrington and McGhee to deprive them of material, exculpatory evidence that they could have used to defend themselves.

169.    The concealed reports were discussed above with relation to Charles Richard Gates. These included the two reports which referred to James Burke's statement that he saw a man with a shotgun running with a dog in the area where the murder occurred.

170.    The withheld reports included the one that referred to David Waide's positive identification of Gates as the man he had seen walking dogs in the vicinity of the murder based on a photograph he was shown by Council Bluffs police and County Attorney Richter.

171.    The withheld documents included Larsen's background report on Gates which set forth that Gates had been a suspect in the 1963 murder in Omaha and that the polygraph examiner had opined that Gates was not truthful when he denied owning a shotgun and shooting Schweer.

172.    The withheld Larsen report also discussed Gates's car; the chewing gum ball and refrigerator; his neighbors' statements about him; and the recommended follow-up investigation that was never done.

173.    The withheld reports included one stating that the County Attorney's Office and the Council Bluffs Police Department consulted an astrologer early in the Schweer investigation and gave her Gates's date of birth so she could prepare astrological charts for him.

28

174.    The withheld reports included the one which referred to Schweer's note to Dave Edwards at McIntyre Oldsmobile requesting that O'Neill Datsun install floodlights in the area where Schweer had run off a man with a gun or carjack and where his body was found.

175.    The withheld reports include one in which Council Bluffs Police Officer Kremer reported that Gates was interviewed at the police station on or about July 25, 1977, three days after the murder, and his residence checked.

**Defendants Also Procured Jailhouse Snitches Against Mcghee**

176.    Knowing the weakness of their false case, the 1977 defendants resorted to a notorious source of false evidence: jailhouse snitches. Defendants sought out prisoners who were in jail with McGhee who would agree to falsely testify that McGhee admitted guilt for the Schweer murder in the hope of gaining leniency in their own cases.

**Ken Freeman**

177.    Ken Freeman was an inmate with McGhee at the Pottawattamie County jail. Larsen told him that he would not have to go back to the Iowa men's prison at Anamosa if he agreed to testify against McGhee. Freeman refused.

**Tyrone Pierce**

178.    Tyrone Pierce was 18 years of age and incarcerated in Pottawattamie County for burglary and car theft. He was fearful of going to the penitentiary on those charges.

179.    Pierce had a history of informing on other prisoners in order to curry favor with the authorities. Prior to McGhee's 1978 trial, a court granted Pierce's public defender's motion to withdraw as his counsel because Pierce was informing against the lawyer's other clients.

180.    Larsen and Hrvol approached Pierce. They told him that the charges

29

against him would be reduced if he testified against McGhee.

181.    Hrvol and Larsen arranged for Pierce to be placed in a cell next to McGhee's.  Pierce later gave a statement that, soon after they were placed in adjacent cells, McGhee told him that he murdered Schweer.

182.    Hrvol told Pierce what to say, including that McGhee made this admission to him while they were bragging to one another about their criminal accomplishments.

183.    Charges against Pierce were dropped after he testified at McGhee's trial.

184.    Pierce admitted to Charles Reese, a prisoner with Pierce and McGhee in 1978, that he had lied at McGhee's trial.  In 1988, Pierce testified under oath that he lied at the 1978 trial when he said that McGhee admitted his involvement in the Schweer murder, and that he did so in exchange for the promise that his own charges would be dropped.  The 1977 defendants knew that Pierce's statement against McGhee was false and concealed that fact from McGhee.

**Larry Plater**

185.    Larry Plater ("Plater") was in the Douglas County, Nebraska jail awaiting transfer to the Kearney reformatory. Larsen and Brown told him that they needed some witnesses, and that they could probably keep Plater from going to the reformatory if he testified as they wanted.

186.    Plater testified at McGhee's trial that McGhee told him a couple of days after the murder that he was present when Harrington killed a police officer.  Plater testified that he expected not to go to Kearney in return for this testimony.

187.    Plater has admitted under oath that his testimony regarding McGhee's admission was false.  The 1977 defendants knew that Plater's statement against McGhee was false, and that it was given by an inmate who was trying to get leniency for himself.  They concealed this fact from

McGhee.

**Eric Hartwell**

188.    Hartwell has a lengthy history of offering testimony against fellow inmates in return for sentencing considerations.

189.    In early 1978, Hartwell was 18 years of age and serving ten years for breaking and entering at the Iowa men's correctional facility in Anamosa.  He hoped to be released after a "shock" treatment of only 90 days in prison.  He contacted the defendants from Anamosa to say that he had information in McGhee's case.

190.    On April 7, 1978, Larsen and Hrvol interviewed Hartwell at Anamosa. Hartwell's signed statement of that date sets forth that McGhee had told him months earlier when they were incarcerated together in the Pottawattamie County jail that he, Harrington and another unnamed person got a 12 gauge shotgun out of the trunk, wrapped it in a jacket and went around back of the dealership where Harrington shot the "sheriff" twice.

191.    Hartwell admitted that McGhee had the True Information against him at the time he was jailed with McGhee, but Hartwell falsely denied looking at it.

192.    The prosecution theory was that only Harrington and McGhee were together when Schweer was killed.  Schweer's body was not found in the back of the dealership.  Schweer was not shot twice.

193.    The 1977 defendants knew that Hartwell was lying, and that he was testifying because he wanted their help to get out of jail.

194.    The 1977 defendants cleaned up Hartwell's story for McGhee's trial.  At trial, Hartwell stated that his April 7 statement about another person being involved with McGhee and

Harrington was a "typo."

195.    On or about May 9, 1978 at McGhee's trial, Hartwell was asked on direct by Hrvol why he came to court to testify. Hartwell answered that he wanted to testify, and that he was coming back in front of the judge the 15th "to see if I get out."

196.    Upon information and belief, Hartwell's sentence was reduced after he testified at McGhee's trial. The 1977 defendants did not disclose this arrangement with Hartwell to McGhee or his lawyers.

**Mcghee and Harrington Are Convicted in 1978**

197.    McGhee's trial began on May 2, 1978. On May 11, 1978, the all-white jury returned a verdict of guilty on the charge of murder in the first degree. On June 13, 1978, McGhee was sentenced to life at hard labor without the possibility of parole.

198.    Harrington's trial began on July 25, 1978. Like McGhee, Harrington is African American. On August 4, 1978, the all-white jury returned a guilty verdict on the charge of murder in the first degree. Harrington was also sentenced to life at hard labor without the possibility of parole.

**The Continued Concealment of Charles Richard Gates**

199.    The 1977 defendants continued to conceal information on the suspect Gates in post-conviction relief proceedings brought by McGhee and Harrington. They also concealed the means by which they procured the false testimony against them.

200.    Detective Brown testified at Harrington's 1978 trial that there were no early-on alternative suspects and he failed to indicate that Charles Richard Gates was ever a suspect. Brown also testified at Harrington's 1987 post-conviction review proceedings that there was no early-on

32

alternative suspects and he failed to indicate that Gates was ever a suspect.

201.    In discovery during Harrington's 1987 post-conviction review hearing, Harrington's attorney James Cleary deposed Richter, Hrvol, Larsen and Brown.  Each denied there were any alternative suspects.

202.  Cleary testified in 2000 that nothing in the materials furnished to him after a global discovery request indicated there was a viable suspect identified early on as Gates, and that he received no reports that included Gates's name.

203.    In his first post-conviction review proceeding in 1987, McGhee served an Interrogatory 2 requesting the "names and addresses of all suspects in the case..."  The State answered "[n]one known other than plaintiff" with "plaintiff" referring to McGhee.  Hrvol assisted in answering this discovery.

204.    In his first post-conviction review proceeding in 1987, McGhee served Interrogatory 14 asking "[w]hat was the result of the investigation of the report of a man and a dog seen in the vicinity of McIntyre Oldsmobile a night or two before John Schweer's death?"  The State responded that the "man and dog" was "never found or identified."  Hrvol assisted in answering the discovery.

205.    Alfredo Parrish, the attorney who represented McGhee in his first post-conviction proceeding, requested all files from the Pottawattamie County Attorney's Office and none of the material delivered to him contained information as to a viable suspect named Charles Richard Gates.

**The 1977 Defendants Continue to Conceal How They Procured the False Testimony**

206.    In his first post-conviction review proceeding in 1987, McGhee served Interrogatory 6 requesting information about "witnesses used at trial who were promised leniency in exchange for their testimony against Curtis McGhee, and the specific promises made to each."  The State

answered "[n]one." Hrvol assisted in answering the discovery.

207.    Neither police nor prosecutors ever disclosed any sentencing considerations or other deals or agreements in any of Harrington's or McGhee's underlying proceedings.

208.    At any time during McGhee's and Harrington's wrongful imprisonment, the 1977 defendants could have come forward with what they knew about Gates and the false testimony they had procured against the two men. But they kept silent, year after year, prolonging McGhee's and Harrington's suffering.

**The Police Reports Regarding Charles Richard Gates Are Discovered in 1999**

209.    In 1999, Ann Danaher worked at the Iowa men's prison and got to know Harrington and his family. She decided to look into his case. Danaher requested the Council Bluffs Police Department's file for the Schweer murder. The withheld reports regarding Charles Richard Gates were included in the materials produced to her.

210.    Harrington brought a post-conviction relief petition based in part on the fact these reports had been withheld from him at the time of his criminal trial in 1978. The Iowa District Court denied Harrington's petition.

**The Iowa Supreme Court Orders a New Trial for Harrington**

211.    The Iowa Supreme Court reversed. It found that the reports regarding Charles Gates were withheld from Harrington in 1978. The court found that these reports were exculpatory because they showed that Gates was an alternative suspect for the Schweer murder, and were material because "Hughes, the primary witness against Harrington, was by all accounts a liar and a perjurer." The court reasoned that "...this circumstance makes it even more probable that the jury would have disregarded or at least doubted Hughes' account of the murder had there been a true

alternative suspect. Gates was that alternative." <u>Harrington v. State of Iowa</u>, 659 N.W.2d 509, 524 (Iowa 2003).

212.    The Iowa Supreme Court held that Harrington's due process right to a fair trial was violated by the State's failure to produce the police reports documenting their investigation of Gates. It remanded Harrington's case for entry of an order vacating Harrington's conviction of first degree murder and granting him a new trial.

## 2003 Proceedings Begin in the Schweer Murder Case

213.    Matthew D. Wilber was the Pottawattamie County Attorney at the time Harrington was granted a new trial. He was approximately 33 years of age and had been in office for less than two months.

214.    As County Attorney, Wilber was the chief law enforcement officer in the County. It was his job to decide whether to retry Harrington for the murder of John Schweer. In addition, McGhee was also seeking a new trial based on the Iowa Supreme Court's decision in Harrington's case, and Wilber had to decide whether to oppose McGhee's petition and whether to retry McGhee for the crime.

215.    Wilber has stated that he personally spent hundreds of hours working on the Schweer murder case after the Iowa Supreme Court's decision. At Wilber's request, Council Bluffs Police Detective David Dawson was assigned to work full-time on the Schweer case with Wilber.

## No Probable Cause

216.    Wilber soon learned that he did not possess sufficient facts to support a reasonable and honest suspicion that Harrington or McGhee were guilty of the Schweer murder. The only witness who placed Harrington or McGhee at the murder was Kevin Hughes, and Hughes had

admitted in 2000 that his testimony against them was false. There was no physical evidence that tied Harrington or McGhee to the Schweer murder independent of the admitted liar Hughes. The prosecution witnesses that "corroborated" Hughes on some peripheral "facts" - Jones, Jacobs, Pride and Lee - had recanted. Wilber did not find the jailhouse snitches to be credible witnesses.

217.    In addition, Wilber believed that the murder occurred between 3 and 4 a.m., based on the two witnesses who heard the gunshot and the medical evidence. The time line based on Hughes's story was inconsistent with the crime occurring between 3 and 4 a.m.

**Creating a Case Against Harrington and Mcghee in 2003**

218.    Wilber very much wanted to obtain a conviction in the case despite the lack of evidence. The Iowa Supreme Court decision in Harrington's case was widely reported in the press and reflected poorly on the Pottawattamie County Attorney's office and the Council Bluffs Police Department. Wilber wanted to vindicate the reputations of these law enforcement agencies by again obtaining convictions of Harrington and McGhee.

219.    Wilber also thought a conviction or convictions would provide "closure" for the Schweer family, as well as positive publicity for himself. Wilber set out to do what was necessary to reconvict Harrington and McGhee despite the lack of evidence.

**Intimidating Hughes**

220.    Wilber knew he had no case at all without Hughes. Wilber set out to intimidate Hughes into backing away from his testimony in 2000 at Harrington's post-conviction review hearing that his 1978 testimony against Harrington and McGhee was false.

221.    In early 2003, Hughes was on probation, living and working a full-time job in Omaha. This was a fact that was readily discoverable, particularly for a law enforcement official such as

County Attorney Wilber.

222.    Wilber knew Hughes was living and working in Omaha.  But he wanted to intimidate Hughes.  Wilber instituted proceedings to have Hughes arrested as a material witness in Omaha, Nebraska on or about Monday, April 21, 2003.  Hughes was incarcerated at the Douglas County jail until his transfer to the Pottawattamie County jail on April 23, 2003.

223.    On April 24, 2003, Hughes was interviewed at the Council Bluffs Police Department by Detective Dawson at Wilber's direction.  Hughes was not read his Miranda rights.  Hughes had been absent from work for days and feared that he would lose his job if he did not return soon.  He also feared that the authorities in Council Bluffs would not release him from jail if he did not say what they wanted him to say.  So Hughes told Dawson that he had lied in 2000 at Harrington's post-conviction relief hearing when he said that his testimony at McGhee's and Harrington's 1978 trials was false.

224.    Having intimidated Hughes to return to his 1978 lies, Wilber proceeded with a criminal case against Harrington for the murder of John Schweer.

225.    Hughes was scheduled for deposition in Harrington's criminal case on or about June 2, 2003.  Wilber knew he could not depend on what Hughes would say as a live witness at that deposition.  His plan was to intimidate Hughes into taking the Fifth.  If Hughes did so, Wilber could argue that Hughes was "unavailable" as a witness so he could use the transcript of Hughes's 1978 testimony at the retrial of Harrington or McGhee.

226.    Wilber spoke to Hughes before Harrington's counsel arrived for the June 2, 2003 deposition.  Wilber told Hughes that he may have a right to a lawyer, considering that if Hughes were to testify that he lied under oath in late 2000, the statute of limitations had not yet run on perjury and,

37

in theory, he could be charged with that crime. Wilber also told Hughes that he could be prosecuted for perjury if he lied at the retrial. Hughes told Wilber that he wanted a lawyer and left before Harrington's lawyer arrived.

227.    McGhee was not represented at Hughes's deposition on June 2, 2003. Wilber never advised McGhee or Chad Primmer, McGhee's court-appointed lawyer in his post-conviction review proceedings, of what occurred between Wilber and Hughes that day.

228.    A lawyer was appointed for Hughes, Greg Steensland ("Steensland"). Steensland told Wilber that Hughes would take the 5th unless he was offered immunity. Steensland further advised Wilber that, if granted immunity, Hughes's testimony would be exculpatory to Harrington with respect to the Schweer murder. Wilber declined to offer Hughes immunity. Hughes then asserted his Fifth Amendment right at his July 26, 2003 deposition in Harrington's murder case.

229.    After Hughes took the Fifth, Wilber argued in court that he would read Hughes's 1978 testimony at Harrington's retrial because Hughes was "unavailable."

**Wilber Also Intimidated and Misled Mcghee and His Lawyer**

230.    Although his office was resisting McGhee's post-conviction relief petition for a new trial, Wilber knew that McGhee would likely succeed in getting a new trial.

231.    Wilber wanted McGhee to enter a plea in connection with the Schweer murder. He also wanted to nail down that McGhee would testify at Harrington's trial the way that McGhee had testified at his own trial in 1978. At that time, McGhee testified that Harrington picked him up at his home, then picked up Hughes at 24th and Pratt before dropping McGhee off at his girlfriend's. McGhee further testified in 1978 that this "could have been" July 21, 1977, the night of the murder.

232.    To make this work, Wilber needed to persuade McGhee and his lawyer that he was

38

prepared to retry McGhee and convict him a second time for the Schweer murder.

233.    Wilber dealt with Chad Primmer, McGhee's court-appointed lawyer.  Primmer was about 26 years of age and had graduated from law school in 2002.  He was admitted to the Iowa Bar in July 2002, about 6 months before he started representing McGhee.  Primmer also sat on the Council Bluffs city council.

234.    Before representing McGhee, Primmer had been charged with rape in Pottawattamie County.  He was represented in that criminal matter by David Richter, who was then in private practice with Matt Wilber.  The charges against Primmer were dismissed.

235.    Wilber knew that Primmer was inexperienced and not as familiar with the facts and witnesses as he was.  Wilber knew that Primmer lacked the resources to conduct his own investigation.  Wilber also knew that Primmer would likely rely on what Wilber told him.

236.    In his dealings with Primmer, Wilber intentionally misrepresented some facts and concealed others in order to mislead Primmer and McGhee into believing the case against McGhee was stronger than it was.

237.    On June 5, 2003, Wilber wrote Primmer a letter in which he requested an opportunity to speak with McGhee about the possibility of his cooperation with regard to the retrial of Harrington and an "alternative resolution" to McGhee's case.  Wilber stated in the letter that the case against McGhee was stronger than his case against Harrington.  This was untrue.  The case against Harrington was built on lies, and Wilber knew it.  So was the "additional evidence" against McGhee.

**The Joseph Rogers Calendar**

238.    Wilber stated in the letter that McGhee had induced Joseph Rogers ("Rogers") to falsify an alibi for the night of the murder.  This was a reference to a calendar that Rogers had

prepared back in 1977.

239.   Rogers had written "me and Cub going to the show" on the calendar for July 22, 1977.  But Wilber believed the murder occurred at 3 to 4 a.m. on July 22, 1977, and no one would be going to the movies at that time.  A person involved in Schweer's murder would have created an alibi for the night of July 21, 1977, and Rogers left that date blank on the calendar.

**The Jailhouse Snitches: Pierce, Gibbs, Hartwell and Plater**

240.   In his June 5, 2003 letter to Primmer, Wilber also stated that McGhee had admitted his involvement in the murder to no less than four individuals: Tyrone Pierce, Aaron Gibbs, Eric Hartwell and Larry Plater.  Wilber further stated in the letter that "[w]e have been able to locate, and speak to, each of these four individuals."  These representations were either outright lies or half-truths.

241.   Wilber knew that Pierce had recanted in 1988 during a post-conviction relief proceeding brought by Harrington.  Wilber's representation that Pierce had been spoken with in 2003 and  returned to his 1978 story was also false.

242.   Wilber knew that in an April 2003 interview by Detective Dawson, Plater did not recall McGhee telling him that he was with Harrington when Schweer was killed.  Plater later admitted that McGhee made no such statement to him.

243.   Aaron Gibbs had never claimed that McGhee admitted involvement in the Schweer murder to him.  Wilber did not reveal this fact to Primmer or McGhee.

244.   Wilber has testified under oath that he did not believe Hartwell was a credible witness.  Wilber did not reveal that to Primmer or McGhee.

**Hughes**

245.    In his June 5, 2003 letter to Primmer, Wilber stated that Hughes has now admitted that his testimony during Harrington's 2000 post-conviction relief hearing was false.  But Wilber concealed how he intimidated Hughes into making that "admission" by having him arrested and incarcerated.  He did not reveal that he did not consider his key witness Hughes to be credible or reliable.  He did not reveal that he had also threatened Hughes with possible perjury charges - charges that Wilber knew he could never prove - to compel Hughes to assert the Fifth Amendment.

**The 1977 Polygraph of Charles Richard Gates**

246.    In his June 5, 2003 letter to Primmer, Wilber also stated that the polygrapher who examined Gates back in 1977 had been interviewed and said that "...contrary to the information contained in Dan Larsen's police report [back in 1977], Gates actually passed his polygraph when questioned about his involvement in the shooting of John Schweer."

247.    This was false.  The polygrapher, Selma Mendyk, did not say that Gates passed the polygraph.

**Other Facts about Gates Were Concealed in 2003**

248.    In his June 5, 2003 letter to Primmer, Wilber stated that "Gates has been effectively eliminated as a suspect at this point in time."

249.    This was untrue.  The 2003 investigation had revealed additional information about Gates that was concealed.

250.    Detective Dawson had gone to the Omaha Police Department and reviewed the file for the 1963 murder in which Gates had been a suspect.  Dawson's report reflected that, during their work on the 1963 murder in Omaha, Omaha Police Officers had done a record check on Gates

"which indicated 'Safe Keeping' in connection with Assault with Gun (Mental) dated 6-22-55."

251.    Detective Dawson took a taped statement from Gates on or about April 25, 2003.  The transcript shows Dawson's bias in favor of Hughes's story against Harrington and McGhee.  At one point, Dawson asks Gates: "Mr. Schweer was murdered by Mr. Herrington [sic] in 1977?"

252.    During his April 25, 2003 interview, Gates admitted that he possibly walked dogs in the area of the murder.

253.    On April 25, 2003, Dawson asked Gates if he ever wore overalls back in 1977.  Gates responded that he "couldn't come up with that."  Dawson then indicated to Gates that he was asking because a witness in the Schweer murder case back in 1977 had been shown his photograph and identified him as a person he had seen wearing overalls.  Gates then responded that he never wore bib overalls and that he hated them.

254.    On April 25, 2003, Dawson asked Gates if he had any idea where he was on the night of the Schweer murder.  Gates said "that's deep" but gave no answer.  He also could not recall whether he told police back in 1977 where he was that night.  This was not revealed to Primmer.

**McGhee's Plea Agreement**

255.    On September 2, 2003, after almost 26 years in prison for a crime he did not commit, McGhee signed a letter agreement with Wilber and the Pottawattamie County Attorney's Office. It provided that McGhee would enter an *Alford* plea to murder in the second degree and be sentenced to 25 years, with credit for time served.  Since McGhee had already served more than 25 years in prison, McGhee would be released from custody if and when the court accepted his plea and sentenced him in accordance with the plea agreement.

256.    In his Alford plea, McGhee was not agreeing to plead guilty and did not admit guilt

42

for the Schweer murder.  The plea agreement provided only that McGhee would stipulate to the minutes of testimony set forth in the 1978 Trial Information against him.  McGhee also did not admit that the minutes of testimony were true.  He merely acknowledged that the state was expected to present the evidence set forth in the minutes of testimony to provide the necessary factual predicate for his plea.

257.    The plea agreement further provided that McGhee would cooperate with the investigation or prosecution of Harrington and truthfully testify at any trial or other court proceeding. The plea agreement further states that it is the understanding of both the Pottawattamie County Attorney's Office and McGhee that McGhee's testimony in 2003 was expected to be consistent with the testimony he gave in 1978.

258.    Under the plea agreement, the Pottawattamie County Attorney's Office agreed to summary judgment in McGhee's favor on his post-conviction relief petition.  This would serve to vacate McGhee's original conviction and grant him a new trial.  McGhee would then be scheduled for an initial appearance and bond review in his new criminal case.  The County Attorney agreed to ask the Court to release McGhee from jail until the completion of his portion of the plea agreement on the same terms and conditions governing the release of Harrington pending his retrial for the Schweer murder.

259.    It was understood between McGhee and County Attorney Wilber that McGhee's plea would not be presented in court until after Harrington's retrial.  Wilber could void the plea agreement if McGhee did not testify in accordance with the terms of that agreement.

**McGhee's September 2, 2003 Deposition**

260.    McGhee gave his deposition in Harrington's criminal trial on September 2, 2003 after

43

signing the plea agreement earlier that same day.

261.    Under questioning by Harrington's lawyer, McGhee explained why he was taking a plea despite his innocence:

> A.  The only reason why I've come to this plea agreement here is 'cause I know how the State is, and I'm just tired, man, you know, I'm tired of fighting with the State, you know.  I have family members that have passed on.  I have a father out there who's ill.  I'm trying to get home and see him.  And, you know, I'm willing to put this in the past, you know, and if it's by means of me taking a plea, you know, I'm willing to do that.

> Q.  Even though you didn't do anything?

> A.  Even though I'm innocent of this crime.  [McGhee deposition at 9].

262.    McGhee testified that Harrington picked him up at his home on the night of the murder; they picked up Hughes at 24th and Pratt; and then Harrington and Hughes dropped McGhee off at his girlfriend's.  McGhee again denied having any knowledge of the Schweer murder.

263.    McGhee testified that he knew he had to testify that he was with Harrington and Hughes that night in order to get the plea deal from the County Attorney.  The County Attorney's Office made no claim that McGhee's testimony violated the plea agreement.

264.    On or about September 2, 2003, Judge Abel of the Iowa District Court in and for the County of Pottawattamie vacated McGhee's 1978 conviction and granted him a new trial based on the summary judgment entered in McGhee's post-conviction relief proceeding pursuant to McGhee's plea agreement.

265.    McGhee was released from jail after his September 2, 2003 deposition on his payment of 10% of a $15,000 bond.  He was subject to electronic monitoring and pretrial release supervision.

**On October 23, 2003, Hughes Again Admits He Lied at the 1978 Trials**

266.    Wilber failed in his attempt to keep Hughes from testifying as a live witness at Harrington's retrial.  The judge allowed Harrington's counsel to depose Hughes in that case on October 23, 2003.

267.    County Attorney Wilber attended Hughes's deposition.  McGhee did not attend, nor did his lawyer Primmer.

268.    Hughes testified that he had lied in 1978 and that he had no knowledge of Harrington or McGhee being involved in Schweer's murder.  He explicitly stated that he would not testify as he did in 1978.

**Wilber Conceals Hughes's October 23, 2003 Testimony from McGhee and the Court**

269.    Wilber knew that, based on Hughes's testimony at his October 23, 2003 deposition, he had no case against Harrington or McGhee.  He knew that the prosecution would not be able to prove the minutes of testimony in the 1978 True Information against McGhee or in the renewed case against Harrington.  Wilber also knew that he had to dismiss the case against Harrington.

270.    Wilber knew that McGhee was entitled to the same dismissal as Harrington.  But Wilber wanted to convict someone for the Schweer murder, and that meant McGhee.  If McGhee entered his guilty plea and it was accepted by the court, Wilber could tell the press and public that the killers had been found:  McGhee had pled to the charge of murdering Schweer, and Harrington was guilty but he just could not prove it in court.  Wilber chose to trick McGhee into following through with his plea.  He also chose to trick the court into finding McGhee guilty based on that plea.

271.    Wilber knew that McGhee's plea was not effective until it was accepted by the Court at a formal hearing.  He also knew that the Court would ask questions at that hearing to determine

if there was a factual basis for McGhee's plea and to make sure that McGhee's plea was informed and voluntary.

272.    Wilber knew that McGhee would not follow through with his plea if he knew that the case against Harrington was being dismissed. Wilber concealed the fact that he was going to dismiss the case against Harrington from McGhee. He made sure that McGhee's plea and sentencing took place before he announced the dismissal of Harrington's case.

273.    Wilber knew that McGhee would not follow through with his plea if he knew that Hughes had testified as he did on October 23, 2003. He concealed this material, exculpatory evidence from McGhee to induce him to enter his plea in court on October 24, 2003.

274.    Wilber also did not reveal this material, exculpatory evidence to the Court that found McGhee guilty based on the plea. At the hearing on McGhee's plea and sentencing, the following exchange occurred between the Court and Mr. Wilber:

> THE COURT: ...does the State intend to offer the Minutes of Testimony?
>
> MR. WILBER: Yes, Your Honor.
>
> THE COURT: All right. And you're asking the Court to take judicial notice of those Minutes of Testimony as true and correct and provable in this case?
>
> MR. WILBER: Yes, we are, Your Honor [October 24, 2003 txcript at 8].

275.    At the time he represented to the Court that the Minutes of Testimony were provable in McGhee's case, Wilber knew that the critical minutes of testimony concerning Kevin Hughes's story were not provable. Wilber knowingly made this false representation to induce the Court to find McGhee guilty and sentence him for Second Degree murder.

276.    McGhee entered his plea and the Court accepted it at around noon on October 24,

46

2003.  Wilber dismissed the case against Harrington a few hours later.

**Wilber's October 24, 2003 Press Release**

277.     After dismissing the case against Harrington, County Attorney Wilber issued a press release and gave a press conference.

278.     Wilber's October 24, 2003 press release announced his decision to discontinue the prosecution of Terry Harrington for the murder of John Schweer because he could not prove the case. The press release specifically referred to "the recent recantation of Kevin Hughes during his deposition yesterday morning."

279.     The press release included the following:

> After personally spending hundreds of hours on this case, I have no doubt that Terry Harrington committed the murder of John Schweer on July 22, 1977. The jury made the right decision in 1978, and the right man went to prison for over twenty-five years.  That said, I also have no doubt that the admissible evidence which is left after twenty-six years is not sufficient to sustain a conviction against Mr. Harrington.

280.     As for McGhee, Wilber's October 24, 2003 press release states:

> On a related note, Curtis McGhee, a co-defendant of Mr. Harrington's in this case, pleaded no contest today to a charge of Second Degree Murder for the death of John Schweer.  Mr. McGhee was sentenced to a term of imprisonment of twenty-five years.  Since Curtis McGhee had already served more than twenty-five years in prison since his original conviction in 1978, he was credited with time served and left the courthouse this morning.  Even though Mr. McGhee did not actually pull the trigger on the gun that killed John Schweer, our case against him was stronger than against Terry Harrington.  Mr. McGhee had made admissions to at least three different people about being with Terry Harrington when Harrington shot a police officer in Council Bluffs.  Those statements would likely not be admissible in a trial against Terry Harrington, but would certainly have come into evidence at a trial against Mr. McGhee.  Mr. McGhee was offered a chance to plead to Second Degree Murder back in 1978 and, had he taken that deal back then, he would probably have been paroled over ten years ago.

281.    At the time Wilber made these statements, he knew that the three persons who had claimed that McGhee admitted involvement in the murder were jailhouse snitches that had offered testimony to seek leniency in their own cases.  He also knew that two of the three had recanted and that he personally did not find the third to be credible.

**McGhee's Injuries**

282.    As a result of defendants' unconstitutional conduct, McGhee was arrested, prosecuted and convicted.  He suffered imprisonment for almost 26 years.  He was incarcerated from November 17, 1977 until September 2, 2003.  McGhee spent from age 17 until age 43 in prison.  In addition, McGhee remained in custody on bond from September 2, 2003 until October 24, 2003.

283.    McGhee endured great mental and physical suffering while imprisoned for a crime he did not commit.

284.    During those years, McGhee lost the society of his family and friends.  He lost his chance to marry and have children.  He lost his chance to get an education and have a rewarding job. He lost the joys of a free life.

285.    McGhee still suffers today from the effects of defendants' misconduct.  He has been thrown back into the world without money, education or prospects.  He continues to suffer the stigma, lost reputation and diminished employment opportunity that comes with being a "convicted murderer," a scar he would not bear but for the unconstitutional misconduct of these defendants. McGhee has suffered other injuries as a result of defendants' misconduct including, but not limited to, lost wages; lost earning capacity; and medical expenses, past and future.

## COUNT I - Sec. 1983 - Larsen in His Individual Capacity

286.    Plaintiff reasserts paragraphs 1 through 285 as though fully set forth herein.

287.     At all times relevant hereto, Larsen was acting under the color of state law and within the scope of his employment as a police officer with the Council Bluffs Police Department.

288.     During the course of the investigation, Larsen knew that he lacked sufficient facts to support a reasonable and honest belief that McGhee was guilty of involvement in the Schweer murder.

289.     Larsen coerced and coached witnesses to lie in order to manufacture the case against McGhee.  He also knew that other 1977 defendants did so.

290.     Larsen concealed how these witnesses' false testimony was obtained.

291.     Larsen also participated in the concealment of information gathered about an alternative suspect, Charles Richard Gates, to prevent McGhee from defending himself against the false charge that he had participated in the murder of John Schweer.

292.     Larsen's misconduct subjected McGhee to an unreasonable arrest and incarceration in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

293.     Larsen's misconduct deprived McGhee of his liberty without the due process of law in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

294.     Larsen's  prejudice against McGhee because of  his race was a motivating force in his misconduct and violated McGhee's right to the equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

295.     Larsen's unconstitutional misconduct was a proximate cause of McGhee's injuries.

296.     Larsen acted with a wanton disregard for McGhee's rights, needs and feelings.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Daniel Larsen for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

### COUNT II - Larsen - Malicious Prosecution

297.    Plaintiff reasserts paragraphs 1 through 296 as though fully set forth herein.

298.    McGhee was prosecuted for the first degree murder of John Schweer in 1978.

299.    Defendant Larsen was an instigator of the criminal proceedings against McGhee.

300.    McGhee's conviction for first degree murder was vacated on or about September 3, 2003.

301.    The criminal proceedings against McGhee were initiated without probable cause.

302.    Defendant Larsen acted with malice in that he acted for a purpose other than to bring the guilty to justice.

303.    Defendant Larsen's misconduct was a proximate cause of McGhee's injuries.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Daniel Larsen for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

### COUNT III - Larsen - False Arrest and Imprisonment

304.    Plaintiff reasserts paragraphs 1-296 as though fully set forth herein.

305.    As a direct and proximate result of Defendant Larsen's misconduct, McGhee was detained against his will from on or about November 17, 1977 until September 2, 2003.

306.    McGhee's detention was unlawful.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Daniel Larsen for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

### COUNT IV - Larsen - Intentional Infliction of Emotional Distress

307.    Plaintiff reasserts paragraphs 1-306 as though fully set forth herein.

308.    Defendant Larsen's misconduct in the arrest and prosecution of McGhee without probable cause; the fabrication of evidence against him; the concealment of that fabrication; and the concealment of other material, exculpatory evidence was so outrageous and extreme as to go beyond all possible bounds of decency.

309.    Defendant Larsen intended to cause emotional distress to McGhee or acted in reckless disregard of the probability of causing emotional distress to him.

310.    McGhee has suffered and continues to suffer severe emotional distress.

311.    Defendant Larsen's outrageous misconduct was an actual proximate cause of McGhee's emotional distress.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Daniel Larsen for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

### COUNT V - Sec. 1983 - Brown in His Individual Capacity

312.    Plaintiff reasserts paragraphs 1 through 285 as though fully set forth herein.

313.    At all times relevant hereto, Brown was acting under the color of state law and within the scope of his employment as a police officer with the Council Bluffs Police Department.

314.    During the course of the investigation, Brown knew that he lacked sufficient facts to

support a reasonable and honest belief that McGhee was guilty of involvement in the Schweer murder.

315.    Brown coerced and coached witnesses to lie in order to manufacture the case against McGhee.  He also knew that other 1977 defendants did so.

316.    Brown concealed how these witnesses' false testimony was obtained.

317.    Brown also participated in the concealment of information gathered about an alternative suspect, Charles Richard Gates, to prevent McGhee from defending himself against the false charge that he had participated in the murder of John Schweer.

318.    Brown's misconduct subjected McGhee to an unreasonable arrest and incarceration in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

319.    Brown's misconduct also deprived McGhee of his liberty without the due process of law in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

320.    Brown's prejudice against McGhee because of his race was a motivating force in his misconduct and violated McGhee's right to the equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

321.    Brown's unconstitutional misconduct was a proximate cause of McGhee's injuries.

322.    Brown acted with a wanton disregard for McGhee's rights, needs and feelings.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Lyle Brown for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and

for such further relief as this Court deems just.

## COUNT VI - Brown - Malicious Prosecution

323.    Plaintiff reasserts paragraphs 1 through 285 and 312-322 as though fully set forth herein.

324.    McGhee was prosecuted for the first degree murder of John Schweer in 1978.

325.    Defendant Brown was an instigator of the criminal proceedings against McGhee.

326.    McGhee's conviction for first degree murder was vacated on or about September 3, 2003.

327.    The criminal proceedings against McGhee were initiated without probable cause.

328.    Defendant Brown acted with malice in that he acted for a purpose other than to bring the guilty to justice.

329.    Defendant Brown's misconduct was a proximate cause of McGhee's injuries.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Lyle Brown for compensatory and punitive damages in amounts to be determined by the jury; interest, costs, and attorney's fees; and for such further relief as this Court deems just.

## COUNT VII - Brown - False Arrest and Imprisonment

330.    Plaintiff reasserts paragraphs 1 through 285 and 312-322 as though fully set forth herein.

331.    As a direct and proximate result of Defendant Brown's misconduct, McGhee was detained against his will from on or about November 17, 1977 until September 2, 2003.

332.    McGhee's detention was unlawful.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Lyle Brown for

compensatory and punitive damages in amounts to be determined by the jury; interest, costs, and attorney's fees; and for such further relief as this Court deems just.

### COUNT VIII - Brown - Intentional Infliction of Emotional Distress

333.    Plaintiff reasserts paragraphs 1 through 285 and 312-332 as though fully set forth herein.

334.    Defendant Brown's misconduct in the arrest and prosecution of McGhee without probable cause; the fabrication of evidence against him; the concealment of that fabrication; and the concealment of other material, exculpatory evidence was so outrageous and extreme as to go beyond all possible bounds of decency.

335.    Defendant Brown intended to cause emotional distress to McGhee or acted in reckless disregard of the probability of causing emotional distress to him.

336.    McGhee has suffered and continues to suffer severe emotional distress.

337.    Defendant Brown's outrageous misconduct was an actual proximate cause of McGhee's emotional distress.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Lyle Brown for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

### COUNT IX - Sec. 1983 - Hrvol in His Individual Capacity

338.    Plaintiff reasserts paragraphs 1 through 285 as though fully set forth herein.

339.    At all times relevant hereto, Hrvol was acting under the color of state law and within the scope of his employment with the Pottawattamie County Attorney's Office.

340.    During the course of the investigation, Hrvol knew that he lacked sufficient facts to

support a reasonable and honest belief that McGhee was guilty of involvement in the Schweer murder.

341.    During the course of the investigation, Hrvol coerced and coached witnesses to lie in order to manufacture the case against McGhee.  He also knew that other 1977 defendants did so.

342.    Hrvol concealed how these witnesses' false testimony was obtained.

343.    Hrvol also participated in the concealment of information gathered about an alternative suspect, Charles Richard Gates, to prevent McGhee from defending himself against the false charge that he had participated in the murder of John Schweer.

344.    Hrvol's misconduct subjected McGhee to an unreasonable arrest and incarceration without probable cause in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

345.    Hrvol's misconduct deprived McGhee of his liberty without the due process of law in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

346.    Hrvol's prejudice against McGhee because of his race was a motivating force in his misconduct and violated McGhee's right to the equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

347.    Hrvol's unconstitutional misconduct was a proximate cause of McGhee's injuries.

348.    Hrvol acted with a wanton disregard for McGhee's rights, needs and feelings.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Joseph Hrvol for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988;

and for such further relief as this Court deems just.

## COUNT X - Hrvol - False Arrest and Imprisonment

349.     Plaintiff reasserts paragraphs 1 through 285 and 338-348 as though fully set forth herein.

350.     As a direct and proximate result of Defendant Hrvol's misconduct, McGhee was detained against his will from on or about November 17, 1977 until September 2, 2003.

351.     McGhee's detention was unlawful.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Joseph Hrvol for compensatory and punitive damages in amounts to be determined by the jury; costs, attorney's fees and interest; and for such further relief as this Court deems just.

## COUNT XI - Hrvol - Intentional Infliction of Emotional Distress

352.     Plaintiff reasserts paragraphs 1 through 285 and 338-351 as though fully set forth herein.

353.     Defendant Hrvol's misconduct in the arrest and prosecution of McGhee without probable cause, the fabrication of evidence against him; the concealment of that fabrication; and the concealment of other material, exculpatory evidence was so outrageous and extreme as to go beyond all possible bounds of decency.

354.     Defendant Hrvol intended to cause emotional distress to McGhee or acted in reckless disregard of the probability of causing emotional distress to him.

355.     McGhee has suffered and continues to suffer severe emotional distress.

356.     Defendant Hrvol's outrageous misconduct was an actual proximate cause of McGhee's emotional distress.

56

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Joseph Hrvol for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

### COUNT XII - Sec. 1983 - Richter in His Individual Capacity

357.    Plaintiff reasserts paragraphs 1 through 285 as though fully set forth herein.

358.    At all times relevant hereto, Richter was acting under the color of state law and within the scope of his employment as County Attorney for Pottawattamie County, Iowa.

359.    During the course of the investigation, Richter knew that he lacked sufficient facts to support a reasonable and honest belief that McGhee was guilty of involvement in the Schweer murder.

360.    Richter coerced and coached witnesses to lie in order to manufacture the case against McGhee.  He also knew that other 1977 defendants did so.

361.    Richter concealed how these witnesses' false testimony was obtained.

362.    Richter also participated in the concealment of information gathered about an alternative suspect, Charles Richard Gates, to prevent McGhee from defending himself against the false charge that he had participated in the murder of John Schweer.

363.    Richter's misconduct subjected McGhee to an unreasonable arrest and incarceration in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

364.    Richter's misconduct deprived McGhee of his liberty without the due process of law in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

365.    Richter's prejudice against McGhee because of his race was a motivating force in his misconduct and violated McGhee's right to the equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

366.    Richter's unconstitutional misconduct was a proximate cause of McGhee's injuries.

367.    Richter acted with wanton disregard for McGhee's rights, needs and feelings.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against David Richter for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

## COUNT XIII - Richter - False Arrest and Imprisonment

368.    Plaintiff reasserts paragraphs 1 through 285 and 357-367 as though fully set forth herein.

369.    As a direct and proximate result of Defendant Richter's misconduct, McGhee was detained against his will from on or about November 17, 1977 until September 2, 2003.

370.    McGhee's detention was unlawful.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against David Richter for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

## COUNT XIV - Richter - Intentional Infliction of Emotional Distress

371.    Plaintiff reasserts paragraphs 1 through 285 and 357-370 as though fully set forth herein.

372.    Defendant Richter's misconduct in the arrest and prosecution of McGhee without

probable cause; the fabrication of evidence against him; the concealment of that fabrication; and the concealment of other material, exculpatory evidence was so outrageous and extreme as to go beyond all bounds of decency.

373.    Defendant Richter intended to cause emotional distress to McGhee or acted in reckless disregard of the probability of causing emotional distress to him.

374.    McGhee has suffered and continues to suffer severe emotional distress.

375.    Defendant Richter's outrageous misconduct was an actual proximate cause of McGhee's emotional distress.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against David Richter for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

## COUNT XV - 1977 Conspiracy

376.    Plaintiff reasserts paragraphs 1-375 as though fully set forth herein.

377.    The 1977 defendants - Larsen, Brown, Hrvol and Richter - conspired with each other and perhaps others to arrest, prosecute, convict and imprison McGhee for the murder of John Schweer when they lacked sufficient facts to support a reasonable and honest belief that McGhee was guilty.

378.    In furtherance of their conspiracy, the 1977 defendants and each of them fabricated evidence against McGhee; concealed this fabrication; and also concealed other material, exculpatory evidence in order to frame an innocent teenager for a crime he did not commit.

379.    The overt acts of these defendants were a proximate cause of McGhee's injuries.

380.    This conspiracy violated McGhee's right not to be deprived of liberty without

probable cause and the due process of law under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

381.    A purpose and effect of the conspiracy was to deprive McGhee of the equal protection of the laws because of his race in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1985(3).

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Defendants Larsen, Brown, Hrvol, Richter and each of them, jointly and severally, for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

### COUNT XVI - Pottawattamie County - Sec. 1983 - 1977 Policy or Custom

382.    Plaintiff reasserts paragraphs 1 through 285 and 338-381 as though fully set forth herein.

383.    At all times relevant hereto, Richter was the County Attorney of Pottawattamie County, Iowa.  As County Attorney, Richter was the county's highest law enforcement officer and its final policymaker regarding the manner in which the County Attorney's Office investigated, administered and prosecuted criminal cases.

384.    Pottawattamie County is responsible for the unconstitutional misconduct of its final policymaker, County Attorney Richter.

385.    In addition, the treatment afforded to both McGhee and Harrington from 1977 through 2003 demonstrates that it is the policy and custom of the Pottawattamie County Attorney's Office to arrest and prosecute persons without probable cause; to intimidate and coach witnesses to

give false testimony against them; to conceal this fabrication of evidence; and to conceal other material, exculpatory evidence in order to convict and imprison innocent persons of serious crimes. The County's policy or custom of discriminating against African Americans was a motivating force in this unconstitutional misconduct.

386.    The County failed to properly train or supervise its personnel to avoid such unconstitutional conduct.

387.    McGhee was deprived of both his liberty and of the equal protection of the laws by this policy or custom of the Pottawattamie County Attorney's Office in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Pottawattamie County, Iowa for compensatory damages in an amount to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

## COUNT XVII - Pottawattamie County, Iowa - 1977 Indemnity

388.    Plaintiff reasserts paragraphs 1 through 285 and 338-381 as though fully set forth herein.

389.    At all times relevant hereto, Hrvol and Richter were working within the scope of their employment with Pottawattamie County, Iowa.

390.    Under Section 670.8 of the Iowa Code, I.C.A. §670.8, Pottawattamie County, Iowa is obligated to to indemnify Hrvol and Richter against all claims against them except for punitive damages.

391.    The County is also responsible for any punitive damages awarded against Hrvol

and/or Richter for misconduct within the scope of their employment to the extent the County has agreed to indemnify its employees against punitive damages as permitted by Section 670.8 of the Iowa Code.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Pottawattamie County, Iowa for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

### COUNT XVIII - City of Council Bluffs - Sec. 1983 - 1977 Policy or Custom

392.    Plaintiff reasserts paragraphs 1 through 337 and 376-381 as though fully set forth herein.

393.    The treatment afforded to both McGhee and Harrington from 1977 through 2003 demonstrates that it is the policy and custom of the City of Council Bluffs to arrest and prosecute persons without probable cause; to intimidate and coach witnesses to give false testimony against them; to conceal this fabrication of evidence; and to conceal other material, exculpatory evidence in order to convict and imprison innocent persons of serious crimes.  The City's policy or custom of discriminating against African Americans was a motivating force in this unconstitutional misconduct.

394.    The City failed to properly train or supervise its personnel to avoid such unconstitutional conduct.

395.    McGhee was deprived of both his liberty and of the equal protection of the laws by this policy or custom of the City of Council Bluffs in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

62

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against the City of Council Bluffs, Iowa for compensatory damages in an amount to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

### COUNT XIX - City of Council Bluffs, Iowa - 1977 Indemnity

396.    Plaintiff reasserts paragraphs 1 through 337 and 376-381 as though fully set forth herein.

397.    At all times relevant hereto, Larsen and Brown were working within the scope of their employment as police officers with the City of Council Bluffs, Iowa.

398.    Under Section 670.8 of the Iowa Code, I.C.A. §670.8, the City of Council Bluffs is obligated to indemnify Larsen and Brown against all claims against them except for punitive damages.

399.    The City is also responsible for any punitive damages awarded against Larsen and/or Brown for misconduct within the scope of their employment to the extent the City has agreed to indemnify its employees against punitive damages as permitted by Section 670.8 of the Iowa Code.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against the City of Council Bluffs, Iowa for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

### COUNT XX - Wilber - Sec. 1983 in His Individual Capacity

400.    Plaintiff reasserts paragraphs 1 through 285 as though fully set forth herein.

401.    At all times relevant hereto, Wilber was acting under the color of state law and within

the scope of his employment with Pottawattamie County, Iowa.

402.    During the course of the investigation, Wilber knew that he lacked sufficient facts to support a reasonable and honest belief that McGhee was guilty of involvement in the Schweer murder.

403.    Wilber directed that Hughes be arrested as a material witness and intimidated into backing away from his testimony in 2000 that his testimony against Harrington and McGhee in 1978 was false. Wilber improperly threatened Hughes with prosecution for perjury when he knew he could not prove that charge against Hughes. Wilber did these acts to pressure and intimidate Hughes into asserting the Fifth Amendment so that Wilber could use Hughes's false 1978 testimony against Harrington and McGhee in 2003.

404.    Wilber misrepresented and concealed material exculpatory evidence from McGhee to induce McGhee to sign the September 2, 2003 plea agreement.

405.    Wilber withheld the material exculpatory evidence that Hughes had testified at his October 23, 2003 deposition that his 1978 testimony was false and the dismissal of the case against Harrington to induce McGhee to follow through with his Alford plea to Second Degree Murder on October 24, 2003.

406.    Wilber lied to the court at McGhee's October 24, 2003 hearing that the minutes of testimony in the information against McGhee were provable when he knew they were not to induce the Court to find McGhee guilty.

407.    Wilber's misconduct caused McGhee to be unreasonably held in custody without probable cause to believe he was involved in the murder of John Schweer in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

408.    Wilber's misconduct deprived McGhee of his liberty without the due process of law in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

409.    Wilber's prejudice against McGhee because of his race was a motivating force in his misconduct and violated McGhee's right to the equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

410.    Wilber's unconstitutional misconduct was a proximate cause of McGhee's injuries.

411.    Wilber acted with wanton disregard for McGhee's rights, needs and feelings.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Matthew Wilber for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

### COUNT XXI - Wilber - False Arrest and Imprisonment

412.    Plaintiff reasserts paragraphs 1 through 285 and 400-411 as though fully set forth herein.

413.    As a direct and proximate result of Defendant Wilber's misconduct, McGhee was detained against his will from the time of the Iowa Supreme Court's ruling in Harrington's case until September 2, 2003.  McGhee's liberty was also restrained against his will while he was in custody on bond from September 2, 2003 until October 24, 2003.

414.    McGhee's detention was unlawful.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Matthew Wilber for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and

attorney's fees; and for such further relief as this Court deems just.

## COUNT XXII - Wilber - Intentional Infliction of Emotional Distress

415.    Plaintiff reasserts paragraphs 1 through 285 and 400-414 as though fully set forth herein.

416.    Defendant Wilber's misconduct - proceeding against McGhee for the murder of John Schweer without probable cause; the fabrication of evidence through the coercion and intimidation of Hughes; the concealment of that fabrication from McGhee; the concealment of material, exculpatory evidence from McGhee, including Hughes's deposition testimony on October 23, 2003 and the dismissal of the charges against Harrington; and the misrepresentation to the Court on October 24, 2003 that the minutes of testimony were provable when Wilber knew they were not - was so outrageous and extreme as to go beyond all possible bounds of decency.

417.    Defendant Wilber intended to cause emotional distress to McGhee or acted in reckless disregard of the probability of causing emotional distress to him.

418.    McGhee has suffered and continues to suffer severe motional distress.

419.    Defendant Wilber's outrageous misconduct was an actual proximate cause of McGhee's severe emotional distress.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Matthew Wilber for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

## COUNT XXIII - Wilber - Defamation

420.    Plaintiff reasserts paragraphs 1 through 285 as though fully set forth herein.

421.    In his October 24, 2003 press release and in oral statements he made to the press,

Wilber published statements of and concerning McGhee that could reasonably be understood as defamation per se.

422.  Wilber stated that "...our case against him [McGhee for murder] was stronger than against Terry Harrington" when Wilber knew that was not true.

423.  Wilber's remarks could reasonably be understood to mean that McGhee had admitted involvement in the Schweer murder when Wilber knew that McGhee continued to declare his innocence and was merely entering a plea so he could finally get out of jail after being incarcerated for over 25 years for a crime he did not commit.

424.  Wilber stated that "McGhee had made admissions to at least three different people about being with Terry Harrington when Harrington shot a police officer in Council Bluffs" and that these admissions "would certainly have come into evidence at a trial against Mr. McGhee." Wilber made this statement knowing it was false or in reckless disregard for the truth.  He knew that McGhee had denied making those admissions;  two of the three witnesses referenced had recanted; and that Wilber himself did not find the third to be a believable witness.

425.  Wilber's libelous, defamatory statements were a proximate cause of injury to the plaintiff McGhee.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Matthew Wilber for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

## COUNT XXIV - Sec. 1983 - Dawson in His Individual Capacity

426.  Plaintiff reasserts paragraphs 1 through 285 as though fully set forth herein.

427.  At all times relevant hereto, Dawson was acting under the color of state law and

within the scope of his employment as a police officer with the Council Bluffs Police Department.

428.    During the course of the investigation, Dawson knew that he lacked sufficient facts to support a reasonable and honest belief that McGhee was guilty of involvement in the Schweer murder.

429.    Dawson participated in the scheme to arrest Hughes as a material witness.  He failed to Mirandize Hughes and coerced him to say that he had lied at Harrington's post-conviction relief hearing in 2000.

430.    Dawson's misconduct wrongfully continued McGhee's unreasonable imprisonment in violation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

431.    Dawson's misconduct also deprived McGhee of his liberty without the due process of law guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. Section 1983.

432.    Dawson's prejudice against McGhee because of his race was a motivating force in his misconduct and violated McGhee's right to the equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. Section 1983.

433.    Dawson's unconstitutional conduct was a proximate cause of McGhee's injuries.

434.    Dawson acted with a wanton disregard for McGhee's rights, needs and feelings.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against David Dawson for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

## COUNT XXV - Dawson - Malicious Prosecution - 2003

435.    Plaintiff reasserts paragraphs 1 through 285 and 426-434  as though fully set forth herein.

436.    McGhee was prosecuted for the murder of John Schweer in 2003.

437.    Defendant Dawson was an instigator of the criminal proceedings against McGhee in 2003.

438.    The criminal proceedings were instigated in 2003 without probable cause.

439.    McGhee's conviction for second degree murder on or about October 24, 2003 was in violation of McGhee's rights under the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution.

440.    McGhee's conviction is also void because it was procured by fraud.

441.    Defendant Dawson acted with malice in that he acted for a purpose other than to bring the guilty to justice.

442.    Defendant Dawson's misconduct was a proximate cause of McGhee's injuries.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against David Dawson for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

## COUNT XXVI - Dawson - False Arrest and Imprisonment

443.    Plaintiff reasserts paragraphs 1 through 285 and 426-434 as though fully set forth herein.

444.    As a direct and proximate result of Defendant Dawson's misconduct, McGhee was detained against his will from the time of the Iowa Supreme Court's decision in Harrington's case

until October 24, 2003.

445.    McGhee's detention was unlawful.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against David Dawson for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

## COUNT XXVII - Dawson - Intentional Infliction of Emotional Distress

446.    Plaintiff reasserts paragraphs 1 through 285 and 426-445 as though fully set forth herein.

447.    Defendant Dawson's misconduct in the intimidation of Hughes; the concealment of that intimidation; and the concealment of other material, exculpatory evidence was so outrageous and extreme as to go beyond all possible bounds of decency.

448.    Defendant Dawson intended to cause emotional distress to McGhee or acted in reckless disregard of the probability of causing emotional distress to him.

449.    McGhee has suffered and continues to suffer severe emotional distress.

450.    Defendant Dawson's outrageous misconduct was an actual proximate cause of McGhee's severe emotional distress.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against David Dawson for compensatory and punitive damages in amounts to be determined by the jury; interest, costs and attorney's fees; and for such further relief as this Court deems just.

## COUNT XXVIII - 2003 Conspiracy

451.    Plaintiff reasserts paragraphs 1 through 285, 400-419 and 426-450 as though fully set forth herein.

452.    The 2003 defendants - Wilber and Dawson - conspired with each other and perhaps others to continue McGhee's wrongful imprisonment and reconvict him of the murder of John Schweer when they lacked sufficient facts to support a reasonable and honest belief that McGhee was guilty.

453.    In furtherance of their conspiracy, these 2003 defendants and each of them intimidated Hughes so as to obtain false evidence against McGhee; concealed this misconduct; concealed other material, exculpatory evidence in order to obtain McGhee's Alford plea to a crime he did not commit; and concealed Hughes's October 23, 2003 deposition testimony and the dismissal of the charges against Harrington to obtain McGhee's plea and conviction on October 24, 2003.

454.    The overt acts of these defendants were a proximate cause of McGhee's injuries.

455.    This conspiracy violated McGhee's right not to be imprisoned without probable cause under the Fourth and Fourteenth Amendments to the United States Constitution in violation of 42 U.S.C. § 1983.

456.    This conspiracy violated McGhee's right not to be deprived of his liberty without due process of law under the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.

457.    A purpose and effect of the conspiracy was to deprive McGhee of the equal protection of the laws because of his race in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1985(3).

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Defendants Wilber, Dawson and each of them, jointly and severally, for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees

and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

### COUNT XXIX - County of Pottawattamie - Sec. 1983 - 2003 Policy or Custom

458.     Plaintiff reasserts paragraphs 1 through 285, 400-419 and 451-457 as though fully set forth herein.

459.     At all times relevant hereto, Wilber was the County Attorney of Pottawattamie County, Iowa.

460.     As County Attorney, Wilber was the county's highest law enforcement officer and its final policymaker regarding the manner in which the County Attorney's Office investigated, administered and prosecuted criminal cases.

461.     Pottawattamie County is responsible for the unconstitutional misconduct of its final policymaker.

462.     As shown by the treatment afforded to McGhee and Harrington in 1977-78 and in 2003, it is the policy and custom of the Pottawattamie County Attorney's Office to arrest and prosecute persons without probable cause; to intimidate and coach witnesses to give false testimony against them; to conceal this fabrication of evidence; and to conceal other material, exculpatory evidence in order to convict and imprison innocent persons of serious crimes. The County's policy or custom of discriminating against African Americans was a motivating force in this unconstitutional misconduct.

463.     The County failed to properly train or supervise its personnel to avoid such unconstitutional conduct.

464.     This policy or custom of the Pottawattamie County Attorney's Office was a proximate

cause of McGhee's deprivation of liberty and of the equal protection of the laws in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Pottawattamie County, Iowa for compensatory damages in an amount to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

## COUNT XXX - County of Pottawattamie - 2003 Indemnity Obligation

465.    Plaintiff reasserts paragraphs 1 through 285, 400-425 and 451-457 as though fully set forth herein.

466.    At all times relevant hereto, Wilber was acting within the scope of his employment with Pottawattamie County, Iowa.

467.    Under Section 670.8 of the Iowa Code, I.C.A. §670.8, Pottawattamie County, Iowa is obligated to to indemnify Wilber against all claims against him in this case except punitive damages.

468.    The County is also responsible for any punitive damages awarded against Wilber for his misconduct within the scope of his employment to the extent the County has agreed to indemnify its employees against punitive damages as permitted by Section 670.8 of the Iowa Code.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against Pottawattamie County, Iowa for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

## COUNT XXXI - City of Council Bluffs, Iowa - Sec. 1983 - 2003 Policy or Custom

469.    Plaintiff reasserts paragraphs 1 through 285 and 426-457 as though fully set forth herein.

470.    As shown by the treatment afforded to McGhee and Harrington from 1977 through 2003, it is the policy and custom of the City of Council Bluffs to arrest and prosecute persons without probable cause; to intimidate and coach witnesses to give false testimony against them; to conceal this fabrication of evidence; and to conceal other material, exculpatory evidence in order to convict and imprison innocent persons of serious crimes.  The City's policy or custom of discriminating against African Americans was a motivating force in this unconstitutional misconduct.

471.    The City failed to train and/or supervise its personnel to avoid such unconstitutional misconduct.

472.    This policy or custom of the City of Council Bluffs was a proximate cause of McGhee's deprivation of liberty and of the equal protection of the laws in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against the City of Council Bluffs, Iowa for compensatory damages in an amount to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

## COUNT XXXII - City of Council Bluffs, Iowa - 2003 Indemnity

473.    Plaintiff reasserts paragraphs 1 through 285 and 426-457 as though fully set forth herein.

474.    At all time relevant hereto, Dawson was working within the scope of his employment with the City of Council Bluffs, Iowa.

475.    Under Section 670.8 of the Iowa Code, I.C.A. §670.8, the City of Council Bluffs is obligated to indemnify Dawson against all claims against him except for punitive damages.

476.    The City is also responsible for any punitive damages awarded against Dawson for his misconduct within the scope of his employment to the extent the City has agreed to indemnify its employees against punitive damages as permitted by Section 670.8 of the Iowa Code.

WHEREFORE, Curtis McGhee asks for a judgment in his favor and against the City of Council Bluffs, Iowa for compensatory and punitive damages in amounts to be determined by the jury; interest and the costs of this action, including attorneys' fees and experts' fees pursuant to 42 U.S.C. Section 1988; and for such further relief as this Court deems just.

Respectfully Submitted,


By:    _____
       One of the attorneys for Plaintiff Curtis McGhee

Stephen D. Davis
William H. Jones
Canel, Davis & King
10 South LaSalle Street, #3400
Chicago, Illinois 60603
312-372-4142 - - 312-372-6737 [fax]
sdavis@daviskinglaw.com

Alan O. Olson              By:    _____
OLSON LAW OFFICE, P.C.            One of the attorneys for Plaintiff Curtis McGhee
3116 Ingersoll Avenue
Des Moines, Iowa 50312-3910
515-271-9100 - - 515-271-8100 [fax]
aoo@olson-law.net

**DEMAND FOR JURY TRIAL**

Plaintiff Curtis McGhee, by and through counsel, hereby demands trial by jury.

DATED this _____ day of  May 2005.

                                        By:    _____
                                               One of the attorneys for Plaintiff Curtis McGhee

Stephen D. Davis
William H. Jones
Canel, Davis & King
10 South LaSalle Street, #3400
Chicago, Illinois 60603
312-372-4142
312-372-6737 [fax]
sdavis@daviskinglaw.com


Alan O. Olson                           By:    _____
OLSON LAW OFFICE, P.C.                         One of the attorneys for Plaintiff Curtis McGhee
3116 Ingersoll Avenue
Des Moines, Iowa 50312-3910
515-271-9100
515-271-8100 [fax]
aoo@olson-law.net