IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL  DIVISION

| | | |
|---|---|---|
| CURTIS W. MCGHEE, JR., | * | |
| | * | |
| | * | 4:05-cv-00255 |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| POTTAWATTAMIE COUNTY, IOWA; THE CITY OF COUNCIL BLUFFS, IOWA; JOSEPH HRVOL; DAVID RICHTER; MATTHEW WILBER; DANIEL LARSEN; LYLE BROWN; and DAVID DAWSON, | * * * * * * | ORDER |
| Defendants. | * * | |

| | | |
|---|---|---|
| TERRY HARRINGTON, individually and in his capacity as the father of NICOLE ANTOINETTE HARRINGTON, | * * * * | 4:05-cv-00178 |
| Plaintiff, | * * | |
| v. | * * | |
| COUNTY OF POTTAWATTAMIE, IOWA; CITY OF COUNCIL BLUFFS, IOWA; DAVID RICHTER, in his individual and official capacities; JOSEPH HRVOL, in his individual and official capacities; DANIEL C. LARSEN, in his individual and official capacities; LYLE W. BROWN, in his individual and official capacities; and JOHN DOES ONE THROUGH NINE, in their individual and official capacities, | * * * * * * * * * * * | MEMORANDUM ORDER AND OPINION |
| Defendants. | * | |

On March 25, 2005, Plaintiff Terry Harrington ("Harrington"), individually and in his
capacity as the father of Nicole Antoinette Harrington, filed a Complaint and Jury Demand
(Clerk's No. 1) against Pottawattamie County, the City of Council Bluffs, David Richter
("Richter"), Joseph Hrvol ("Hrvol"), Daniel Larsen ("Larsen"), Lyle Brown ("Brown"), and
various John Does, alleging the following claims:  1) Fabricated and Perjured Testimony—§
1983 Civil Rights Violations; 2) Withheld Evidence—*Brady* and *Giglio* Violations; 3)
Conspiracy under the Color of State Law to Deny Constitutional Rights; 4) State
Claim—Intentional Infliction of Emotional Distress; 5) State Claim—Malicious Prosecution;
and 6) State Claim—Loss of Parental Consortium.  Harrington Clerk's No. 1.  On May 4, 2005,
Plaintiff Curtis W. McGhee, Jr. ("McGhee"), filed a similar action against Pottawattamie
County, Council Bluffs, Hrvol, Richter, Matthew Wilber ("Wilber"), Larsen, Brown, and David
Dawson ("Dawson"), alleging thirty-two counts, including § 1983 violations; Malicious
Prosecution; False Arrest and Imprisonment; Intentional Infliction of Emotional Distress;
Conspiracy; Unconstitutional Customs and Policies; and Defamation.  McGhee Clerk's No. 1.

On October 10, 2006, having previously consolidated both of the above-captioned cases,
along with a defamation case filed by Harrington, for purposes of discovery, United States Chief
Magistrate Judge Thomas Shields ordered the trials of both cases consolidated.  The Magistrate
Judge ordered that McGhee's defamation claim be consolidated with Harrington's defamation
and slander claims made in Case No. 4:03-cv-90616, and that trial on those matters should be
bifurcated from the trial on Harrington and McGhee's various constitutional and other state law
claims.  *See* McGhee Clerk's No. 103; Harrington Clerk's No. 97 (Order Consolidating Cases for
Trial) ("[T]he underlying facts and the common thread throughout the testimony of all liability

witnesses who will testify is essentially the same.").

Currently pending before the Court are several motions, including Motions for Summary Judgment, filed by Defendants Pottawattamie County, Hrvol, Richter, and Wilber, in each of the above-captioned actions (McGhee Clerk's No. 95; Harrington Clerk's No. 93); a Motion for Partial Judgment on the Pleadings, filed by Defendants Larsen, Brown and the City of Council Bluffs in the Harrington case (Clerk's No. 90); a Motion for Judgment on the Pleadings, filed by Defendants Dawson and the City of Council Bluffs in the McGhee case (Clerk's No. 99); and a Motion for Judgment as a Matter of Law, filed by Defendants Larsen, Brown, and the City of Council Bluffs in the McGhee case (Clerk's No. 100). Each Plaintiff has resisted the respective motion and the matters are fully submitted. In light of the fact that both cases arise from fundamentally the same factual backgrounds, and in light of the fact similar arguments are raised in each of the motions, the Court finds it prudent to deal with all pending motions in one order.

Additionally pending before the Court is McGhee's Motion for Leave to File Surreply Brief on County and Prosecutors' Motion for Summary Judgment (Clerk's No. 133). Defendants filed a resistance to the Motion and a Request to Strike the Surreply accompanying it (Clerk's No. 137). Defendants argue that the Surreply is redundant and merely continues arguing points raised in McGhee's resistance. While admittedly the Local Rules do not provide for the filing of a surreply, they also do not prohibit the consideration of a surreply in the Court's discretion. Having reviewed the surreply, filed in response to Defendants' Reply Brief, the Court finds that consideration of the document will aid the Court in resolution of the pending Motions for Summary Judgment. Accordingly, McGhee's Motion for leave to file the document is GRANTED.

# I. FACTUAL BACKGROUND[1]

On approximately July 5, 1977, Captain John Schweer ("Schweer") retired from the Council Bluffs, Iowa Police Department. On or about July 12, 1977, Schweer went to work as a night security guard for three car dealerships in Council Bluffs: McIntyre Oldsmobile; Bluffs Toyota; and O'Neill Datsun.[2] At around 9:30 a.m. on Friday, July 22, 1977, Schweer's body was found on the railroad tracks near O'Neill Datsun. Schweer had died of a 12-gauge shotgun wound to the right chest. A lone 12-gauge shotgun shell was found on the premises of McIntyre Oldsmobile. The shell was a green Remington paper shotgun shell containing size #4 shot, the same size pellets found in Schweer's body. Additionally, the live shell found at McIntyre Oldsmobile had paper wadding, a component that Remington stopped using in approximately 1966, and similar to that found at the murder scene.

Defendants Brown and Larsen, detectives with the Council Bluffs police department at the time of the murder, were assigned as lead investigators on the Schweer murder. County Attorney Richter and Assistant County Attorney Hrvol worked closely with Brown, Larsen, and the Council Bluffs Police Department during the investigation, and both participated in witness interviews prior to any arrests being made in the case.[3]

Early in the Schweer investigation, Defendants learned that, on or about July 20, 1977,

---

[1] The Defendants, with very few exceptions, do not resist the facts as set forth in the Plaintiffs' Complaints for purposes of the pending motions.

[2] According to the Complaints, the three dealerships had common ownership and were located near the intersection of 32nd Avenue and South 11th Street in Council Bluffs, Iowa.

[3] Throughout this Memorandum Order and Opinion, the Court will, where appropriate, refer to Richter, Hrvol, Larsen, and Brown as the "1977 Defendants."

Schweer had written a note to McIntyre Oldsmobile employee David Edwards, stating that he had witnessed a man trying to get into one of the trucks on the lot the night before. When Schweer approached the man, the man ran away. Schweer recommended that flood lights be placed in that portion of the dealership lot. Additionally, Defendants learned that Schweer had a conversation with Council Bluffs Police Officer Ron Cady in the early morning hours of July 21, 1977. Schweer told Cady that he had seen a man carrying what he thought was a rifle or a car jack at O'Neill Datsun, and that he believed the man and his dog were still in the area.

Plaster casts of footprints and dog prints were taken in the area around Schweer's body following the murder. On July 23, 1977, Council Bluffs Police Officer Richard Moore reported that he and Officer O.G. Chapin had found shoe and dog prints west of the area where Schweer's body was found that were of the same type and shape as those found at the crime scene. Moore also noted that a fit person could get from the murder scene and completely across the nearby I-29 interstate in four minutes.

On July 25, 1977, Brown wrote a report of an interview with James Burke ("Burke"), an employee at the Northwestern Bell office located due west of where Schweer's body was found. Brown reported that Burke told police that he had seen a man of average build running in a westerly direction between the Northwestern Bell building and I-29 on July 19, 1977, at about 11:30 p.m. According to Burke, the man was wearing overalls, and had a shotgun and a dog with him. Burke also reported that Schweer drove up to him that same evening and asked if he had seen a man running in the area. A July 28, 1977 report by Council Bluffs Police Sergeant Larry Williams states that when Williams and Richter reinterviewed Burke, they obtained substantially the same information as Brown had reported.

When Larsen heard that a man with a dog had been seen in the area of Schweer's murder, he thought of Charles Richard Gates ("Gates").  Gates was a white male, aged approximately 47, whose sister, Marcella Oamek was married to a Captain on the Council Bluffs Fire Department. Gates was known to carry a shotgun while walking his dogs.  Council Bluffs police picked up Gates and photographed him.  A police report states that Gates was questioned by Council Bluffs police officers a few days after the murder, but there is no report detailing that interview.

A July 28, 1977, police report reflects that Council Bluffs police, along with Richter, interviewed David Waide ("Waide"), who worked in the area of the murder.  Waide was shown a photograph of Gates and positively identified him as the man Waide saw walking his dogs in the area.  Waide had last seen Gates on July 19, 1977.  Another report of the same date reflects that Council Bluffs Police Officer L.L. Diamond and Hrvol canvassed the neighborhood near the scene of the murder.  One Mrs. Shea told them that she had seen a man in overalls and a hat walking dogs.  The report states that Mrs. Shea gave a "perfect description of Gates, a previous suspect in [the] case."  Information obtained from Mrs. Akins, another neighborhood resident, "concur[red] exactly" with Mrs. Shea's information, though Mrs. Akins had seen the individual as recently as July 22, 1977.

Larsen did a background check on Gates and wrote a report of his findings on August 12, 1977.  According to the report, Gates' neighbors described him as a "spooky type individual" who constantly walked his three dogs and was "strictly a loner."  Larsen reported that Gates drove a white car painted to look like a police vehicle that had a set of "top lights consisting of backup or turn signal type lights made for larger type trucks" which gave the appearance of lights on a police car.  Larsen additionally reported that Gates had been a suspect in the 1963

homicide of a female co-worker at a printing company in Omaha.  Larsen wrote in his report that

Gates had been given a polygraph and that the tester opined that Gates was not truthful in his

denials of owning a shotgun or having shot Schweer.  Larsen's report recommended further

investigation of Gates.  According to the Complaints, there is no documentation anywhere in the

Schweer murder file indicating that Gates' home was searched, that footprint comparisons were

made, or indicating why Gates was ultimately eliminated as a suspect.[4]  Regardless, at some

point the investigation began to focus on a "car theft ring," rather than on Gates.

On September 1, 1977, two cars were stolen in Fremont, Nebraska:  a 1977 Cadillac

("Cadillac") from Sid Dillon Oldsmobile and a 1976 Lincoln ("Lincoln") from Diers Ford.  The

suspects in the thefts were three black youths driving a black Oldsmobile Cutlass Supreme with

Douglas County, Nebraska, license plates.  Police believed that the thieves visited the

dealerships during business hours, took the keys for the cars and replaced them with "dummy"

keys, and then returned after hours to steal the cars (referred to hereinafter as a "key-switch

scheme").  The thefts were reported by the Nebraska State Patrol to the Council Bluffs Police on

September 5, 1977.  Larsen checked the Council Bluffs Police records and found that a Black

Oldsmobile Cutlass ("black Cutlass") had been reported stolen from Bluffs Toyota shortly before

Schweer started working as a night watchman.  Also on September 5, 1977, the Lincoln was

discovered abandoned in Omaha, but a t-shirt had been left in the vehicle with "Contact Band"

written on the front and "Jones" on the back.  On September 9, 1977, Lincoln Nebraska police

---

[4]  Plaintiffs also allege that in the early stages of the investigation of Schweer's murder, more
than a dozen suspects other than Harrington and McGhee were considered.  Further, with regard
to Gates, Richter and Hrvol, in conjunction with the police, consulted an astrologer to prepare
astrological charts on Gates.

stopped three black teenagers—Kevin Mack (age 16), Roderick Jones (age 17), and Candice Pride (age 16)—in the stolen Cadillac.  Jones admitted that the t-shirt that had been found in the abandoned Lincoln was his t-shirt.

Kevin Mack, a/k/a Kevin Hughes (hereinafter "Hughes") had a long criminal record, but denied that he stole the Cadillac he was found driving.  He told Fremont, Nebraska police that three other individuals—Terry Harrington, Anthony Houston, and "Cub" (later identified as Curtis McGhee) had stolen the cars from Fremont, as well as the black Cutlass from Council Bluffs and another Lincoln from a dealership in Omaha.  Hughes told police that Houston had given him permission to drive the Cadillac, and that the other set of keys found in the Cadillac belonged to the real car thieves.

After being notified by Nebraska authorities that Hughes might have information on the Schweer murder, Larsen and Brown traveled to Lincoln to interview Hughes.  According to the Complaints, Hughes was told that police knew he was involved in the car theft ring, and that police knew that he and his fellow car thieves were responsible for Schweer's murder.  Hughes was purportedly told that he would not be charged with murder if he gave authorities someone else, and that there was a $5,000.00 reward for information leading to the arrest and conviction of Schweer's murderer or murderers.  Additionally, Hughes was told that authorities would help him with numerous pending charges if Hughes helped them on the Schweer case.

Hughes first told Larsen and Brown in a written statement that he saw an individual named Dennis Jackson and a "light-skinned man" (later identified as Steven Frazier) at a car wash in Omaha.  Hughes stated that Frazier told him he had stolen his Lincoln Continental from McIntyre Oldsmobile and had killed a security guard to get it.   As no Lincoln was stolen from

McIntyre Oldsmobile on the night of the murder, Larsen and Brown told Hughes they knew he was lying.  At some point in time, Hughes also told investigators that Arnold Kelly was involved in the Schweer murder.  Subsequent police investigation, however, revealed that Kelly was in the Kansas City Job Corp at the time and could not have been involved in Schweer's murder.

According to the Complaints, the Defendants began pressuring Hughes to implicate Harrington, McGhee, and Houston (the same individuals Hughes accused of various car thefts) in the Schweer murder.  Hughes initially told investigators that he did not think the three were capable of murder, but he eventually told authorities that while he was not personally involved, Harrington and others told him that they had killed Schweer.  When authorities accused Hughes of lying, Hughes admitted that he was lying.

On September 30, 1977, Hughes next told police that he was present on the night of the murder.  He was brought to Council Bluffs to meet with the 1977 Defendants at the scene of the murder.  The Complaints allege that, although authorities knew that Hughes was a liar, they nonetheless "worked with" him to create a case against Harrington and McGhee by editing Hughes' story to eliminate those items that could be proved false and by providing Hughes with more details of the crime to make his story more credible.  Indeed, the Complaints allege that in his September 30, 1977 statement, Hughes claimed to have gone to McIntyre Oldsmobile on the night of the murder with Houston, but ultimately dropped Houston from his story after Defendants told Hughes that Houston was in jail on the night of the murder and could not have been present at the Schweer murder.

Hughes' story in 1977 also changed in other ways.  He first claimed that Schweer was killed with a pistol, but later said the murder weapon was a 20-gauge pump shotgun.

Accordingly to the Complaints, Defendants told Hughes that a 12-gauge shotgun shell was found near a Toronado parked in front of the new-car showroom at McIntyre Oldsmobile, and Hughes then changed his story to say a 12-gauge shotgun was used to murder Schweer, and that the plan was to steal the Toronado that evening.  Ultimately, Hughes claimed that he, Harrington, and McGhee drove around the three Council Bluffs car dealerships the night of the murder.  They parked Harrington's green 1970 Oldsmobile 98, and Harrington, who had the keys to the Toronado, retrieved a shotgun from the trunk, wrapped it in a tan leather jacket, and proceeded to walk from his vehicle to the Toronado, along with McGhee.  Hughes stated that he sat in the backseat of Harrington's car listening to music and smoking cigarettes.  Hughes claimed that he heard a shot and then saw Harrington, McGhee and Houston (though Hughes later omitted Houston from the scenario) come running back to the car from behind McIntyre Oldsmobile.  At some point, Hughes changed his story to more aptly reflect the fact that Schweer's body was found closer to O'Neill Datsun.  Though Schweer's Toyota Land Cruiser was found near his body with the lights on and the door open, Hughes never mentioned seeing or hearing Schweer or his vehicle, nor did Hughes ever state that Harrington or McGhee told him that Schweer had come upon them during their attempt to steal the Toronado.

Hughes also stated in his September 30, 1977 statement that Harrington wrapped a tan leather jacket around the gun before going to steal the Toronado.  In an October 1977 search of Harrington's mother's home, authorities seized a reddish-maroon vinyl jacket, which was later given to the Iowa Bureau of Investigation to be tested for gunpowder residue.  Michael Petersen, the Iowa Bureau of Investigation technician who examined the jacket, found no evidence that Harrington's jacket had been wrapped around a shotgun at the time of its firing.  Petersen did,

however, state that two particles of debris from the surface of the jacket were unburned, smokeless gunpowder.  The particles were destroyed by the testing and thus were not subject to independent testing by either Harrington or McGhee.  Petersen did not match the particles to the gunpowder found in the shotgun shell found at McIntyre Oldsmobile after the murder, or with gunpowder found on the victim.  There was also no attempt to rule out the possibility that the particles could have come from a .410 shotgun owned by Harrington and retrieved during the search.

Plaintiffs claim that Defendants then undertook a scheme to coerce other "witnesses" into corroborating Hughes' story.  While Hughes initially told authorities that he was watching television with Pride on the night of the murder, he later stated that McGhee and Harrington picked him up in Omaha before the murder.  Eventually, Hughes stated that others, including Candice Pride and another individual named Clyde Jacobs, were present when Harrington and McGhee picked Hughes up in Omaha.  Hughes also initially stated that Harrington and McGhee picked him up at around 11:00 p.m.  Harrington's high school football coach, however, had seen him at an Ohio Players concert in Omaha at approximately that time.  Hughes later stated that Harrington and McGhee picked him up around midnight, rather than at 11:00 p.m.[5]

On October 17, 1977, Larsen wrote a report indicating that Roderick Jones had admitted being with Hughes on several occasions when the key-switch scheme was used to steal cars from dealerships.  According to the Complaints, Brown told Jones that they knew McGhee, Harrington, and Hughes had killed Schweer and that Jones should say he saw them together on

---

[5] Hughes testified at Harrington's trial that Hrvol told him about Harrington's alibi defense and emphasized that time was important.

the night of the murder or risk being charged with auto theft and murder.  In a taped statement made after being placed in a room with Hughes, Jones said that everything he knew came from Hughes, and that he was with Hughes and Clyde Jacobs when Harrington and McGhee picked up Hughes on the night of the murder.  Later at the trials, Jones stated that Pride was also present when Harrington and McGhee picked up Hughes.  Though Jones' taped statement indicated that McGhee and Harrington picked up Hughes in the late part of July, he testified at McGhee's trial that it was sometime in the middle of July, and testified at Harrington's trial that it was the evening of July 21, 1977.  Likewise, Jones' taped statement indicated that Hughes was picked up around 11:30 p.m., but at McGhee's 1978 trial he claimed it was around 11:00 p.m. or midnight, and at Harrington's trial he said that he was at the same Ohio Players concert as Harrington and saw Harrington and McGhee pick Hughes up around midnight or 12:30 a.m.

Clyde Jacobs was brought to Council Bluffs numerous times by Larsen, Brown and Hrvol for questioning, sometimes with Jones and Pride.  Jacobs originally stated that Harrington and "another colored guy" picked up Hughes, but testified at McGhee's trial that Harrington and McGhee picked Hughes up at "12 something."  At Harrington's trial, Jacobs stated that Harrington and McGhee picked up Hughes at "11 something" and also stated that he had been at the same Ohio Players concert as Harrington.

Candice Pride was dating Hughes in the fall of 1977.  According to the Complaints, Pride was told that her boyfriend, Hughes, would be charged with murder if she did not corroborate his story about being picked up by Harrington and McGhee on the night of the murder.  On October 12, 1977, Pride signed a statement indicating that in the latter weeks of July 1977, she, Jones, Hughes and others were together in a parking lot when Harrington and McGhee picked up

-12-

Hughes at around 10:45 p.m.  In an April 1978 statement to McGhee's lawyer, however, Pride stated that she didn't think she was in Omaha in July 1977, that she was not involved with Hughes at that time, and that she did not see Harrington and McGhee pick up Hughes.  At the McGhee trial, however, Pride testified consistent with her October 12, 1977 statement, though she stated that Hughes was picked up at 11:00 or 11:30 p.m.  At Harrington's trial, Pride testified that Hughes was picked up around midnight.

According to the Complaints, Hughes claimed that he had Harrington and McGhee drop him off at his girlfriend, Linda Lee's house in Omaha after the murder.  Hughes claimed that he arrived at Lee's house at around 1:30 a.m. and that Lee saw Harrington's car leave.  Lee was interviewed by Larsen and Brown in October 1977, and she signed a statement indicating that Hughes came to her house after midnight one evening in the latter part of July, and that she saw Harrington and another black male in Harrington's car that night.  At McGhee's trial, Lee was unable to say during what part of July she saw Hughes and whether it was before or after 1:00 a.m.  At Harrington's trial, Lee testified that Hughes came over after midnight twice on the same night in July 1977.  The first time was after midnight, and the second time was around 2:00 a.m.

Within a few days after Schweer's murder, two workers at Transley Trucking, a business around 200 yards from where Schweer's body was found, informed authorities that they had heard a loud noise like a firecracker between 3:00 and 3:30 a.m. on July 22, 1977.  The medical examiner's report placed the time of Schweer's death at around 4:00 a.m.  The pathologist who performed Schweer's autopsy testified that Schweer died approximately fifteen minutes to one hour after being shot, and that it was "very possible" that Schweer died close to 4:00 a.m.

On November 16 (Harrington) and 17 (McGhee), 1977, preliminary informations, signed

by Brown and approved by Hrvol and Richter, were filed charging McGhee and Harrington with Schweer's murder.  McGhee and Harrington were each arrested the same day the respective informations were issued in Omaha and were extradited to Pottawattamie County, Iowa, on or about December 22, 1977.  The cases were transferred to juvenile court on or about December 23, 1977, but were referred back to the County Attorney's office on or about January 20, 1978.  On February 17, 1978, a True Information was filed formally charging McGhee and Harrington with first degree murder.  The evidence implicating McGhee and Harrington listed in the True Information was the Minutes of Testimony containing Hughes' story.

Plaintiffs allege that, due to credibility concerns about Hughes, the 1977 Defendants concealed at least eight Council Bluffs Police Department reports from Plaintiffs to deprive them of material, exculpatory evidence.[6]  Specifically, Plaintiffs claim that the two reports related to James Burke seeing a man with a dog and shotgun were concealed; that David Waide's identification of Gates was concealed; that Larsen's background report on Gates was concealed; that a report of the County Attorney's Office's consultation with an astrologer about Gates was concealed; that the report referencing Schweer's note suggesting the installation of floodlights was concealed; and that a report in which Officer Kremer reported that Gates had been interviewed shortly after the murder was concealed.

After arresting and filing True Informations against the Plaintiffs for the murder of Schweer, the 1977 Defendants sought out prisoners who were in jail with McGhee to falsely

---

[6] It is noteworthy that police procedure required that all police reports from the Schweer homicide be given to the County Attorney's Office.  Indeed, Plaintiffs allege repeatedly that the prosecutors, Richter and Hrvol, were at all times aware of the various exculpatory information that was not disclosed to them during their criminal cases.

-14-

testify against him.  Ken Freeman was allegedly promised that he would not have to go back to the Anamosa prison if he agreed to testify against McGhee, but refused.  Tyrone Pierce, an eighteen year old charged with burglary and car theft, was allegedly offered reduced charges for testimony against McGhee.  After he was placed in a cell adjacent to McGhee's, Pierce stated that McGhee admitted to killing Schweer.  Pierce's own charges were ultimately dropped.  Larry Plater, a jail inmate awaiting transfer to a reformatory, claimed that McGhee told him a few days after the murder that he had been present when Harrington killed a police officer.  Plater purportedly gave this testimony in exchange for a promise not to go to the reformatory.  Eric Hartwell, an eighteen year old inmate serving a ten-year sentence at the Anamosa prison, contacted Larsen and Hrvol and told them that McGhee had told him that Harrington and another unnamed individual had gotten a 12-gauge shotgun out of the trunk, wrapped it in a jacket, and shot the "sheriff" twice.  Hartwell admitted that when incarcerated near McGhee, McGhee had a copy of the True Information which alleged this information, but Hartwell denied looking at it. Hartwell testified at McGhee's trial that the information about an unknown individual was a "typo."  Hartwell's sentence was subsequently reduced.  Plaintiffs claim that Defendants did not tell them about any of the "deals" they had with jailhouse informants.

On June 13, 1978, McGhee was convicted for the first-degree murder of John Schweer and sentenced to life imprisonment without parole.  Harrington was convicted of the same crime and received the same sentence on August 4, 1978.   According to the Complaints, Brown testified at Harrington's 1978 trial, and at Harrington's 1987 post-conviction review proceedings, that there were no early alternative suspects in Schweer's murder.  He did not indicate that Charles Gates was ever a suspect.  At the depositions of Richter, Hrvol, Larsen, and

Brown related to Harrington's 1987 proceedings, each denied the existence of alternative suspects.  James Cleary, Harrington's attorney, testified in 2000 that, after making a global discovery request, he received documents, but none contained Gates' name or indicated that Gates was a viable suspect.  McGhee's attorney in his 1987 post-conviction proceeding also claimed that he requested all files relating to Schweer's murder from the Pottawattamie County Attorney's Office, but that nothing in those materials mentioned Gates as a viable suspect.  In McGhee's first post-conviction review in 1987, McGhee served an interrogatory requesting the "names and addresses of all suspects in the case."  The answer was that no one "other than the plaintiff" was a suspect.  Likewise, McGhee served an interrogatory asking "[w]hat the result of the investigation of the report of a man and a dog seen in the vicinity of McIntyre Oldsmobile a night or two before John Schweer's death?"  The response to the interrogatory was that the "man and dog" was "never found or identified."  In 1987, McGhee also served an interrogatory requesting information about "witnesses used at trial who were promised leniency in exchange for their testimony against Curtis McGhee, and the specific promises made to each."  The reply was "[n]one."  Hrvol assisted in answering the interrogatories.

In 1999, Anne Danaher, an employee of the Iowa prison where Harrington was incarcerated, got to know Harrington and his family.  She requested the Council Bluffs Police Department file concerning Schweer's murder.  The withheld reports regarding Charles Gates were in the materials provided to her.  Harrington brought a new post-conviction relief petition based in part on the fact that these reports had been withheld at trial.  The Iowa district court denied Harrington's petition, but the Iowa Supreme Court reversed, finding that the Gates reports were withheld from Harrington in 1978, and that they were exculpatory in that they

showed an alternative suspect for the murder.  In its opinion, the Iowa Supreme Court stated that

Hughes was "by all accounts a liar and a perjurer" and that admission of the Gates reports

reasonably could have caused the jury to disregard or at least doubt Hughes' account of the

murder.  The court found that Harrington's due process rights were violated for the failure of the

prosecution to turn over exculpatory evidence, vacated his conviction for first degree murder,

and granted Harrington a new trial.

At the time of the Iowa Supreme Court's reversal of Harrington's conviction, Matthew

Wilber was the Pottawattamie County Attorney, and had been for just under two months.  Wilber

had to determine whether to retry Harrington, and whether to oppose McGhee's petition for new

trial based on the Iowa Supreme Court's decision in Harrington's case.  Council Bluffs Police

Detective David Dawson was assigned to work full-time on the case with Wilber, at Wilber's

request.  Wilber claims to have spent hundreds of hours working on the case after the Supreme

Court's decision.  Wilber found that the only person who placed Harrington or McGhee at the

murder scene was Hughes, who had admitted in a 2000 deposition that his testimony against

Harrington and McGhee was false.  Likewise, Jones, Jacobs, Pride, and Lee had all recanted

their stories, and Wilber found the jailhouse informants to be not credible.  Wilber also claims

that he believed that the murder occurred between 3:00 and 4:00 a.m., and that Hughes' time line

was inconsistent with that determination.

According to the Complaints, Wilber wanted to vindicate the law enforcement agencies

involved in the prosecution of McGhee and Harrington by reconvicting both for Schweer's

murder.  Hughes, who had recanted in 2000, was living in Omaha at the time.  Wilber instituted

proceedings to have Hughes arrested as a material witness, and Hughes was arrested on April 21,

2003, and was transferred to Pottawattamie County on April 23, 2003.  On April 24, 2003,

Hughes was interviewed by Dawson.  Hughes was not Mirandized and feared that he would lose

his job if he did not return to it soon.  To obtain his release from custody, he told Dawson that he

had lied in 2000 at Harrington's post-conviction relief hearing when he said that his testimony at

the 1978 trials was false.  Wilber used this information to proceed with a criminal case against

Harrington.

On June 2, 2003, Hughes was scheduled to be deposed regarding Harrington's retrial.

The Complaints claim that Wilber undertook a plan to get Hughes to "take the Fifth" so that he

could claim Hughes was "unavailable" as a witness and use Hughes' 1978 testimony at any

retrial.  Wilber spoke to Hughes before Harrington's counsel arrived for the deposition and told

Hughes that he may have a right to an attorney, because if he lied under oath in 2000, he could

be charged with perjury.  Hughes told Wilber he wanted a lawyer and left before Harrington's

attorney arrived.  McGhee was not represented by counsel that day, and his attorney for his post-

conviction proceedings was never informed of what Wilber said to Hughes.  Greg Steensland

was appointed to represent Hughes, and told Wilber that Hughes would "take the Fifth" unless

he was offered immunity.  Wilber declined to grant Hughes immunity and Hughes "took the

Fifth" when he was deposed in Harrington's case on July 26, 2003.  Wilber then argued in court

that Hughes' 1978 testimony would be read at Harrington's retrial because Hughes was

"unavailable."

Knowing that McGhee would likely be granted a retrial on the same basis as Harrington,

Wilber told McGhee that he was prepared to retry him for Schweer's murder.  Wilber allegedly

misrepresented some facts and concealed other facts in his discussions with McGhee's attorney,

a relatively inexperienced lawyer who had been represented on criminal charges by Wilber's former law partner, Richter.  Wilber informed McGhee's attorney that he had a stronger case against McGhee than against Harrington, and would like to discuss the possibility of resolving McGhee's case if McGhee would testify against Harrington.[7]  Wilber claimed that the "stronger evidence" against McGhee stemmed from McGhee's attempt to induce Joseph Rogers to falsify an alibi for him for the night of the murder.[8]  Wilber also claimed that McGhee had admitted his involvement in Schweer's murder to several jailhouse informants, including Tyrone Pierce, Aaron Gibbs, Eric Hartwell, and Larry Plater.  Wilber told McGhee's attorney that "[w]e have been able to locate, and speak to, each of these four individuals."  Pierce, however, had recanted his story in a 1988 post-conviction proceeding by Harrington.  In an April 2003 interview with Plater by Detective Dawson, Plater did not recall McGhee telling him he was with Harrington when Schweer was killed and later admitted that McGhee made no such statement.  Aaron Gibbs never claimed McGhee admitted involvement in Schweer's murder.  Wilber testified under oath that he did not believe Hartwell was a credible witness, but did not reveal this information to McGhee or his attorney.  Wilber also told McGhee's attorney that the polygrapher who examined Gates in 1977 had been interviewed and said that "contrary to the information contained in Dan Larsen's [1977] police report, Gates actually passed his polygraph when questioned about his involvement in the shooting of John Schweer."  The polygrapher, Selma

---

[7] McGhee had testified at his own trial in 1978 that Harrington picked him up at his home, then picked up Hughes, and then dropped McGhee off at his girlfriends, and that these events could have taken place on the night of Schweer's murder.

[8] Apparently in 1977, Rogers had written on a calendar "me and Cub [McGhee] going to the show" on July 22, 1977.  Schweer, however, was murdered in the early morning hours on that date.  Rogers did not write anything for the evening of July 21, 1977.

Mendyk, did not make such a statement.

Wilber also told McGhee's attorney in a letter dated June 5, 2003, that "Gates has been effectively eliminated as a suspect at this point in time."  Indeed, the Complaints allege that Dawson had gone to the Omaha Police Department and reviewed the 1963 murder file for which Gates had been a suspect.  He discovered that a records check performed on Gates at that time indicated "'Safe Keeping' in connection with Assault with Gun (Mental) dated 6-22-55." Dawson also took a taped statement from Gates on April 25, 2003.  During that interview, Gates admitted that he may have walked dogs in the area of the murder.  When asked where he was the night of the murder, Gates said, "that's deep," but didn't answer.  Gates could not recall what he told police in 1977 about his whereabouts on the night of the murder.

On September 2, 2003, McGhee signed a letter agreement with Wilber and the Pottawattamie County Attorney's Office.  It provided that McGhee would enter an *Alford* plea to second degree murder and be sentenced to 25 years with credit for time served.  McGhee had already served nearly 26 years in prison for his conviction for the first-degree murder of Schweer.  By entering an *Alford* plea, McGhee could maintain his innocence for Schweer's murder, but finally be released from custody.  The plea agreement provided that McGhee would stipulate to the Minutes of Testimony set forth in the 1978 True Information against him. McGhee did not admit the truth of the Minutes of Testimony.  As part of the plea agreement, McGhee also agreed to cooperate in the re-prosecution of Harrington.  The Pottawattamie County Attorney's Office agreed that McGhee's sentence should be vacated on the same basis as Harrington's, and that he should be granted a new trial.  It was expected that McGhee's plea would not be presented to a court until after Harrington's retrial, and Wilber retained the right to

-20-

void the plea agreement if McGhee did not testify in accordance with the terms of the agreement. On the same date, Iowa District Court Judge Abel vacated McGhee's 1978 conviction, pursuant to the parties' agreement, and granted McGhee a new trial.

Also on September 2, 2003, following the signing of the letter agreement, McGhee gave a deposition in regards to Harrington's new trial. McGhee maintained his innocence during the deposition and stated he would take any deal just to get home. McGhee claimed that Harrington picked him up at his home the night of the murder, they picked up Hughes, and then Hughes and Harrington dropped McGhee off at his girlfriend's home. McGhee was released from custody after his deposition and payment of a $15,000 bond. He remained subject to electronic monitoring and pretrial release supervision.

On October 23, 2003, the judge in Harrington's retrial permitted Harrington's counsel to depose Hughes. Neither McGhee nor his attorney were in attendance, but Wilber was present. Hughes testified that he had lied in 1978 and that he had no knowledge of Harrington or McGhee being involved in the murder of Schweer. He stated that he would not testify as he did in 1978. Despite his knowledge that the Minutes of Testimony were based on Hughes' now recanted 1978 story, Wilber appeared at a plea hearing for McGhee on October 24, 2003. There, Wilber stated that the [1978] Minutes of Testimony were true and provable, and the judge accepted McGhee's *Alford* plea on that basis. Shortly after the plea was finished, Wilber issued a press release and gave a press conference announcing his decision to discontinue the prosecution of Terry Harrington for the murder of John Schweer. The press release read as follows:

> It is with regret that I am announcing my decision to discontinue the prosecution against Terry Harrington for the murder of John Schweer. Recent events have unfortunately made it impossible for us to proceed with the trial. As you are all

undoubtedly aware, I am very limited on the information I can convey outside of an official court document or proceeding.  I can tell you that I have filed a very detailed application to dismiss this case and that Chief Judge Charles Smith granted that application a short while ago.  It is important to note that this dismissal is considered to be "without prejudice," which basically means that should additional evidence come to light, or should evidence which is currently not admissible become admissible, our office could refile the charge of First Degree Murder against Mr. Harrington.

I met with the children of John Schweer for about two hours this morning.  They have asked me to let you know that they may be issuing a statement through a family representative but would prefer that they not be contacted directly by the media. They did ask me to let you know that, while disappointed in the outcome, they are supportive of the decision to discontinue the prosecution of this case at this time.

The interesting irony of this case is that Terry Harrington was put in prison by his own friends and associates.  If they are now choosing to change their sworn testimony there is little I can do to stop that.  We play the cards we are dealt as best we can.  In this case, there were multiple witnesses who changed their testimony from what was given in 1978, including the recent recantation of Kevin Hughes during his deposition yesterday morning.

I want to thank Detective Dave Dawson (and the rest of the Council Bluffs Police Department for that matter) for his dedication to this case.  Detective Dawson was able to track down over 71 of our 82 witnesses and the 11 he couldn't track down actually passed away during some point over the past twenty-six years.  Detective Dawson did a fantastic job organizing this case after it sat in our closed files for over twenty-five years.

After personally spending hundreds of hours on this case, I have no doubt that Terry Harrington committed the murder of John Schweer on July 22, 1977.  The jury made the right decision in 1978, and the right man went to prison for over twenty-five years.  That said, I also have no doubt that the admissible evidence which is left after twenty-six years is not sufficient to sustain a conviction against Mr. Harrington.

The easy decision on this case would have been to let it drop when the Supreme Court granted Mr. Harrington a new trial earlier this year.  I certainly had many people recommend that I take that easier path.  That would not have been the right decision, however.  I owed it to the family of John Schweer to do my best on this case to bring his killer to justice a second time.  And while I am disappointed that I will not get the opportunity to put this case before a jury, I am satisfied that nothing else could have been done, by my office or by the Council Bluffs Police Department. As for final justice for Terry Harrington, I will defer that honor to a higher power.

On a related note, Curtis McGhee, a co-defendant of Mr. Harrington's in this case, pleaded no contest today to a charge of Second Degree Murder for the death of John Schweer.  Mr. McGhee was sentenced to a term of imprisonment of twenty-five years.  Since Curtis McGhee had already served more than twenty-five years in prison since his original conviction in 1978, he was credited with time served and left the courthouse late this morning.  Even though Mr. McGhee did not actually pull the trigger on the gun that killed John Schweer, our case against him was stronger than against Terry Harrington.  Mr. McGhee had made admissions to at least three different people about being with Terry Harrington when Harrington shot a police officer in Council Bluffs.  Those statements would likely not be admissible in a trial against Terry Harrington, but would certainly have come into evidence at a trial against Mr. McGhee.  Mr. McGhee was offered a chance to plead to Second Degree Murder back in 1978 and, had he taken that deal back then, he would probably have been paroled over ten years ago.

Matt Wilber, Pottawattamie County Attorney.

## II.  STANDARDS OF REVIEW

### A.  *Summary Judgment*

Summary judgment has a special place in civil litigation.  The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways."  *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991).  In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.  *See id.*; *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances."  *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th

Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n.5 (8th Cir. 1975)).  The

purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have

issues to  try," *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (quoting *Sartor v.*

*Ark. Natural Gas Corp.*, 321 U.S. 620, 627 (1944)), but to avoid "useless, expensive and

time-consuming trials where there is actually no genuine, factual issue remaining to be tried,"

*Anderson v. Viking Pump Div.*, *Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976)

(citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir. 1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  The precise standard for granting summary judgment is well-

established and oft-repeated:  summary judgment is properly granted when the record, viewed in

the light most favorable to the nonmoving party and giving that party the benefit of all

reasonable inferences, shows that there is no genuine issue of material fact, and the moving party

is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Harlston v. McDonnell*

*Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).  The court does not weigh the evidence nor

make credibility determinations, rather the court only determines whether there are any disputed

issues and, if so, whether those issues are both genuine and material.  *See Anderson v. Liberty*

*Lobby*, *Inc.*, 477 U.S. 242, 252 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987)

("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims

with no basis in material fact.") (citing *Weightwatchers of Quebec*, *Ltd. v. Weightwatchers Int'l*,

*Inc.*, 398 F. Supp. 1047, 1055 (E.D.N.Y. 1975)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any.  *See Celotex*, 477 U.S. at 323;  *Anderson*, 477 U.S. at 248.   Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial.  *See* Fed. R. Civ. P. 5(c), (e); *Celotex*, 477 U.S. at 322-23; *Anderson*, 477 U.S. at 257.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis added). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party.  *See id.* at 248.  "As to materiality, the substantive law will identify which facts are material. . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

## B.  *Motion to Dismiss*

A motion to dismiss under Rule 12(b)(1) may challenge either the facial sufficiency or the factual truthfulness of a plaintiff's jurisdictional allegations.  *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  Regardless, jurisdictional issues are for the court to determine.  *See Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).  When considering a facial challenge, a court must presume that all of the facts alleged by the plaintiff in support of jurisdiction are true. *See Osborn v. United States*, 918 F.2d 724, 729 (8th Cir. 1990) ("In the first instance, the court restricts itself to the face of the pleadings, and the non-moving party receive[s] the same

protections as it would defending against a motion brought under Rule 12(b)(6).  The general

rule is that a complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief.'" (citations

omitted)).   A court confronted with a factual challenge must weigh the conflicting evidence

concerning jurisdiction, without presuming the truthfulness of the plaintiff's allegations.  *Land v.*

*Dollar*, 330 U.S. 731, 735 n.4 (1947); *Osborn*, 918 F.2d at 730.

### C. *Motion for Judgment on the Pleadings*

The Motion for Judgment on the Pleadings is filed pursuant to Federal Rule of Civil

Procedure 12(c), which provides:

> Motion for Judgment on the Pleadings.  After the pleadings are closed but within
> such time as not to delay the trial, any party may move for judgment on the
> pleadings.  If, on a motion for judgment on the pleadings, matters outside the
> pleadings are presented to and not excluded by the court, the motion shall be treated
> as one for summary judgment and disposed of as provided in Rule 56, and all parties
> shall be given reasonable opportunity to present all material made pertinent to such
> a motion by Rule 56.

Fed. R. Civ. P. 12(c).  The standard for determining a Rule 12(c) motion is the same as that

employed in a Rule 12(b)(6) motion.  *See St. Paul Ramsey County Med. Ctr. v. Pennington*, 857

F.2d 1185, 1187 (8th Cir. 1998).  Thus, when the Court considers a Motion for Judgment on the

Pleadings, it "is constrained by a stringent standard. . . .   A complaint should not be dismissed  .

. . unless it appears beyond doubt that the plaintiff can prove *no* set of facts in support of his

claim which would entitle him to relief."  *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 545-46

(8th Cir. 1997) (quoting *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir. 1982) (citation

omitted) (emphasis added)).

In addition, the complaint must be liberally construed in the light most favorable to the

plaintiff and should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations.  *See id.* at 546.  Finally, when considering a motion pursuant to Rule 12(c), a court must accept the facts alleged in the complaint as true.  *See Cruz v. Beto*, 405 U.S. 319, 322 (1972).

## III.  LAW AND ANALYSIS

As noted, for purposes of the present motions Defendants argue that, even assuming that all of the facts as alleged by Plaintiffs in their Complaints are true, they are still entitled to judgment on various bases, including absolute immunity, qualified immunity, sovereign immunity, and qualified privilege.  The Court will address each argument in turn.

### A.  *Absolute Immunity*

Defendants Hrvol, Richter, Wilber, and Pottawattamie County argue that the following claims made by Plaintiffs are barred by the doctrine of absolute immunity:  Counts 9 (§ 1983 claim against Hrvol), 12 (§ 1983 claims against Richter), and 20 (§ 1983 claim against Wilber), filed by McGhee; Counts 1 (§ 1983 claims for fabricated and perjured testimony against Richter and Hrvol) and 2 (§ 1983 claim for withholding evidence against Richter and Hrvol), filed by Harrington; Counts 15 (§ 1985 Conspiracy claim against the 1977 Defendants) and 28 (§ 1985 Conspiracy claim against Wilber and Dawson), filed by McGhee; and Count 3 (§ 1985 Conspiracy claim against the 1977 Defendants), filed by Harrington.  In essence, each of the asserted claims allege that the prosecutors Hrvol, Richter, and Wilber improperly concealed exculpatory evidence; concealed the alleged coercion of witnesses; participated in court proceedings; coerced witnesses; participated in the Schweer murder investigation; and conspired with the respective police defendants to commit the alleged misdeeds against the Plaintiffs.

Prosecutors may be entitled to either absolute or qualified immunity from civil liability under 42 U.S.C. § 1983 for actions undertaken pursuant to their official duties.  If the prosecutor is acting as advocate for the state in a criminal prosecution, then the prosecutor is entitled to absolute immunity.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993) (hereinafter referred to as "*Buckley I*").  Absolute immunity insulates from liability prosecutorial functions such as the initiation and pursuit of a criminal prosecution, the presentation of the state's case at trial, and other conduct that is intimately associated with the judicial process.  *Id.*; *Imbler v. Pachtman*, 424 U.S. 409, 430-31 n. 33 (1976).   Qualified immunity, on the other hand, insulates a prosecutor when he pursues actions in an "investigatory" or "administrative" capacity.  *Buckley I*, 509 U.S. at 273.  In determining whether a particular act fits within the common-law tradition of absolute immunity, the Supreme Court takes a "functional approach," *Burns v. Reed*, 500 U.S. 478, 486 (1991), examining "'the nature of the function performed, not the identity of the actor who performed it.'"  *Buckley I*, 509 U.S. at 259 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988) (finding state court judge was not absolutely immune from damages suit for his administrative decision to demote and dismiss a court employee)); *see also Buckley I*, 509 U.S. at 260 (holding prosecutor's comments to the media have no functional tie to the judicial process because they do not involve presentation of case in court or initiation of prosecution); *Imbler*, 424 U.S. at 431 (holding prosecutor absolutely immune for initiating prosecution and for actions taken in presenting state's case).  The United States Supreme Court has emphasized that "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486.

The functional analysis requires the Court to draw a line between preparatory conduct

that is merely administrative or investigative, preparatory conduct that is itself prosecutorial.  For

instance, some, but not all, of a prosecutor's preparatory acts in initiating a prosecution and

presenting a case are absolutely immune.  *See Buckley I*, 509 U.S. at 270; *Burns*, 500 U.S. at

492-96; *Imbler*, 424 U.S. at 431 n.33.  The prosecutorial nature of an act does not, however,

spread backwards, immunizing everything it touches.  *See Burns*, 500 U.S. at 495 ("Almost any

action by a prosecutor, including his or her direct participation in purely investigative activity,

could be said to be in some way related to the ultimate decision whether to prosecute, but we

have never indicated that absolute immunity is that expansive." ).  Indeed, when performing

functions such as investigative and administrative tasks—functions that are not seen as

intimately associated with the judicial process—the overriding public policy justification of

freeing the judicial process from intimidation and harassment no longer exists, such that the

costs on society do not necessitate application of absolute immunity.   While the legal distinction

regarding the applicability of absolute immunity seems clear, it is substantially more easily

stated than applied, particularly in light of the Supreme Court's clear statement that absolute

immunity may attach to some decisions by prosecutors regarding obtaining, reviewing, and

evaluating evidence:

> We recognize that the duties of the prosecutor in his role as advocate for the State
> involve actions preliminary to the initiation of a prosecution and actions apart from
> the courtroom.  A prosecuting attorney is required constantly, in the course of his
> duty as such, to make decisions on a wide variety of sensitive issues.  These include
> questions of whether to present a case to a grand jury, whether to file an information,
> whether and when to prosecute, whether to dismiss an indictment against particular
> defendants, which witnesses to call, and what other evidence to present.  Preparation,
> both for the initiation of the criminal process and for a trial, may require the
> obtaining, reviewing, and evaluating of evidence.  At some point, and with respect
> to some decisions, the prosecutor no doubt functions as an administrator rather than
> as an officer of the court.  Drawing a proper line between these functions may

present difficult questions, but this case does not require us to anticipate them.

*Imbler*, 424 U.S. at 431 n.33.

Despite the difficulty in evaluating the function at issue, however, the Supreme Court has indicated that prior to the establishment of probable cause to arrest, a prosecutor generally will not be entitled to absolute immunity. *Buckley I*, 509 U.S. at 273 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). Correspondingly, the fact that probable cause to arrest has been established "does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Id.* at 273 n.5. "Even after [the probable cause] determination, as the opinion dissenting in part, points out . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* Indeed, the Supreme Court rejected the notion that a "true anomaly" would be created by "denying absolute immunity for a state actor's investigative acts made before there is probable cause to have a suspect arrested just because a prosecutor would be entitled to absolute immunity for the malicious prosecution of someone whom he lacked probable cause to indict":

> That criticism ignores the essence of the function test. The reason that lack of probable cause allows us to deny absolute immunity to a state actor for the former function (fabrication of evidence) is that there is no common-law tradition of immunity for it, whether performed by a police officer or prosecutor. The reason that we grant it for the latter function (malicious prosecution) is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not. By insisting on an equation of the two functions merely because a prosecutor might be subject to liability for one but not the other, the dissent allows its particular policy concerns to erase the function test it purports to respect.
>
> In general, the dissent's distress over the denial of absolute immunity for prosecutors who fabricate evidence regarding unsolved crimes . . . seems to conflate the question

-30-

>whether a § 1983 plaintiff has stated a cause of action with the question whether the
>defendant is entitled to absolute immunity for his actions.

*Id.* Thus, in evaluating whether the prosecutors were immune from liability for their allegedly

wrongful actions, the Court must first evaluate whether the acts occurred before or after probable

cause to arrest Plaintiffs existed.

"Probable cause for an arrest exists if, at the moment the arrest was made, the facts and

circumstances within the officers' knowledge and of which they had reasonably trustworthy

information were sufficient to warrant a prudent person in believing that an offense has been

committed." *United States v. Rivera*, 370 F.3d 730, 733 (8th Cir. 2004) (citing *United States v.

Wajda*, 810 F.2d 754, 758 (8th Cir. 1987)).  In the analysis, law enforcement officers are given:

>"substantial latitude in interpreting and drawing inferences from factual
>circumstances," but such latitude is not without limits.  First, because the totality of
>circumstances determines the existence of probable cause, evidence that tends to
>negate the possibility that a suspect has committed a crime is relevant to whether the
>officer has probable cause.  An officer contemplating an arrest is not free to disregard
>plainly exculpatory evidence, even if substantial inculpatory evidence (standing by
>itself) suggests that probable cause exists.  In this sense, the Fourth Amendment
>requires that we analyze the weight of all the evidence—not merely the sufficiency
>of the incriminating evidence—in determining whether [law enforcement] had
>probable cause to arrest [a suspect].

*Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (internal citations omitted).  Thus, "law

enforcement officers have a duty to conduct a reasonably thorough investigation prior to

arresting a suspect, at least in the absence of exigent circumstances and so long as 'law

enforcement would not [be] unduly hampered . . . if the agents . . . wait[ ] to obtain more facts

before seeking to arrest.'"  *Id.* (quoting *United Sates v. Woolbright*, 831 F.2d 1390, 1394 (8th

Cir. 1987); *United States v. Everroad*, 704 F.2d 403, 407 (8th Cir. 1983)).  "An officer need not

conduct a 'mini-trial' before making an arrest, but probable cause does not exist when a

'minimal further investigation' would have exonerated the suspect." *Id*. (internal citations and quotations omitted). In analyzing whether probable cause for arrest existed, the Court must "ignore the officers' subjective intentions and focus solely on the objective question of whether probable cause existed." *United States v. Clarke*, 110 F.3d 612, 614 (8th Cir. 1997).

"The task of determining whether probable cause to arrest exists as a matter of law in section 1983 actions is different than a similar determination in the context of a direct review of a criminal arrest." *Warren v. City of Lincoln*, 864 F.2d 1436, 1443 (8th Cir. 1989) (citing *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984)). "In the latter situation, we are called upon to review both law and fact and to draw the line as to what is and is not reasonable behavior. By contrast, in a § 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury." *Id*. (citing *McKenzie*, 738 F.2d at 1007-08). "Thus, a finding that probable cause existed as a matter of law is appropriate 'only if no reasonable jury could find that the officers did or did not have probable cause to arrest.'" *Id*. (quoting *McKenzie*, 738 F.2d at 1007-08). The Court, therefore, must determine, taking all of Plaintiff's "allegations as true and resolving all inferences in [their] favor, whether a reasonable jury could find that the police officers could not have reasonably believed that [Plaintiffs murdered John Schweer], i.e., did not have probable cause for [their] arrest." *Id*. (quoting *Deary v. Three Unnamed Police Officers*, 746 F.2d 185, 191 (3d Cir. 1984)).

     1. *Richter and Hrvol*.

        a. *Plaintiffs' section 1983 claims.*

In the present case, Defendants Richter and Hrvol argue that Harrington and McGhee

-32-

were suspects in the Schweer murder because other law enforcement agencies discovered their involvement in a car theft ring, and because Kevin Hughes implicated them in the Schweer murder.  According to the Defendant prosecutors, the totality of the facts known before either Hrvol or Richter became involved in the case justified them in concluding that probable cause existed to believe that Harrington and McGhee murdered Schweer.  Specifically, Hrvol and Richter argue that three separate Nebraska law enforcement entities independently suspected and investigated Harrington and McGhee in a car theft ring; the Omaha Police independently secured Hughes' statement implicating Harrington and McGhee in the Schweer murder; and Hughes eventually described the Schweer murder in detail and led police to McGhee who confirmed Harrington was involved in a car theft ring and owned a shotgun.  *See* Defs.' Reply Br. at 7-8.

Viewing the facts proffered by Defendants in isolation, it is doubtful that they are sufficient to establish probable cause to have arrested either Harrington or McGhee.  While probable cause to arrest can come from "an identification or a report from a single, credible victim or eyewitness," *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000), it is clear from the record that law enforcement had abundant reason to doubt the credibility and veracity of Hughes' statements.  The day that Hughes was arrested driving a stolen Cadillac Deville (September 9, 1977), he gave a taped interview to Detectives Dean and Tellatin, identifying Harrington, Cub (McGhee), and Anthony Houston as the individuals who had stolen the Deville.  Defs.' Supp. App. at 89.  Hughes stated that "Terry [Harrington,] they're not mean you know, they do robberies and stuff like that cause Terry's got a sawed-off shotgun in the back of his trunk, .12 gauge pump."  McGhee Supp. App. at 327.  Hughes further stated that Harrington "just tries to scare people with it."  *Id*. at 328.  When asked if either Harrington or McGhee

would ever "waste somebody" if they "got in a pinch," Hughes stated: "Unt uh, they didn't take no gun with them, they just take it when they do a burglary or robbery or something like that." *Id*.

The day after Hughes was arrested driving a stolen Cadillac (September 10, 1977), Hughes wrote a statement saying that "this light-skinned dude . . . was across the street at Cleaners and they was . . . getting their cars waxed so I went across the street." *Id*. at 273.  After discussing potential drug dealing with the light-skinned man and another individual named Dennis, Hughes claims the following occurred:

> Then I said who car is that and the light-skinned dude said mine.  I said that a pretty car he said you know how I got it.  I said how.  He said should I tell him Dennis he said yeah he's cool he said.  So the light-skinned dude said I stole it from Council Bluffs he said but I had killed this honkey out of my way then he say don't you tell nobody about this he said because if the word gets out and only three of us know about it I'm coming to see you, you dig, and I said yeah so I got out the car and came back across the street.  I seen this light-skinned dude before with Dennis for about a year.

*Id*. at 273.  Detective Larsen also discussed Hughes' information in a report dated September 13, 1977:

> [Three persons, Kevin Mack,[9] Roderick Jones, and Candy Pride were arrested in Lincoln, Nebraska driving a 1977 Cadillac Deville stolen from Fremont, Nebraska].  Upon arrival in Lincoln, Nebraska Officers interrogated Mack concerning his involvement in the theft . . . with theory in mind that this vehicle may have been involved in a theft ring possibly connected to [Schweer's] homicide.  The results of the interview with Mack are as follows:  He stated he received the vehicle early Friday morning from his cousin, Houston, Anthony.  And that he knew the vehicle was stolen upon receipt of it. . . .
>
> In bringing up the subject of the homicide to Kevin Mack, Officers learned that he had some knowledge concerning this crime.

---

[9]  Kevin Hughes is frequently referred to as Kevin Mack in various supporting documentation.  The names will be used interchangeably.

Kevin Mack stated that approximately July 25, 1977 he was in the area of 20th and Lake Street, Omaha, Nebraska at a car wash he knows as Hoskins' when he observed a 1974 Cadillac Fleetwood Brougham belonging to a person he knew as Dennis ? (last name unknown).  As he approached the vehicle he observed Dennis? and a light-skinned man sitting in the vehicle.  Dennis was behind the wheel and light-skinned man in the front passenger's seat.  Dennis called Mack over to the car and told him to get in the back.  Dennis said, "Want to make two to three grand?"  Mack replied, "How?"  Dennis stated, "Deliver 'II' to Kansas City."  Mack replied, "That's some pretty heavy stuff, I don't want to get involved, I have to go to school you know."  Mack then changed the subject and mentioned a black Continental that was receiving a simonize wax job at the car wash.  He remembers saying something similar to "Nice Continental, that's really a pretty car."  The light-skinned man said it was his then turned to Dennis and said "Tell him how I got it."  "Dennis replied that it was stolen and proceeded to explain that it was taken from Council Bluffs, Iowa from McIntyre Oldsmobile-Cadillac and then said something about you saw it on TV."  The light-skinned man then became somewhat upset and there was a discussion of Kevin's trusworth[i]ness to which Dennis replied that he was a brother and that he was trustworthy with any information.  The light-skinned man then made the statement, "The mother-fucking honky was in my way."
. . . .

Officers asked Mack, Kevin Duane to describe persons involved in the theft of the vehicles from Fremont, Nebraska and the 1977 black Cutlass Supreme from Council Bluffs, Iowa.  He said his cousin HOUSTON, Anthony was involved in auto thefts as was HARRINGTON, Terry, and a person known only to him as Cub.  He described Harrington, Terry as a doper who is involved in numerous thefts and robberies.  He stated Harrington carries a sawed-off 12 ga. pump shotgun in the trunk of his vehicle.  He stated he also saw red plastic 12 ga. shotgun shells in the trunk of Harrington's vehicle [described as a green Oldsmobile Delta 88].

*Id.* at 346-47.  Detective Larsen went on to state that he and Officer Howlett went to Omaha to do computer work, which ultimately revealed that Hughes was very close with an individual named Dennis Jackson.  *Id.* at 348.  Jackson, in turn, was stopped by Omaha police in several locations on August 23, 1977, driving a black 1974 Cadillac.  *Id.*  He was accompanied by an individual named Steven Frazier, who fit the description of the "light-skinned dude" given by Hughes.  *Id.*  Frazier, the purported "light-skinned dude" was alleged by Hughes to have killed Schweer while stealing a Lincoln Continental from McIntyre Oldsmobile.  Authorities were well

aware that no vehicle was stolen the night of the murder.  Hughes later accused an individual

named Arnold Kelly of the Schweer murder.  Subsequent police investigation revealed that Kelly

was in the Job Corp in Kansas City at the time of the murder.

Hughes, in custody for possession of a stolen automobile and felony assault on a police

officer (charges that were later dropped), was interviewed again on September 30, 1977.  He

indicated that Harrington and others had told him that they had killed Schweer and that those

individuals had threatened Hughes not to say anything.  Defs.' Supp. App. at 42-43.  Hughes

handwrote a statement to this effect, noting that he was told by "Terry Harrington that him, Cub,

Anthony Houston was the ones who shot the man over in Council Bluffs."  *Id*. at 49.  Officers

believed that Hughes was lying and requested a polygraph examination.  *Id*. at 42-43.  Hughes

consented to the polygraph, and the examiner "advised the officers that he had received

indications of deception on the part of Hughes."  *Id*.  After being informed of this fact, Hughes, a

short time later, stated that he had been lying and indicated that he had been with Harrington in

his green 1970 Oldsmobile on the night that Schweer was murdered.  *Id*.  In a handwritten

statement dated September 30, 1977, at 4:00 p.m., Hughes stated:

> Me, Terry, Cub, Anthony [Houston] went over to McIntyre Olds . . . and Terry,
> Cub, Anthony went to the lot and I was in the car listening to music and I heard
> one shot and the car was parked on a dirt road when Terry, Cub, Anthony got out
> and Terry went to the trunk and got this 12 gauge and they went over.  And then
> they came running from behind the building and Terry had put the gun under his
> seat under the drivers' seat.  Terry drove back to Omaha.

Defs.' Supp. App. at 50.  After authorities discovered that Houston was in jail the night of

Schweer's murder, Hughes' dropped Houston from his version of events.

Hughes gave information about how the shooting occurred, but because officers were not

familiar with the territory described, they requested permission to take Hughes to the Council Bluffs scene of the crime.  *Id*. at 42-43.  "Hughes pointed out to officers where they had parked the Harrington automobile on the night that they had gone to steal another automobile and where Hughes stated he saw the other three parties [Harrington, McGhee, and Houston] running from after he heard a shot."  *Id*. at 44.  Hughes gave a taped interview to Omaha police after returning from the crime scene.  A reasonable investigation would have revealed that Hughes' story did not match the facts of Schweer's murder.  First, Houston was in jail on the night of the murder.  Second, Schweer was not murdered in the location indicated by Hughes (near the McIntyre Oldsmobile lot south of 32nd Avenue in Council Bluffs), but rather on the other side of the street near O'Neill Datsun and Bluffs Toyota (north of 32nd Avenue).  Third, Hughes' September 9 claim that Harrington, McGhee, and Houston stole the Fremont vehicles was dubious at best, in light of the fact that Hughes was driving the 1977 Cadillac stolen from Fremont when Lincoln police picked him up, and Harrington, McGhee, and Houston were not even in the car. Additionally, the car had vanity plates with the name "Kevin" on it and a t-shirt revealed later to belong to Roderick Jones was in the 1976 Lincoln when police recovered it.  With regard to the 1977 Cutlass, evidence available to authorities linked it more to Hughes than to either Harrington or McGhee, as the car was retrieved at 2517 Burdette Street (on September 10, 1977, Hughes stated he lived at 2617 Burdette Street), and had Hughes' mother's boyfriend's license plates on it.  Fourth, in a transcription of Hughes' interrogation, he originally stated that Harrington retrieved a 20-gauge shotgun pump action from his trunk, but then stated Harrington got a 12-gauge shotgun and wrapped it in a tan leather coat.  McGhee Supp. App. at 421, 429. McGhee, however, claimed that Harrington had a .410 shotgun, and indeed, a .410 shotgun was

recovered when authorities searched Harrington's residence, not a 12-gauge shotgun. Further,

McGhee's deposition reveals that he originally told police that the weapon Harrington carried

was not even a shotgun, but a pistol. *Id*. at 414-16, and Larsen also confirmed that Hughes had

told authorities that Harrington had a pistol. *Id*. at 388-89. Fifth, Hughes claimed that the others

were gone from Harrington's car for only 5-6 minutes. *Id*. at 422. Hughes also stated that the

murder occurred between 12:30 and 1:00 a.m., *id*. at 420-22, but employees working at a

trucking company near the murder scene reported hearing a loud explosion after 3:00 a.m. *Id*. at

466, 467. Likewise, the medical examiner reported that Schweer died at approximately 4:00

a.m. *Id*. at 468. Sixth, Hughes' accounts to police about who picked up whom in the 1977

Cadillac conflicted with Pride's version of those events (Hughes originally stated that he drove

up to Jones and Pride), though Hughes eventually changed his story to match Pride's after

hearing it (Pride stated that Houston picked Hughes, Pride, and Jones up). Finally, police

possessed exculpatory evidence implicating Charles Gates as the possible murderer of Schweer.

"An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if

substantial inculpatory evidence . . . suggests that probable cause exists." *Anderson v. Cass

County, Mo.*, 367 F.3d 741, 747 (8th Cir. 2004). By September 30, 1977, authorities were aware

that Schweer had seen a man fitting Gates' description only nights before the murder; four

witnesses saw the same thing; police found foot and dog prints near Schweer's body; and Gates

was a suspect in a 1963 homicide in Omaha.

At approximately 7:00 p.m on September 30, 1977, Detectives Brown and Larsen, along

with Hrvol, arrived in Omaha and interrogated Hughes for approximately 2 hours, though there

appears to be no record of what transpired during that interrogation. Thus, at the time that

Larsen, Brown, and Hrvol became involved with Hughes regarding Schweer's murder, Hughes

had given no less than four different accounts of the murder, first accusing the "light-skinned

dude" (Frazier), then accusing Arnold Kelly, then accusing McGhee, Houston, and Harrington,

and then implicating himself as being present. Officials knew that Hughes' account of events

kept changing, and that it did not match up with the actual details of the crime scene or with

information received from other sources. The 1977 Defendants also were aware that a viable

suspect, Charles Gates, could have been responsible for Schweer's murder. Moreover, for

purposes of the present Motions for Summary Judgment, Defendants have admitted that both the

police and prosecutors coerced and coached Hughes' testimony.

The credibility and reliability of a person providing information to the police are

important factors to be considered in a determination of probable cause. *See Illinois v. Gates*,

462 U.S. 213, 230 (1983). They are not, however, "separate and independent requirements to be

rigidly exacted in every case." *Id.* Probable cause is to be determined based upon the totality of

the circumstances in each case. *See id.*; *see also Massachusetts v. Upton*, 466 U.S. 727, 730-31

(1984). This standard allows "an informant's clear basis of knowledge [to] be balanced against,

rather than automatically overruled by, that informant's lack of a 'track record' of reliability."

*United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986). In support of their conclusion that

probable cause existed before any of the Defendants entered the scene, Defendants cite

*Brodnicki v. City of Omaha*, 75 F.3d 1261, 1264 (8th Cir. 1996), for the proposition that despite

inconsistencies in Hughes' story, probable cause was established because Hughes had made

detailed statements about the Schweer murder and led police to McGhee who confirmed that

Harrington was in the car theft ring and owned a shotgun. In *Brodnicki*, a nine-year old victim

gave a slightly inaccurate description of her kidnapper.  *Brodnicki*, 75 F.3d at 1263 (noting that

the victim stated her kidnapper was 5'11", 220 pounds, with dark brown hair, but Brodnicki was

6'2", 280 pounds, and had dirty-blonde hair, amongst other things).   Finding that the police had

other evidence supporting probable cause, and noting the "tender age" of the victim, the Eighth

Circuit Court of Appeals found that the inconsistencies in the victim's description of her

kidnapper did not defeat the probable cause finding and that police reasonably believed their

victim-informant was reliable and reasonably relied on that information.  *Id.* at 1265.

Unlike in *Brodnicki*, at the time Brown, Larsen, and Hrvol became involved with

Hughes, police had ample reason to doubt Hughes' credibility, as noted above.  Certainly,

independent corroboration of the facts given by an unreliable informant should be examined in

the totality of the circumstances test, *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir.

1996), but the record here reveals that the more independent corroboration that was attempted,

the more variances between Hughes' story and the actual facts of the murder became apparent.

Indeed, the only corroboration of Hughes' story alleged by Defendants as of September 30,

1977, is the fact that McGhee confirmed that Harrington kept a shotgun in the trunk of his car,

and that McGhee, Harrington, Hughes, and Houston were involved in a car theft ring.  Defs.'

Supp. App. at 54-64.   McGhee, however, stated that he believed the gun kept in the trunk of

Harrington's car was a .410, and indeed, a search of Harrington's residence in October 1977

turned up a .410 shotgun, not a 12-gauge shotgun like the one used to kill Schweer.  These

"corroborative facts" offer little, if anything to the probable cause evaluation.  While certainly

the corroboration of even minor, innocent details can bolster a conclusion that an informant is

reliable, *see United States v. Ramos*, 818 F.2d 1392, 1397 n.7 (8th Cir. 1987), the confirmation

that Harrington kept a shotgun (though of a different variety than that which Hughes identified) and the fact that a group of people were involved in a car theft ring, cannot overcome the plethora of contradictions and falsities evident when simply comparing Hughes' various stories to the facts known by law enforcement regarding the murder of John Schweer.  A reasonable jury could find that on September 30, 1977, authorities lacked probable cause to arrest the Plaintiffs.

Between September 30, 1977, the date that Brown, Larsen, and Hrvol first had contact with Kevin Hughes, and the dates that Harrington and McGhee were arrested, November 16 and 17, 1977, authorities did acquire additional information and statements from other witnesses that could have been relevant to the Schweer murder.  Authorities searched Harrington's home, finding a .410 shotgun and a reddish, maroon, vinyl jacket.  The jacket was tested for evidence of gunpowder in light of Hughes' claim that Harrington wrapped his (tan leather) jacket around the shotgun.  The examination of the jacket, however, revealed only two particles of unburned smokeless gunpowder.  The technician analyzing the particles could not say what type of gun the particles came from, and they were never compared with the gunpowder residue found at the Schweer murder scene.  There was also no attempt to rule out the possibility that the particles could have come from Harrington's .410 shotgun.

Authorities also interviewed Roderick Jones in October 1977.  In a taped interview, Jones claimed that everything he knew came from Hughes, and that he was at 24th Street and Pratt (the intersection where Hughes claimed McGhee and Harrington picked him up on the night of the murder) on a night that could have been the night of the murder when Harrington and McGhee picked up Hughes.  Jones had implicated himself in using the key-switch scheme on several

occasions to steal cars with Hughes, and was purportedly told by Brown that if he did not say that he saw Harrington, McGhee and Hughes together on the night of the murder, he would be charged with stealing cars and with Schweer's murder.  Candice Pride also stated in October that she was present at the intersection when Harrington and McGhee picked up Hughes.  Pride had been caught in the stolen Cadillac with Hughes and Jones, and was also dating Hughes.  Larsen and Brown are claimed to have threatened Pride with Hughes being charged with murder to obtain her statement.  Larsen and Brown also interviewed another of Hughes' girlfriends, Linda Lee, in October 1977.  They allegedly told Lee that her boyfriend, Hughes, would be charged with murder unless she corroborated his story.  Lee then claimed that she saw Harrington and another black male in Harrington's car waiting for Hughes on the night of the murder.  Clyde Jacobs was also questioned by authorities, and was allegedly threatened with being charged with Schweer's murder.  Jacobs stated that he was present at 24th and Pratt when Harrington and "another colored guy" picked up Hughes.  Jacobs later said that McGhee was with Harrington when Hughes was picked up.  Despite the statements of these individuals, Defendants have not denied, for purposes of this motion, coercing and coaching their statements.  Indeed, it is alleged that authorities left Jones, Pride, Jacobs, and Hughes alone together before questioning them so that they could "get their stories straight."  Despite all of these statements incriminating McGhee and Harrington, however, the fact remains that all of the witnesses gave shifting stories, all were cohorts of Hughes, their statements were less than precise as to the time and date that they saw Harrington and McGhee pick up Hughes, and all were allegedly threatened with some sort of legal action (or that legal action would be taken against a loved one).  Considering this evidence with the evidence in the possession of law enforcement (including the serious doubts about

Hughes' credibility, substantial contradictions in his statement, and exculpatory evidence including the existence of another possible suspect for the murder) prior to September 30, 1977, the Court still must conclude that a reasonable jury could find probable cause was lacking to arrest Harrington and McGhee on November 16 and 17, 1977.

Additional evidence regarding McGhee came to the prosecutors' attention through jailhouse informants that were housed with him following his arrest in November 1977.  Tyrone Pierce, incarcerated for burglary and car theft, had a history of informing on other prisoners and was approached by Larsen and Hrvol.  Larsen and Hrvol allegedly told Pierce that if he testified against McGhee, his charges would be reduced.  Pierce was placed in a cell next to McGhee's, and shortly thereafter told Larsen and Hrvol that McGhee had told him he murdered Schweer while they were bragging to each other about their criminal accomplishments.  Larsen and Brown also allegedly told Larry Plater that they needed witnesses and that he might not have to go to a reformatory if he testified against McGhee.  Plater claimed that McGhee told him a few days after the murder that he was present when Harrington killed a police officer.  Eric Hartwell contacted the Defendants from the Anamosa prison, where he was serving ten years for breaking and entering.  Larsen and Hrvol interviewed Hartwell at the Anamosa prison on April 7, 1978, and Hartwell signed a statement setting forth that while he and McGhee were incarcerated together in the Pottawattamie County jail, McGhee told him that he, Harrington, and another person got a 12-gauge shotgun out the trunk, wrapped it in a jacket, went around the back of the dealership, and Harrington shot the "sheriff" twice.  Hartwell admitted, however, that McGhee had the True Information dated February 17, 1978, with him in jail, but Hartwell denied looking at the document.  Hartwell expected and receive a reduction in his sentence in exchange for his

testimony.

Again, the Court believes that a reasonable jury could still find probable cause lacking

viewing the totality of the circumstances known even after the three jailhouse informants offered

testimony about McGhee allegedly discussing Schweer's murder.  The Second Circuit Court of

Appeals has noted that "numerous scholars and criminal justice experts have found the testimony

by 'jail house snitches' to be highly unreliable" because such informants typically have "a

significant incentive to offer testimony against other Defendants in order to curry favor with

prosecutors" and because their proffered testimony is "oftentimes partially or completely

fabricated."  *Zappulla v. New York*, 391 F.3d 462, 470 n.3 (2d. Cir. 2004) (citing Daryl K.

Brown, Essay, *Rationing Criminal Defense Entitlements: An Argument From Institutional

Design*, 104 Colum. L. Rev. 801, 824 (2004); Jana Winograde, Comment, *Jailhouse Informants

and the Need for Judicial Use Immunity in Habeas Corpus Proceedings*, 78 Cal. L. Rev. 755,

756 (1990)).  Accordingly, the Court must conclude that, even given all information known to

law enforcement at the time Harrington and McGhee went to trial in 1978, a reasonable jury

could find that probable cause was lacking to arrest them for Schweer's murder.

Despite the Court's conclusion that a reasonable jury could find probable cause lacking

to arrest the Plaintiffs at all stages of the proceedings prior to trial, the Court must still evaluate

whether absolute immunity is available to Richter or Hrvol at any stage of the proceedings.

Under both Supreme Court and Eighth Circuit jurisprudence, the law is clear that prosecutors

enjoy absolute immunity only for actions within the scope of their prosecutorial duties, and not

for administrative or investigative duties.  *See Smith v. Updegraff*, 744 F.2d 1354, 1364 (8th Cir.

1984).  "Prosecutors must act 'clearly outside their jurisdiction' (i.e., pursuant to their

investigatory duties) to lose the defense of absolute immunity." *Webster v. Gibson*, 913 F.2d

510, 514 (8th Cir. 1990) (citing *Wilhelm v. Turner*, 431 F.2d 177, 182-83 (8th Cir. 1970)).  As

noted previously, "the official seeking absolute immunity bears the burden of showing that such

immunity is justified for the functions in question." *Burns*, 500 U.S. at 486.  A short review of

the history and purpose of the absolute immunity doctrine sheds some light on its applicability to

the present case.

In *Imbler*, the Supreme Court evaluated for the first time whether the common law

doctrine of absolute immunity, long extended to judicial officers in malicious prosecution cases,

should be extended to prosecutors in the context of § 1983 actions.  *Imbler*, 424 U.S. at 421-22

(citing *Griffith v. Slinkard*, 44 N.E. 1001 (1896) (finding that a prosecutor without probable

cause who added a name to a grand jury true bill after the grand jurors refused to indict him was

entitled to absolute immunity from a charge of malicious prosecution) and *Yaselli v. Goff*, 275

U.S. 503 (1927) (affirming a Second Circuit decision granting absolute immunity on a claim of

malicious prosecution where the Special Assistant to the Attorney General of the United States

maliciously and without probable cause procured plaintiff's grand jury indictment by the willful

introduction of false and misleading evidence)).   In finding that absolute prosecutorial immunity

should apply to § 1983 actions, the *Imbler* Court stated:

> If a prosecutor had only a qualified immunity, the threat of § 1983 suits would
> undermine performance of his duties no less than would the threat of common-law
> suits for malicious prosecution.  A prosecutor is duty bound to exercise his best
> judgment both in deciding which suits to bring and in conducting them in court.  The
> public trust of the prosecutor's office would suffer if he were constrained in making
> every decision by the consequences in terms of his own potential liability in a suit
> for damages.  Such suits could be expected with some frequency, for a defendant
> often will transform his resentment at being prosecuted into the ascription of
> improper and malicious actions to the State's advocate.  Further, if the prosecutor

could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

Moreover, suits that survived the pleadings would pose substantial danger of liability even to the honest prosecutor. The prosecutor's possible knowledge of a witness' falsehoods, the materiality of evidence not revealed to the defense, the propriety of a closing argument, and ultimately in every case the likelihood that prosecutorial misconduct so infected a trial as to deny due process, are typical of issues with which judges struggle in actions for post-trial relief, sometimes to differing conclusions. The presentation of such issues in a § 1983 action often would require a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury.  It is fair to say, we think, that the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials.  Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation.  Defending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials.

The affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system.  Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence.  The veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify, as is illustrated by the history of this case.  If prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.

The ultimate fairness of the operation of the system itself could be weakened by subjecting prosecutors to § 1983 liability.  Various post-trial procedures are available to determine whether an accused has received a fair trial.  These procedures include the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies.  In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair trial under law. This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.

We conclude that the considerations outlined above dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law.  To be sure, this immunity does leave the genuinely wronged defendant without civil redress against

a prosecutor whose malicious or dishonest action deprives him of liberty.  But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest.  It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system. Moreover, it often would prejudice defendants in criminal cases by skewing post-conviction judicial decisions that should be made with the sole purpose of insuring justice. With the issue thus framed, we find ourselves in agreement with Judge Learned Hand, who wrote of the prosecutor's immunity from actions for malicious prosecution:

> "As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative.  In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation."

*Gregoire v. Biddle*, 177 F.2d 579, 581 (C.A.2 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

*Imbler*, 424 U.S. at 424-28 (some internal citations omitted).   Thus, the Supreme Court held "only that initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."  *Id*. at 431.

In light of *Imbler*, the Court must find that the filing of a True Information against the Plaintiffs on February 17, 1978, constitutes the "initiation of criminal proceedings" and the prosecutors are, hence, absolutely immune from liability, even in the absence of probable cause. In the State of Iowa, a prosecutor charging a defendant with an indictable offense by filing a trial information must endorse the information as a true information.  Iowa R. Crim. P. 2.5(1); 2.5(2); *State v. Petersen*, 678 N.W.2d 611, 613 (Iowa 2004).[10]   "When the court approves the trial

---

[10]  The requirement that the County Attorney must endorse the charging document as a "true information" is long-standing in Iowa, dating back at least to 1924.  *State v. Voss*, 206 N.W.292, 293 (Iowa 1925) ("Section 13646, Code of 1924, requires that such information shall be indorsed 'a true information,' which indorsement shall be signed by the county attorney."); *see also Burry v. Haynes*, 7 N.W.2d 914, 917 (Iowa 1943) ("Section 13646, Code 1935, did require the county attorney's signature to an endorsement to the information.  It provided as follows: 'Such

-47-

information, it determines whether there is probable cause to detain the Defendant to answer the charge." *Petersen*, 678 N.W.2d at 614 (citing *State v. Shank*, 296 N.W.2d 791, 792 (Iowa 1980) ("[A] judge or magistrate must approve [the information] by finding that the evidence shown in the minutes, 'if unexplained, would warrant a conviction by the trial jury.'")). The conclusion that filing the True Information is protected by absolute immunity is consistent with the Supreme Court's holding in *Kalina v. Fletcher*, 522 U.S. 118 (1997). There, Fletcher sued a deputy prosecuting attorney under § 1983 for commencing a criminal proceeding by filing three documents: an information charging Fletcher with burglary, a motion for an arrest warrant, and a "Certification for Determination of Probable Cause," which contained two inaccuracies, but was filed in support of the arrest warrant to satisfy a Washington Criminal Rule requiring that an arrest warrant be supported by "sworn testimony." *Kalina*, 522 U.S. at 120-21. Based on the certification, the trial court found probable cause and issued an arrest warrant for Fletcher. *Id*. at 121. The Court found that the prosecutor was not protected by absolute immunity under § 1983 because state law did not require that the prosecutor be the one to make a sworn statement supporting probable cause. *Id*. at 129-30. Thus, the prosecutor "performed an act that any competent witness might have performed" and hence could be liable to the same extent as any complaining witness. *Id*. Here, in contrast, Iowa law required that the prosecutor endorse the true information. Thus, the task could not have been performed by anyone other than a prosecutor, and distinguishes the present facts sufficiently from *Kalina* such that the function of signing the True Information must necessarily be deemed an intimate part of the judicial process.

---

information shall be indorsed, "a true information", which indorsement shall be signed by the county attorney.'")

*See Schenk v. Chavis*, 461 F.3d 1043, 1046 (8th Cir. 2006) (prosecutors actions in signing and filing a criminal complaint constituted prosecutorial functions).  Likewise, any actions taken by Hrvol or Richter in actually presenting the State's case against Harrington and McGhee at trial must be considered part of the judicial process and absolutely immune from liability.  *See*, *e.g.*, *Burns*, 500 U.S. at 490-91 (appearing before a judge and presenting evidence in court part of "role as advocate" absolutely immune); *Imbler*, 424 U.S. at 431 (presenting the State's case at trial is absolutely immune from liability); *Myers v. Morris*, 810 F.2d 1437, 1446 (8th Cir. 1987) ("Allegations that a prosecutor knowingly offered, used or presented false, misleading or perjured testimony at trial or before a grand jury do not defeat absolute prosecutorial immunity, regardless of how reprehensible such conduct would be if it occurred.  The same is true for allegations of withholding or suppressing exculpatory evidence. . . .  Soliciting and suborning perjured testimony does not create liability in damages for a prosecutor . . . ."), cert denied, *Lallak v. Morris*, 484 U.S. 828 (1987).

Prior to the filing of the True Information, however, the record supports a conclusion that both Hrvol and Richter were acting in an investigatory capacity rather than in an advocatory capacity.  First, as the Court has pointed out, it appears that probable cause was lacking at all stages of the proceedings, given the wealth of information, known to the prosecutors, that any inculpatory evidence against Harrington and McGhee was plagued with inconsistencies, incompleteness, and verifiable lies, and due to their knowledge that significant exculpatory evidence also existed.  Supreme Court precedent supports the conclusion that, because no probable cause was established at the time that Hrvol and Richter are alleged to have coerced witnesses and fabricated evidence prior to the filing of the True Information, the prosecutors

-49-

were acting in an investigatory capacity rather than an advocatory capacity.  *See Buckley I*, 509

U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he

has probable cause to have anyone arrested").

 Furthermore, evaluating the functions performed by Richter and Hrvol supports a

conclusion that their actions prior to the filing of the True Information were investigatory in

nature, and thus entitled, at best, to qualified immunity.   Richter testified at deposition that he

oversaw the prosecutor's participation in the investigation of the Schweer murder and that his

office participated to a significant extent in the investigation.  Harrington's Statement of

Undisputed Facts ¶¶ 16-17.   Hrvol participated in a canvassing of the neighborhood near the

scene of the murder, and did a lot of other "stuff" related to the investigation because the "police

field investigators needed help with the investigation and put a lot of man-hours into the

investigation."  *Id*. ¶¶ 5-6.  While Hrvol was not present on every occasion that Hughes was

questioned by the police, he was present with them on nearly every occasion when Hughes was

interviewed, including when Hughes was taken to the scene of the Schweer murder.  *Id*. at ¶ 20.

Hence, it is reasonable to presume that Hrvol was present when law enforcement caught Hughes

in lies, told him he'd "better cough up the truth" or it wouldn't look good for him, and when

Hughes was told that he would be deemed the "trigger man" if he didn't come up with

something.  *Id*. ¶¶ 21-22.  Hrvol admits that he was not even assigned the responsibility of

prosecuting the case throughout the early part of the investigation, but rather was assisting the

police in the investigation.  *Id*. ¶ 7 ("The only one in the office intensely involved in the

investigation was me [Hrvol]").   Richter personally interviewed a witness after the murder, but

before Harrington or McGhee were suspects, who stated that he had seen Charles Gates walking

his dogs in the vicinity of the murder.  *Id.* ¶ 18.  Richter also interviewed Hughes only a day after

police and prosecutors took him to the scene of the murder (for the fourth or fifth time)[11] to "re-

enact" Hughes' account of the events.  During that interview, Richter cited Iowa Code § 769.19,

a provision entitled "Investigation by prosecuting attorney," which permitted county attorneys to

subpoena witnesses whose testimony may be required in "investigating an offense."  McGhee

Supp. App. at 517.  Richter and Hrvol, along with the police, consulted an astrologer to prepare

astrological charts on Gates.  Harrington's Statement of Undisputed Facts ¶ 19.  Indeed, both

Richter and Hrvol worked closely with the Council Bluffs Police Department during the entirety

of the Schweer murder investigation, "including participating in witness interview before any

arrests were made."  *Id.* ¶ 2.  Council Bluffs police officer Larry Williams testified that Hrvol

and Richter worked side by side with the police on the investigation.  *Id.* ¶ 30.

　　　Plaintiffs allege that Defendants actually participated in the coercion of witnesses and in

the fabrication of false testimony by making promises to putative witnesses that criminal charges

would be dismissed or reduced, by making threats of criminal prosecution, and by coaching and

altering the witness statements to better fit the facts of the Schweer murder.  The fact that Hrvol

and Richter do not contest any of the allegations of fact made by Plaintiffs for purposes of the

summary judgment motion prohibits the Court from concluding that these actions were the

function of advocates rather than investigators.  The Court finds that these activities took place

prior to the establishment of probable cause and reasonably could be viewed as causatively

violating the Plaintiffs' rights to a fair trial.  Because Defendants have fundamentally admitted

---

[11] Hughes has testified that police and prosecutors took him to the scene of Schweer's murder
four or five times, and that they discussed the case with him "too many times to count."
McGhee Supp. App. at 303-04.

that they coached and coerced witnesses and fabricated evidence, the prosecutors have utterly

failed to carry their burden to show that such acts were "intimately associated with the judicial

process" such that they are entitled to absolute immunity.   *See Buckley I*, 509 U.S. at 275

("Respondents have not cited any authority that supports an argument that a prosecutor's

fabrication of false evidence during the preliminary investigation of an unsolved crime was

immune from liability at common law, either in 1871 or at any date before the enactment of §

1983.  It therefore remains protected only by qualified immunity."); *Genzler v. Longanbach*, 410

F.3d 630, 638-41 (9th Cir. 2005) (holding prosecutor and investigator not entitled to absolute

immunity for encouraging witness, during meetings prior to bail hearing and more than month

prior to preliminary hearing, to fabricate testimony); *Brown v. Daniel*, 230 F.3d 1351 (4th Cir.

2000) ("When acting in an investigative role, no government official, including prosecutors, is

entitled to absolute immunity.") (unpublished disposition); *Moore v. Valder*, 65 F.3d 189, 194-

95 (D.C. Cir. 1995) ("Intimidating and coercing witnesses into changing their testimony is not

advocatory.  It is rather a misuse of *investigative* techniques legitimately directed at exploring

whether witness testimony is truthful and complete and whether the government has acquired all

incriminating evidence.  It therefore relates to a typical police function, the collection of

information to be used in a prosecution."); *Hill v. City of New York*, 45 F.3d 653, 662 (2d Cir.

1995) (finding absolute immunity does not protect efforts of prosecutors to manufacture

evidence during the investigatory phase of a criminal case); *Kulwicki v. Dawson*, 969 F.2d 1454

(3d Cir. 1992) (declining to extend prosecutorial immunity to a district attorney who

manufactured evidence);  *Spurlock v. Whitley*, 971 F. Supp. 1166, 1180 (M.D. Tenn. 1997)

(denying absolute immunity for prosecutor's alleged efforts to have a witness testify falsely).[12]

With regard to Plaintiffs' allegation that Defendants intentionally concealed exculpatory information, the outcome is necessarily different.  Plaintiffs claim that Richter and Hrvol intentionally concealed exculpatory evidence and promises of leniency or payments made to witnesses.  In 1963, the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  There can be no doubt that evidence of promises or threats in exchange for testimony and evidence of an alternate suspect would have been material to determining Plaintiffs' guilt or innocence in their 1978 trials.  *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (requiring prosecutors to disclose "evidence of any understanding or agreement as to future prosecution" relating to any government witnesses).  Nonetheless, extensive authority exists to support a conclusion that the failure to turn over exculpatory evidence is necessarily a function intimately associated with the judicial process.  *See Imbler*, 424 U.S. at 431, n.34 (rejecting dissenting Justice White's recommendation that a prosecutor should be denied absolute immunity for willfully suppressing

---

[12]  Defendants cite to *Reasonover v. St. Louis County*, 477 F.3d 569, 579-80 (8th Cir. 2006) for the proposition that a prosecutor is immune from liability for interviewing witnesses because that function is prosecutorial rather than investigatory.  While the Eighth Circuit in *Reasonover* did find that "[n]ot all of an advocate's work is done in the courtroom.  For a lawyer to properly try a case, he must confer with witnesses, and conduct some of his own factual investigation," the facts of *Reasonover* are distinguishable.  The prosecutor in *Reasonover* only had the role of prosecuting the case.  He did not participate in fabricating evidence and interviewed witnesses only after they had been brought to him by the police, as opposed to seeking out and interviewing witnesses himself.  *See id.* at 577 ("Police working independently on Lyner's case later brought Lyner to the prosecutor, Goldman, because Lyner told the police she had information about the Buckley murder.").

exculpatory information); *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (per curiam) (finding that the decision to withhold or turn over exculpatory information turns on "evaluating the credibility of the alleged exculpatory information, and [on] determining its bearing on the trial," thus making the function necessarily one requiring the exercise of prosecutorial discretion (citations omitted)); *Carter v. Burch*, 34 F.3d 257, 263 (4th Cir. 1994) (holding a prosecutor absolutely immune for failure to turn over exculpatory evidence when he became aware of it "after [the § 1983 plaintiff's] arrest, but before his conviction").  Moreover, the duty to turn over *Brady* evidence necessarily arises in the context of preparation for trial, thus making it inherently a prosecutorial function intimately associated with the trial process.  *See United States v. Banky-Alli*, No. 05-0589CR, 2005 WL 3116754, at *2 (2d. Cir. Nov. 22, 2005) ("We have declined to specify the timing of disclosure that *Brady* requires, but rather have required that *Brady* material be disclosed 'in time for its effective use at trial.'") (citing *Leka v. Portundo*, 257 F.3d 89, 100 (2d Cir. 2001) (noting that "disclosure prior to trial is not mandated")).

The question of whether Hrvol and Richter should receive absolute immunity for allegedly coercing jailhouse informants to give false testimony presents a slightly more difficult issue, primarily because the activity took place after the filing of the True Information (which the Court has found is protected by absolute immunity).  The Complaints allege that Hrvol, along with Larsen, sought out Pierce to get him to testify against McGhee.  Hrvol is alleged to have told Pierce to lie about McGhee's confession in exchange for a reduction in his own sentence, and then made arrangements to place Pierce in a cell near McGhee to effectuate this purpose.  Harrington's Statement of Undisputed Facts ¶ 67.  It is also claimed that Hrvol met with Pierce several times, without Pierce's attorney present, to tell Pierce what to say.  *Id*. ¶ 71.  Likewise,

Hrvol was present when Eric Hartwell was initially interviewed, and helped to "clean up" his story to match other false testimony they had obtained.[13]

The fabrication and coercion of evidence claims against Richter and Hrvol regarding the jailhouse informant witnesses presents something of a conundrum.  On the one hand, a jury could reasonably find that even the jailhouse informant testimony was insufficient to establish probable cause against the Plaintiffs, indicating that the prosecutors were necessarily acting in an investigatory capacity under *Buckley I*.  Additionally, *Buckley I* noted that the fact that a prosecutor's bad act occurs after probable cause is established does not *necessarily* immunize it from liability, as a prosecutor may still act in an investigatory capacity even after probable cause has been established.  On the other hand, once the True Information was filed against each of the Plaintiffs, actions by the prosecutor in securing sufficient testimony to take the case to trial served the function of furthering the prosecutors' preparation for trial, i.e., whether the evidence up to that point was fabricated or not, prosecutors already had sufficient information to proceed to trial.  Plaintiffs appear to argue that the lack of probable cause means that the prosecutors could never have put on their "advocate" hat, even during the trial, under *Buckley I*.  To make such a finding, however, would result in the exception to prosecutorial immunity swallowing the rule, and would fly in the face of the purposes for such immunity in the first instance.  Given the choices, and considering the fact that the informant testimony was elicited *after* the filing of the

---

[13] It is unclear from the record whether Plaintiffs are alleging that Richter actually played any active role in soliciting false testimony from jailhouse witnesses.  However, because the Complaint alleges that both Hrvol and Richter "sought out prisoners who were in jail with McGhee who would agree to falsely testify that McGhee admitted guilt for the Schweer murder in the hope of gaining leniency in their own cases," and because Defendants have admitted for purposes of the present motion that such statement is true, the Court's analysis will include Richter.

formal charging documents, the Court finds that the prosecutors are entitled to absolute immunity for their role in coercing and fabricating jailhouse informant testimony.

             b.  *Section 1985 conspiracy claim.*

Count 15 of McGhee's Complaint, and Count 3 of Harrington's Complaint allege that Richter and Hrvol, along with Larsen and Brown, conspired with each other and perhaps others to arrest, prosecute, convict and imprison Plaintiffs for the murder of John Schweer when they lacked sufficient facts to support a reasonable and honest belief that McGhee was guilty.  The Complaints charge that, in furtherance of the conspiracy, Richter, Hrvol, Larsen, and Brown fabricated evidence, concealed the fabrication of evidence, and concealed other exculpatory evidence to frame the Plaintiffs for a crime they did not commit.  According to Plaintiffs, the conspiracy violated Plaintiffs' rights not to be deprived of liberty without probable cause, as well as their due process rights under the Fourth, Fifth, and Fourteenth Amendments.  The Complaints also allege that the purpose and effect of the conspiracy was to deprive Plaintiffs of the equal protection of the laws because of their race, in violation of the Fourteenth Amendment.

        Title 42, United States Code, § 1985(3) provides:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages

occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1983(3). "Unlike § 1983, § 1985(3) does not provide a cause of action for the deprivation of independent rights 'secured by the Constitution and laws.' Instead, it prohibits private conspiracies intended to prevent persons or classes of persons from the equal exercise of any of their civil rights. No violation of an independent legal right is required; nor does § 1985(3) require state action or the involvement of the State in any other way." *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 840-41 (1983).

Defendants argue that Plaintiffs have failed to plead with specificity that a "meeting of the minds directed at unconstitutional action" occurred. Defendants cite *Myers*, 810 F.2d at 1453 for the proposition that "a conclusory and unsupported allegation of conspiratorial purpose" is insufficient to state a valid conspiracy claim under § 1985. The Court finds Defendants' argument to be without merit. Throughout the pleadings, Plaintiffs allege that Hrvol, Richter, Brown, and Larsen made joint decisions to fabricate evidence and to arrest the Plaintiffs without probable cause for the purpose of denying Plaintiffs their constitutional rights. The fact that the specific count in question does not use the phrase "meeting of the minds" does not prohibit the claim from proceeding, given Plaintiffs' allegations that the four Defendants conspired with each other and the numerous statements of fact (which Defendants do not resist for the present motions) indicating that the four acted jointly with an intent to wrongfully convict the Plaintiffs for a crime they did not commit.

Nonetheless, to the extent that the Court has found the prosecutors absolutely immune from liability with respect to Plaintiffs' § 1983 claims, that same immunity extends to any

potential liability of the Defendants under § 1985.  *White v. Bloom*, 621 F.2d 276, 280 (8th Cir.

1980) (finding that absolute immunity on a § 1983 claim extends to a § 1985 claim).  To the

extent, however, that the Court has found that the prosecutors are not entitled to absolute

immunity on Plaintiffs' claims of lack of probable cause to arrest and fabrication/coercion of

evidence, Plaintiffs have sufficiently pled a § 1985 claim on those bases, and the prosecutors are

not entitled to absolute immunity therefor.

> c.  *State law claims.*

With regards to Plaintiffs' state law claims of False Arrest and Imprisonment (McGhee

only), Intentional Infliction of Emotional Distress, and Loss of Parental Consortium (Harrington

only), the prosecutor Defendants argue that Iowa courts use a modified *Imbler* approach in

determining whether absolute immunity will shield a prosecutor from state law claims.

Defendants cite *Gartin v. Jefferson County*, 281 N.W.2d 25 (Iowa Ct. App. 1979), for the

proposition that Iowa courts have extended absolute immunity to actions taken by prosecutors in

their administrative or investigative role.  The *Gartin* court wrote:  "[*Imbler*] did not present an

occasion to consider whether the policy reasons for granting immunity to the judicial aspects of

the prosecutorial function also require immunity for those aspects of a prosecutor's responsibility

which are administrative or investigative in nature."  *Gartin*, 281 N.W.2d at 29.  After *Gartin*

was decided, however, the United States Supreme Court clearly took up the issue of whether

absolute immunity protects administrative or investigative functions of prosecutors and

concluded that it did not.  *See, e.g.*, *Burns*, 500 U.S. at 492-96 (absolute immunity not applicable

when prosecutor advised police).  Indeed, the Iowa Supreme Court recently recognized this fact

in *Beck v. Phillips*, 685 N.W.2d 637 (Iowa 2004), when it denied absolute immunity to a

prosecutor for acts it deemed as administrative and not "intimately associated with the judicial phase of the criminal process." *Beck*, 685 N.W.2d at 645.[14]  It appears, then, that Iowa courts use precisely the same absolute immunity analysis as do the federal courts, and as is mandated by the United States Supreme Court in *Imbler*, *Buckley I*, *Burns*, and other like decisions. Defendants argument, therefore, that they should be provided with absolute immunity against Plaintiffs' state law claims fail for the same reasons it fails to protect them from many of Plaintiffs' federal claims.

For the reasons stated herein, the Court finds that Defendants' activities in arresting Plaintiffs without probable cause and coercing/fabricating witness testimony all took place prior to the point at which the prosecutor Defendants began acting as advocates, and thus, they are entitled, at best, to qualified immunity.  The acts of the prosecutors in filing the True Information, in coercing/fabricating jailhouse informant testimony, in actually presenting even fabricated or perjured evidence at trial, and in failing to produce or reveal exculpatory evidence, however, are part of the prosecutors function as an advocate, and are, therefore, entitled to absolute immunity.

2. *Matthew Wilber.*

The analysis of absolute immunity regarding Matthew Wilber's actions in 2003 is necessarily different from the analysis regarding Richter and Hrvol.  Like the other Defendants, Wilber admits all of the facts (for purposes of this motion), and thus concedes the allegations

---

[14] Defendants also cite *Hike v. Hall*, 427 N.W.2d 158 (Iowa 1988), in support of their position that a different absolute immunity analysis is applicable under Iowa law.  *Hike* was decided in 1988, well before *Burns* was decided in 1991 and *Buckley I* was decided in 1993.  The Court believes that the law used by the Iowa Supreme Court in *Beck* is the appropriate application under Iowa law, and that it mirrors federal law on the issue.

against him (notably made only by McGhee), i.e., that he knew he had no probable cause to pursue a case against either Harrington or McGhee; that he intimidated and coerced Hughes to get him to revert to his 1977 version of events and essentially recant his recantation of his 1977 testimony; that he threatened and intimidated Hughes to get him to take the Fifth Amendment so that he could claim that Hughes was "unavailable" as a witness and rely on the transcript of Hughes' 1978 trial testimony; and that he intentionally misrepresented some facts and concealed others to mislead McGhee and his attorney into believing that he had a strong case against McGhee to convince McGhee to take a plea to second-degree murder.

There is one primary difference between the actions of Wilber and those of Hrvol and Richter, however.  While a reasonable jury could conclude that Hrvol and Richter never had probable cause to even arrest the Plaintiffs, at the time of Wilber's investigation and alleged reprehensible acts, McGhee stood convicted for the 1977 first-degree murder of John Schweer. It seems certain that in light of the fact that the Iowa Supreme Court had vacated Harrington's sentence for the prosecution's concealment of exculpatory evidence, that McGhee could have petitioned the Iowa courts to have his sentence and conviction vacated on the same basis.  It is also reasonable to conclude that Wilber necessarily would have reviewed all of the 1977-78 information gathered in the case, and potentially interview witnesses and conduct his own review of the evidence to determine whether any cause existed to resist such a motion by McGhee, or to determine whether he possessed sufficient evidence to retry either Harrington or McGhee. Importantly, however, during the time that Wilber conducted his investigation and review of the evidence, McGhee was still serving his sentence under his 1978 conviction for the first-degree murder of John Schweer, that is, his conviction had not been vacated by the Iowa Supreme Court

as had Harrington's.

Harrington's sentence was vacated by the Iowa Supreme Court on April 18, 2003.  *See Harrington v. State*, 659 N.W.2d 509 (Iowa 2003).  On September 2, 2003, McGhee signed a letter agreement with Wilber and the Pottawattamie County Attorney's Office providing that McGhee would enter an *Alford* plea to murder in the second degree and be sentenced to 25 years, with credit for time served.  It was agreed in the plea arrangement that the Pottawattamie County Attorney's Office would stipulate to the granting of McGhee's pending motion for summary judgment in his habeas proceedings, and indeed, summary judgment was entered in favor of McGhee and a state court judge vacated his 1978 sentence and granted him a new trial on September 2, 2003.  McGhee appears to be seeking § 1983 damages for Wilber's actions taken between April 18, 2003 and September 2, 2003.   McGhee also appears to be seeking § 1983 damages for Wilber's actions taken between September 2, 2003 and the date McGhee entered a plea to second-degree murder on October 23, 2003.  This Court has previously held that any damages McGhee could assert under § 1983 as arising or flowing from his conviction on October 23, 2003 are barred by the *Rooker-Feldman* doctrine.

With regard to Wilber's allegedly unlawful actions between the time Harrington's 1978 conviction was vacated and the time that McGhee's sentence was vacated, McGhee offers no evidence or law that would support a causal link between Wilber's conduct and any constitutional deprivation McGhee may have experienced.  "Liability under § 1983 requires a causal link to, *and direct responsibility for*, the deprivation of rights" protected by the Constitution.  *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990) (emphasis added); *see also Gordon v. Hansen*, 168 F.3d 1109, 1113 (8th Cir. 1999) ("Section 1983 . . . requires a

causal relationship between a Defendants' conduct and a plaintiff's constitutional deprivation. Absent such a relationship, the defendant is entitled to dismissal." (citations omitted)).  Between April 18 and September 2, 2003, the only cause of McGhee's incarceration was the fact of his 1978 conviction and life sentence for the first-degree murder of John Schweer.  To the extent that McGhee argues that Wilber knew that he was entitled to dismissal during that time frame, McGhee offers no law demonstrating an affirmative responsibility of Wilber to concede to McGhee's request to have his sentence and conviction vacated simply because Harrington's sentence and conviction were vacated.  Indeed, even to the extent that Wilber may have realized through his review of the 1977-78 evidence and through his own investigation into the matter that he had no probable cause to retry McGhee for Schweer's murder, it is clear that Wilber's actions were part and parcel of his role as the Pottawattamie County prosecutor and that such actions were taken in furtherance of that role.

Defendants Richter and Hrvol cited to *Reasonover v. St. Louis County*, 477 F.3d 569, 579-80 (8th Cir. 2006), for the proposition that a prosecutor is immune from liability for interviewing witnesses because that function is prosecutorial rather than investigatory.  The Eighth Circuit in *Reasonover* found that "[not all of an advocate's work is done in the courtroom.  For a lawyer to properly try a case, he must confer with witnesses, and conduct some of his own factual investigation."   With regard to Hrvol and Richter, the facts of *Reasonover* were distinguishable.   The prosecutor in *Reasonover* only had the role of prosecuting the case. He did not participate in fabricating evidence and interviewed witnesses only after they had been brought to him by the police, as opposed to seeking out and interviewing witnesses himself.  *See id*. at 577 ("Police working independently on Lyner's case later brought Lyner to the prosecutor,

Goldman, because Lyner told the police she had information about the Buckley murder.").

Likewise, other cases cited by Hrvol and Richter distinguish their cases from Wilber's.  In

*Lewellen v. Raff*, 843 F.2d 1103 (8th Cir. 1988), the prosecutors again were not charged with

acting in an investigatory rather than an advocatory manner because the alleged wrongful

conduct, disclosure of defamatory material, was done "during judicial proceedings."  *Lewellen*,

843 F.2d at 1113.  And in *Anderson v. Larson*, 327 F.3d 762 (8th Cir. 2003), the prosecutor was

alleged to have communicated with an informant in violation of rules governing attorney

conduct.  *Anderson*, 327 F.3d at 768.  In *Anderson*, however, the communication took place after

police had brought the informant to the prosecutor, and the prosecutor, himself, only prepared a

cooperation agreement with the informant.  *Id*. at 765.  There was no allegation that the

prosecutor personally undertook any activity that could have been deemed investigatorial, unlike

Richter and Hrvol in the present case.  *Id*.

Unlike Richter and Hrvol, Wilber's review of the 1977-78 evidence, his interviewing of

witnesses who testified in 1978, and any alleged bad acts that he may have taken in performing

those functions, were necessary to his determination of whether to resist McGhee's request for

summary judgment in his habeas proceedings and to determine whether a retrial of either

Harrington or McGhee would be possible.  Additionally, Wilber's investigation into Schweer's

murder, and any unlawful acts he may have taken in relation thereto, could also reasonably be

said to have been taken to bring a conclusion to the matter, either by stipulating to McGhee's

request to vacate his sentence, by determining whether retrial was feasible, or by fashioning a

plea arrangement with McGhee.  Regardless of which of the three formed the basis for Wilber's

actions, each is intimately associated with the prosecutor's function as a prosecutor and thus

would warrant absolute immunity.  *See Myers*, 810 F.2d at 1446 (finding that a "prosecutor's activities in the plea bargaining context" warrant absolute immunity) (citing *Taylor v. Kavanagh*, 640 F.2d 450, 453 (2d Cir. 1981) (rejecting absolute immunity despite misrepresentations made during the negotiation of a plea arrangement)).[15]

With regard to Wilber's allegedly wrongful actions after McGhee's conviction was vacated on September 2, 2003, the record shows that McGhee was released on bond, but was subject to various conditions which, according to McGhee, constituted a further deprivation of his constitutional rights.  Further, McGhee claims that Wilber misrepresented, concealed, and manipulated the evidence between September 2, 2003 and the date his plea was accepted on October 23, 2003.  These claims against Wilber also must fail under the doctrine of absolute immunity.  First, any alleged deprivation of liberty Plaintiff alleges stemmed solely from the fact that, after his 1978 conviction was vacated, he remained charged and was subject to retrial for Schweer's murder.  Wilber is absolutely immune for bringing charges against McGhee and for any alleged damages that may have arisen from the charge.  *See Imbler*, 424 U.S. at 424-28 (finding prosecutor absolutely immune for "initiating a prosecution").  Further, to the extent that Wilber allegedly withheld exculpatory evidence and misrepresented or lied about inculpatory

---

[15] To the extent McGhee argues that Wilber had no probable cause, and thus could not be entitled to absolute immunity under *Buckley I*, the Court must disagree.  A grand jury indictment, even if based on unreliable or perjured testimony, establishes the existence of probable cause as a matter of law.  *See Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 419 (D.D.C. 1991); *Willis v. Cool*, 546 F. Supp. 458, 463 (D. Mo. 1982).  While this case represents a unique procedural posture, it would seem reasonable to extrapolate that McGhee's conviction, by a jury of his peers, evaluating his guilt by the standard of "beyond a reasonable doubt" would also, at a minimum, support probable cause for Wilber to have begun reevaluating the evidence in the case as part of his prosecutorial functions.  To conclude that Wilber had to start the probable cause analysis anew before he could review the 1977-78 evidence in determining an appropriate course of action would defy logic and is without any precedential authority.

evidence to wrongfully induce McGhee into going through with his plea to a charge of second-degree murder, such acts were undertaken in his role as a prosecutor attempting to either prepare for a retrial or to conclude a plea arrangement.  *See Myers*, 810 F.2d at 1446.  Finally, to the extent that Wilber is accused of lying to the state court judge regarding whether the Minutes of Testimony against McGhee could be proven, such misrepresentations, omissions, or lies occurred during the course of a judicial proceeding (the plea hearing), and are protected by absolute immunity.  *See, e.g., Burns*, 500 U.S. at 490-91 (prosecutor absolutely immune for actions at probable cause hearing); *Brodnicki*, 75 F.3d at 1266 (finding prosecutor entitled to absolute immunity when acting as an advocate for the state in a criminal prosecution).  Because the Court finds that Wilber was at all times acting in his role as a prosecutor, and was at all stages of the proceedings undertaking the functions of an advocate, Wilber is entitled to absolute immunity with regard to both McGhee's state and federal claims.[16]

## B.  *Qualified Immunity*

Under the doctrine of qualified immunity, "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  In considering whether an official may rely on qualified immunity to escape

---

[16]  The Court notes that this analysis does not apply to McGhee's claim of defamation against Wilber.  That claim will be discussed in a later part of this order.  Additionally, McGhee's claims against Pottawattamie County, to the extent it is claimed liable for Wilber's actions on an indemnity theory, must also be dismissed as an extension of Wilber's absolute immunity.  *See Schenecker v. City of Sioux City*, 107 F.3d 662, 664 (8th Cir. 1997) (finding that prosecutorial immunity on a § 1983 claim extends to the county employer) (citing *Burr v. City of Cedar Rapids*, 286 N.W.2d 393, 396 (Iowa 1979)).

civil liability, the Court measures the objective legal reasonableness of the unconstitutional act against the clearly established law at the time of the action. *Anderson v. Creighton*, 483 U.S. 635, 639 (1986) (citing *Harlow,* 457 U.S. at 819). Qualified immunity, however, does not provide government officials with a "license to lawless conduct." *Harlow,* 457 U.S. at 819. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate. . ., [b]ut where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.* (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). Essentially, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The qualified immunity analysis is a two-step process. *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000). The Court must first determine whether Plaintiffs have "asserted a violation of a constitutional or statutory right." *Id.* (citations omitted). Next, the Court looks at whether that right was clearly established at the time the alleged unlawful act occurred. *Id*. at 909 (citation omitted). For a right to be clearly established, the law must give the official "fair warning" that his or her conduct would violate an individual's rights when the action was taken. *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). In making its inquiry, the Court is reminded that state officers who "seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz v. Economou*, 438 U.S. 478, 506 (1978).

1. *Richter and Hrvol.*

a. *Plaintiffs' Section 1983 claims.*

Defendants make no argument or citation with regard to Plaintiffs' claims that they were arrested without probable cause.  With regard to the allegation that Richter and Hrvol sought arrest of the Plaintiffs without probable cause, it is plain that "[t]he Fourth Amendment right of citizens not to be arrested without probable cause is indeed clearly established."  *Kuehl*, 173 F.3d at 649.  Ample law predating Schweer's murder demonstrates that the right to be free of such a constitutional violation was clearly established at the time Harrington and McGhee were arrested.  *See*, *e.g.*, *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (holding that no private citizen may be subject to arrest unless "the facts and circumstances within [the knowledge of law enforcement] and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable cause in the belief that 'an offense has been or is being committed'").  As the Court has previously concluded that a reasonable jury could find that Defendants acted without probable cause in their arrest and pursuit of Plaintiffs, the Court must deny qualified immunity on this portion of Plaintiffs' § 1983 claim.  *See Womack v. City of Bellefontaine Neighbors*, 193 F.3d 1028 (1999) (police officers not entitled to qualified immunity where they disregarded plainly exculpatory evidence in their probable cause evaluation).

With regard to the Defendants' claim that they are entitled to qualified immunity for concealing or failing to turn over *Brady* evidence, the Court finds the argument moot in light of its earlier conclusion that Richter and Hrvol are entitled to absolute immunity on the issue.  With regard to Defendants' claim that they are entitled to qualified immunity for fabricating/coercing evidence, the Court preliminarily notes that Defendants' concession of all facts alleged by

Plaintiffs is insufficient to carry their burden of proof on their entitlement to qualified immunity. *See Mahers v. Harper*, 12 F.3d 783, 785 (8th Cir. 1993) ("Qualified immunity is an affirmative defense, so Defendants have the burden of pleading and proving the defense.").  Defendants cite only one case, *Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994) (hereinafter referred to as "*Buckley II*"), supporting their asserted position that Richter and Hrvol are entitled to qualified immunity for bad acts taken even in an investigatory capacity, including coercing and coaching witness testimony, and paying or promising leniency to witnesses in exchange for false testimony.  Because the Court has already concluded that Hrvol and Richter are entitled to absolute immunity for all bad acts alleged to have occurred after the True Information against Plaintiffs was filed (including coercing jailhouse informant testimony and concealing exculpatory evidence), the Court limits its analysis to whether Hrvol and Richter are entitled to qualified immunity for its pre-True Information coercion of witnesses and fabrication of evidence.

In the Seventh Circuit's *Buckley II* decision, a criminal capital murder defendant, Buckley, had the charges against him dismissed after his first trial resulted in a hung jury, and after a retrial was unable to commence due to the death of the prosecution's primary witness. *See Buckley v. Fitzsimmons*, 919 F.2d 1230, 1234-35 (7th Cir. 1990) (referenced in the 1994 *Buckley II* decision as providing the factual background for the case).  Buckley served three years in prison because he had been unable to post bond, and eventually brought a § 1983 action contending "that almost everyone connected with the investigation and prosecution violated his constitutional rights and should be made to pay damages." *Id*. at 1235.  In his complaint against the prosecutors and police, Buckley "narrate[d] a tale of coercive interrogations in 1983 and

1984 by police and prosecutors, arm-twisting of experts that led them to 'find' similarities between his shoes and the bootprint, misleading presentations to the grand jury, indictment, and stubborn refusal to dismiss the case despite [another person's] confession." *Id*. at 1236.  In attempting to parse out Buckley's allegations, the Seventh Circuit found that his accusations boiled down to a claim that prosecutors repeatedly interrogated witnesses and paid them for statements implicating Buckley, coerced witnesses, and should have known that witness accusations of Buckley were "obviously false." *Buckley II*, 20 F.3d at 794.

In concluding that Buckley had not had his constitutional rights violated, the Seventh Circuit found that the "persons aggrieved" by the prosecutor's coercion of witnesses were the witnesses themselves, not Buckley. *Id*.  "Overbearing tactics violate the right of the person being interrogated to be free from coercion.  Buckley cannot complain that the prosecutors may have twisted Cruz's arm, any more than he can collect damages because they failed to read Cruz *Miranda* warnings. . . .   Rights personal to their holders may not be enforced by third parties." *Id*. at 794-95.  Defendants urge the Court to follow *Buckley II* and find that Plaintiffs have not asserted a violation of their *own* constitutional or statutory rights, such that Defendants should receive qualified immunity on their claims of fabricating and coercing evidence.

The Court finds the *Buckley II* decision unpersuasive,[17] and finds that Plaintiffs' claims that the prosecutors manufactured, coerced, and fabricated evidence against them is sufficient to state a substantive due process claim.  Substantive due process is violated where the state's deprivation of certain fundamental liberty interests is so shocking to the conscience that no

---

[17] It is worth noting that the *Buckley II* decision is a Seventh Circuit disposition, and is, therefore, not binding on this Court in the first instance.

amount of procedural safeguards could pass constitutional muster. *See Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (finding a substantive due process claim "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.").   In *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001), a case cited by Defendants in their reply brief to emphasize that the Court should adopt the Seventh Circuit's *Buckley II* analysis, authorities were investigating the brutal murder of a woman in Aurora, Missouri. *Wilson*, 260 F.3d at 949.  Just days after the murder, Wilson was interviewed by police twice, but consistently stated that he had been shopping with his mother at the time of the crime. *Id*.  Law enforcement also focused their investigation on another young man, Gary Wall, because he seemed to know certain details of the crime before those details had been made public. *Id*.  Authorities knew that Wall was slightly mentally impaired and that he was a "very skilled liar." *Id*.  Wall told authorities that Wilson had confessed to him that he had committed the crime. *Id*.  Despite concerns over Wall's credibility, police picked up Wilson under false pretenses and interrogated him about the murder. *Id*.  They told Wilson that Wall had implicated him in the murder, and over the course of a four hour interrogation, eventually elicited a "collection of discombobulated facts about the murder [which evolved] into a confession." *Id*.   Wilson eventually entered an *Alford* plea to avoid the death penalty on a murder charge and spent more than nine years in prison. *Id*.  After conducting an independent investigation, the Governor of Missouri granted Wilson a full pardon, finding that it was "clear he did not commit the crime for which he has been incarcerated." *Id*.  Wilson brought a § 1983 claim against the officers, alleging, amongst other things, that they violated his Fourteenth Amendment Due Process rights by coercing a false inculpatory statement from Wall

and using this unreliable, manufactured evidence against him.  *Id*. at 950.  The district court denied a motion for summary judgment by police on the basis of qualified immunity.  *Id*.

The police argued to the Court of Appeals that Wilson had failed to state a cognizable claim under the Seventh Circuit's *Buckley II* decision, because he was attempting to assert the constitutional rights of a third party.  *Id*. at 954.  The Court rejected the claim, finding that the "district court correctly noted that this claim is not an attempt by Wilson to assert Wall's rights, but rather a claim that the appellants knowingly used false or unreliable evidence (the coerced statement from Wall) against Wilson at his criminal proceedings."  *Id*.  "If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated."  *Id*. (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).  Defendants here would have the Court believe that the Eighth Circuit *Wilson* decision endorsed the *Buckley II* approach, because it "acknowledged and did not reject" it. Defs.' Reply Br. at 10.  On the contrary, the Eighth Circuit merely found *Buckley II* to be inapposite "because the Defendants were prosecutors who enjoyed absolute immunity for conduct *at trial*."  *Wilson*, 260 F.3d at 955 n.6 (emphasis added) (noting that "[t]he [*Buckley II*] court reasoned that since the violation, if any, to the plaintiff occurred when the statements were introduced at trial the Defendants were [absolutely] immune").

The Eighth Circuit's *Wilson* decision demonstrates the insufficiency of *Buckley II* to provide sufficient clarity as to whether the prosecutors in that case manufactured evidence while acting as advocates or as investigators.  As a general matter, immunity may apply to the former, but not the latter.  Indeed, Judge Fairchild, in his *Buckley II* dissent, implied that the majority based their opinion on the conclusion that the prosecutors merely "consulted a number of

-71-

witnesses to find support for their theory," when in fact, reading Buckley's complaint as a whole,

it alleged that the prosecutors actually manufactured bootprint evidence and suborned perjury.

*Buckley II*, 20 F.3d at 800 (Fairchild, J., dissenting).  In rejecting the majority's conclusion,

Judge Fairchild stated:

> I respectfully disagree with the majority's conclusion that "the location of the injury is dispositive . . . for the bootprint evidence and the allegedly coerced confessions alike." As I understand the "location of the injury" concept, it is that because a wrongful act does not ripen into a § 1983 cause of action until it causes an impairment of a constitutional right, a prosecutor is not liable for the result of his wrongful act, not within the scope of advocacy, where the immediate cause of the impairment is an act as to which the prosecutor is immune.  Here, however, the claim is not only that the prosecutors caused injury by using fabricated or perjured evidence in seeking indictment and at trial, but it seems to be that there would not have been either an indictment or trial if some of the prosecutors had not fabricated evidence and suborned perjury.

*Id*. (internal citation omitted).  While agreeing that a prosecutor whose only contribution to

Buckley's loss of liberty was the use of even manufactured evidence at trial, the dissenting judge

concluded that the prosecutors should not be immune from § 1983 liability "for their non-

advocacy wrongful conduct if Buckley can prove that indictment and trial would not have

occurred in the absence of the product of the wrongful conduct."  *Id*.  "Subornation of perjury is

not advocacy and prosecutors are not immune from liability even though the conduct did not

ripen into a § 1983 cause of action except by use of the perjured testimony at trial."  *Id*.

Reading *Buckley II* together with *Wilson*, the Court finds it difficult to reconcile

Defendants' proposition that a prosecutor who at trial uses false evidence that he, himself,

manufactured would be immune from liability when a police officer that manufactures false

evidence, subsequently used by a prosecutor at trial, would be liable.  The Second Circuit Court

of Appeals attempted to resolve this apparent contradiction in *Zahrey v. Coffey*, 221 F.3d 342 (2d

Cir. 2000).  In *Zahrey*, the Second Circuit Court of Appeals denied qualified immunity to a

prosecutor who allegedly fabricated evidence against a criminal defendant, identifying the right

at issue as "the right not to be deprived of liberty as a result of the fabrication of evidence by a

government officer acting in an investigating capacity."  *Zahrey*, 221 F.3d at 349.  The *Zahrey*

court found that "the right at issue is a constitutional right, provided that the deprivation of

liberty of which [the § 1983 plaintiff] complains can be shown to be the result of the

[prosecutor's] fabrication of evidence."  *Id.*  The court found that where a prosecutor was both

accused of fabricating evidence and subsequently using that fabricated evidence at trial, resulting

in the plaintiff's incarceration, the liberty deprivation was directly linked to the fabrication of

evidence while the prosecutor was acting in an investigatory capacity, such that the prosecutor

could not be shielded from liability for the initial act of fabricating evidence.  *Id*. at 353-54.  This

was true even though the prosecutor's act of actually using the fabricated testimony at trial was

shielded by absolute immunity:

> If [the prosecutor] had fabricated evidence and handed it to another prosecutor who
> unwittingly used it to precipitate [the plaintiff's] loss of liberty, the prosecutor would
> be liable for the initial act of fabrication.  It would be a perverse doctrine of tort and
> constitutional law that would hold liable the fabricator of evidence who hands it to
> an unsuspecting prosecutor but exonerate the wrongdoer who enlists himself in a
> scheme to deprive a person of liberty.  If, as alleged, Coffey fabricated evidence in
> his investigative role, it was at least reasonably foreseeable that in his advocacy role
> he would later use that evidence before the grand jury, with the likely result that
> Zahrey would be indicted and arrested.  The complaint adequately alleges that the
> deprivation of Zahrey's liberty was the legally cognizable result of Coffey's alleged
> misconduct in fabricating evidence.

*Id*. at 353-54 ("Deeming the chain of proximate causation broken by the prosecutor's use of

evidence he himself fabricated would also, in practical effect, enlarge the scope of the prosecutor's absolute immunity."). The *Zahrey* court recognized the tension between its decision and that of the Seventh Circuit in *Buckley II*:

> We recognize that this conclusion is in tension, if not conflict, with the majority opinion by Judge Easterbrook for the Seventh Circuit in [*Buckley II*]. In [*Buckley II*], which had facts similar to those alleged here, Judge Easterbrook concluded that the plaintiff had failed to state a claim, even though he "unquestionably suffered a loss of liberty when he was arrested and imprisoned pending trial." He reasoned that a prosecutor violates no constitutional right of a defendant by unlawfully obtaining testimony from a potential trial witness that is known to be false. He acknowledged that a prosecutor using such false testimony at trial could violate the defendant's constitutional rights, but noted that for this act the prosecutor enjoyed absolute immunity. We agree with Judge Easterbrook (just as we agree with Judge Preska in the pending case) that the investigatory act of obtaining evidence known to be false is not itself a violation of a constitutional right. But we disagree with the further point that no valid section 1983 claim is stated where a deprivation of liberty results from the initial act of obtaining evidence known to be false, at least in a case like [*Buckley II*] and the pending case where the same person who fabricated the evidence foreseeably used it.

> We cannot be certain whether the Seventh Circuit rejected Buckley's claim on the ground that the prosecutor's investigatory misconduct did not violate any constitutional right or on the legally distinct ground that the prosecutor's investigatory misconduct was not the legally cognizable cause of the plaintiff's ultimate deprivation of liberty. Several statements in the three Seventh Circuit opinions in the *Buckley* litigation emphasize the issue of causation. The rationale for the Seventh Circuit's final decision in [*Buckley II*] appears to be squarely grounded on the theory that the prosecutor's alleged misconduct in fabricating evidence was not the cause of a liberty deprivation. Discussing a prior decision in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), which had sustained a claim against a police officer who misled a prosecutor by presenting false evidence, Judge Easterbrook wrote:

> > Things would be different [i.e., no cause of action], we implied [in *Jones*], . . . if the prosecutors themselves had concocted the evidence, for then the immunized prosecutorial decisions [to use the evidence] would be the cause of the injury.

> Judge Fairchild dissented on this point. We do not see the implication in *Jones* that Judge Easterbrook observes, and, even if it were evident, we would follow the contrary decisions of the Fifth Circuit in *Thomas* and our own decision in *White*, and

-74-

would consider Judge Fairchild's dissent in [*Buckley II*] persuasive.

*Id*. at 354-55 (some internal citations omitted).

In *Thomas v. Sams*, 734 F.2d 185 (5th Cir. 1984), a decision cited by the *Zahrey* court, the defendant in a § 1983 action was a mayor who was also ex officio a magistrate and municipal judge. *Thomas*, 734 F.2d at 187. The mayor signed a criminal complaint against the local university's president, and then, in his capacity as magistrate, issued a warrant for the president's arrest and set bond. *Id*. While the actions of the mayor in his judicial capacity as magistrate were found to be shielded by judicial immunity, his actions in investigating and swearing out the criminal complaint were not, as such acts were not part of a magistrate's judicial function. *Id*. at 189-90. In rejecting the mayor's argument that he could not be held liable under § 1983 because his investigatory acts did not "result in 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States,'" the Fifth Circuit found that issuance of the warrant did not break the chain of causation between the early un-immunized acts and the later immunized acts:

> Sams did not choose to present the complaint to an impartial intermediary. He deliberately avoided doing so, despite the availability of state judges and justices of the peace who had authority to sign the warrant. Under these circumstances the issuance of the arrest warrant was not an intervening cause: There was no "independent decision" to break the causal chain and to insulate him as the initiating party. Sams acted with "personal animosity, malice, and a lack of good faith" in undertaking the acts that enabled him to take up his magistrate's pen and sign the warrant. He may not innoculate his conduct by that pen-stroke.

*Id*. at 191. The Court finds the reasoning of *Zahrey* and *Thomas* compelling and adopts the reasoning contained therein in its conclusion that the prosecutors' alleged fabrication/coercion of

-75-

evidence caused Plaintiffs' deprivation of liberty by denying them due process, despite the fact that the prosecutors' acts of using the fabricated/coerced evidence *at trial* is shielded by absolute immunity. *Wilson*, 260 F.3d at 954 ("If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated."). Plaintiffs have, therefore, asserted a cognizable violation of their own constitutional or statutory rights.

This holding squares well with *Moran v. Clarke*, a 2002 Eighth Circuit Court of Appeals decision. 296 F.3d 638 (8th Cir. 2002) (en banc). In that case, Moran, a St. Louis police officer, sued the St. Louis Board of Police Commissioners and various police officials and officers, alleging malicious prosecution and violation of his substantive due process rights. *Id.* at 639. The case arose after Moran was charged with felony assault, misdemeanor assault, and conspiracy to hinder prosecution in regards to a struggle with a mentally impaired teenager. *Id.* at 641. Moran was acquitted of all criminal charges and thereafter brought his civil claim. *Id.* at 642. In determining whether Moran had adequately stated a substantive due process violation under § 1983, the Court pointed out that "[t]he Fourteenth Amendment guarantees 'substantive due process which prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Id.* at 643 (citing *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998)). "To that end, the Fourteenth Amendment prohibits 'conduct that is so outrageous that it shocks the conscience or otherwise offends "judicial notions of fairness, or is offensive to human dignity."'" *Id.* (internal citations and quotations omitted).

Thus, to the extent that Defendants urge that their conduct in fabricating and coercing witness testimony is not shocking to the conscience, such that they should be entitled to qualified

immunity, the Court must disagree.  In analyzing whether the conduct at issue is sufficiently egregious to deny qualified immunity, it is well established that "[m]ere negligence is never sufficient.  Proof of intent to harm is usually required, [and] in some cases, proof of deliberate indifference, an intermediate level of culpability, will satisfy this substantive due process threshold."  *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005) (citing *County of Sacramento v. Lewis*, 523 U.S. 833,  848 (1998) ("[We] have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. . . .  It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.")).   Moran, much like the Plaintiffs in the present case, claimed in regard to his due process claim that police engaged in a purposeful conspiracy to manufacture, and did in fact, manufacture false evidence against him to falsely formulate a pretense of probable cause.  *Id*. at 647.  In concluding that he had stated a cognizable due process violation, the court held:  "Although the Fourth Amendment covers seizures, which would be satisfied by Moran's arrest, law enforcement's intentional creation of damaging facts would not fall within its ambit."  *Id*.  Noting that "acts arising out a defendant's deliberate indifference will not sustain a substantive due process claim, 'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.'"  *Id*.  (quoting *Lewis*, 523 U.S. at 849).

On the issue of whether the right allegedly violated was clearly established, the Court also must conclude that it was.  To be clearly established, there need not be a case decided on all

fours with the present factual circumstances.  *Vaughn v. Ruoff*, 253 F.3d 1124, 1130 (8th Cir.

2001).  Rather, it need only be apparent from pre-existing law that the conduct is unlawful.

*Anderson*, 483 U.S. at 640.  Long before the violations alleged in the present case, the Supreme

Court determined that presenting fabricated testimony to a jury is a violation of a criminal

defendant's right to a fair trial.  *See Napue*, 360 U.S. at 270 ("The principle that a State may not

knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit

in any concept of ordered liberty, does not cease to apply merely because the false testimony

goes only to the credibility of the witness."); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)

(stating due process is "a requirement that cannot be deemed to be satisfied by mere notice and

hearing if a State has contrived a conviction through the pretense of a trial which in truth is but

used as a means of depriving a defendant of liberty through a deliberate deception of court and

jury by the presentation of testimony known to be perjured.").[18]  Accordingly, the Court

concludes that Plaintiffs' claims that their rights to due process of law were violated by the

prosecutors' fabrication/coercion of witness testimony while acting in their investigatorial

capacity is cognizable and was well-established at the time of the alleged violations.

> b. *Plaintiffs' section 1985 conspiracy claim.*

Just as with Plaintiffs' § 1983 claims, the Court concludes that, to the extent it has found

the prosecutors absolutely immune from liability with respect to Plaintiffs' § 1983 claims, that

same immunity extends to any potential liability of the Defendants under § 1985.  *White v.*

*Bloom*, 621 F.2d at 280.  To the extent, however, that the Court has found that the prosecutors

---

[18]  Both *Napue* and *Mooney* were cited in *Wilson*, 260 F.3d at 954-55.

are not entitled to either absolute or qualified immunity (probable cause and fabrication/coercion of evidence), Defendants are not immune from liability on Plaintiffs' § 1985 claim. Additionally, Plaintiffs have sufficiently pled a § 1985 claim on those bases.

2.      *Brown and Larsen.*

Defendants Brown and Larsen, the police investigating Schweer's murder in 1977 and 1978, claim that they are entitled to qualified immunity on Plaintiffs' claims against them for arresting them without probable cause, concealing exculpatory evidence, and for fabricating/coercing evidence.  *See* Clerk's No. 90 in Harrington (Larsen, Brown and City of Council Bluffs' Motion for Partial Judgment on the Pleadings); Clerk's No. 100 in McGhee (Larsen, Brown and the City of Council Bluffs' Motion for Judgment as a Matter of Law).

a.      *Section 1983 claims.*

First, with regard to the Plaintiffs' claim that their right to not be arrested without probable cause was violated, the Court has previously found with regard to Richter and Hrvol that Plaintiffs have asserted a cognizable violation of a constitutional right that was clearly established at the time of their arrest.  The reasoning articulated *supra* applies to the officers here in question, and no further analysis is necessary to deny qualified immunity on this claim.  With regard to Defendants' claim that McGhee's 2003 conviction for the second-degree murder of John Schweer established probable cause as a matter of law, this Court previously declined to adopt Defendants' position and declines to change its reasoning in regard to the present

-79-

motions.[19]

_____

[19] In its previous ruling, the Court stated the following:

> The difficulty with Plaintiff's position relates to his allegations that the various defendants acted without probable cause.  In *Williams v. Shario*, 93 F.3d 527 (8th Cir. 1996), the Eighth Circuit Court of Appeals rejected a § 1983 claim founded on a lack of probable cause on the basis that the § 1983 plaintiff's "guilty plea forecloses a section 1983 claim for arrest without probable cause." *Id.* at 528-29*; see also Howell v. Tanner*, 650 F.2d 610, 615 n.6 (5th Cir. 1981) (a conviction conclusively establishes that an arrest was made with probable cause)*; Shkrobut v. Chicago*, No. 04C8051, 2005 WL 2787277, at *2 (N.D. Ill. Oct. 24, 2005) ("A criminal conviction based upon a guilty plea conclusively establishes for purposes of a subsequent civil proceeding that the defendant engaged in the criminal act for which he was convicted"); *Padro v. Heffelfinger*, 110 F.R.D. 333 (E.D. Pa.1986) (guilty plea sufficient to establish probable cause for arrest and, therefore, Plaintiff cannot establish a Section 1983 claim as to lack of probable cause for the arrest).   Thus, for purposes of issue preclusion, it could reasonably be said that the issue of probable cause is identical in the two actions.  McGhee argues, however, that his plea and ultimate conviction in 2003 were fraudulently obtained.  This is so, McGhee claims, because the only part of the Minutes of Testimony that incriminated McGhee stemmed from the testimony of Kevin Hughes, which testimony Hughes recanted the day before McGhee's plea hearing.  Indeed, McGhee alleges that Wilber was entirely aware of Hughes' recantation, but nonetheless represented to the court at the plea hearing that the Minutes of Testimony were true, correct and provable.  *See* Restatement of Torts § 667 ("The conviction of the accused by a magistrate or trial court although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means.").
>
>           In *Haring v. Prosise*, the Supreme Court reviewed "the principles governing our determination whether a § 1983 claimant will be collaterally estopped from litigating an issue on the basis of a prior state-court judgment." 462 U.S. 306, 313 (1983).  Noting that the full faith and credit statute, 28 U.S.C. § 1738, "generally requires 'federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so,'" the Court pointed out, however, that a state-court judgment will nonetheless not be given collateral estoppel effect where "'the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court.'" *Id.* (quoting *Allen v. McCurry*, 449 U.S. 90, 96, 101 (1980)).  "Moreover, additional exceptions to collateral estoppel may be warranted in § 1983 actions in light of the 'understanding of § 1983' that 'the federal courts could step in where the state courts were unable or unwilling to protect federal rights.'"  *Id.* at 313-14 (quoting

The Court next turns to Plaintiffs' allegation that Larsen and Brown concealed exculpatory evidence, including eight police reports that contained information about an alternative suspect, and concealed the fabrication/coercion of witness testimony.  Defendants concede that Plaintiffs have stated a valid constitutional claim under *Brady*, but argue that in 1977-78, there was no law that would arguably place a law enforcement officer on notice that failing to turn over exculpatory evidence could be a constitutional deprivation.  Thus, Defendants argue that the constitutional right was not well-established at the time it was violated.  The Court must agree.

In *Clemmons v. Armontrout*, Nos. 05-4140, 06-1099, 2007 WL 438768 (8th Cir. Feb. 12, 2007), the Eighth Circuit Court of Appeals affirmed that the "suppression by the prosecution of

---

*Allen*, 449 U.S. at 101).  Thus, "[i]f the state courts would not give preclusive effect to the prior judgment, 'the courts of the United States can accord it no greater efficacy' under § 1738."  *Id*. at 314 nn. 6,7 (noting additional exceptions, such as when "'special circumstances warrant an exception to the normal rules of preclusion'" or when "'controlling facts or legal principles have changed significantly since the state-court judgment.'" (citations omitted)).

McGhee asserts that this is precisely the type of situation where Iowa courts would not give preclusive effect to the probable cause finding established by McGhee's guilty plea, in light of the fact that Wilber did not inform either McGhee or the court of conviction that Kevin Hughes had recanted his testimony implicating McGhee in the murder of John Schweer.  Hence, the state court was essentially "unable" to protect McGhee's federal rights due to Wilber's fraudulent conduct.  The Court agrees.  "A fraudulent concealment of facts which would have caused the judgment not to have been rendered will constitute extrinsic fraud under Iowa law."  *Bradley v. Board of Trustees of Washington Township*, 425 N.W.2d 424, 425 (citing *Scheel v. Superior Mfg. Co.*, 89 N.W.2d 377, 384 (1958)).  Extrinsic fraud is necessary to vacate a judgment under Iowa law, and when it is present, "the use of res judicata rules may be suspended."  *Id*. at 425.  In light of Iowa law on this type of situation, the Court does not believe that the Iowa courts would give preclusive effect to the issue of probable cause, even if that issue is fundamentally the same in both the state and federal cases.

evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Clemmons*, 2007 WL 438768, at * 3 (citing *Brady,* 373 U.S. at 87).   The Court also stated, however, "that while '[t]he *Brady* doctrine imposes an absolute duty on the prosecutor to produce all materially favorable evidence in the State's possession,' the Court 'has never imposed this absolute duty on law enforcement officials other than the prosecutor.'" *Id*. (quoting *Villasana v. Wilhoit*, 368 F.3d 976, 979 (8th Cir. 2004)).

Plaintiffs cite *Villasana* for the proposition that police are not protected by qualified immunity when they withhold material, exculpatory evidence in bad faith, i.e., with the intent of depriving the defendant of a fair trial.  McGhee's Resistance to Defs.' Motion for Judgment as a Matter of Law at 6.  In *Villasana*, the question presented was whether laboratory technicians could receive qualified immunity for failing to disclose test documents to either the prosecutor or a criminal defendant.  *Villasana*, 368 F.3d at 977.  The Court found that the lab technicians were not entitled to qualified immunity, but that they were nonetheless not subject to liability for a *Brady* violation because *Brady* has never been held to extend to laboratory technicians an obligation to disclose exculpatory evidence to the prosecutor or a defendant.  *Id*. *Villasana's* discussion of liability of police officers for failing to disclose *Brady* evidence, however, noted that those cases that have extended liability to police for failure to disclose exculpatory evidence have all been based on "claims of intentional or bad faith failure to disclose *Brady* material *to the prosecutor or* to the defense."  *Id*. at at 980 (emphasis added).  This finding is consistent with a long line of cases that have imposed liability on police only when they fail to turn exculpatory evidence over to the defense *and* the prosecutor.  *See Mowbray v. Cameron County, Tx*., 274

F.3d 269, 278 (5th Cir. 2001) ("[O]ur research reveals [] no case extending *Brady* to police officers or lab technicians."); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) (under a qualified immunity analysis, concluding that it was clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information); *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc) (declining to extend liability to police for failure to disclose exculpatory evidence "[b]ecause police knowledge is plainly imputed to the prosecution for purposes of the prosecutor's *Brady* duties, the prosecutor bears the responsibility for implementing procedures designed to ensure that police officers turn over all evidence to him.") (citing *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995)); *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996) (although investigators have no *Brady* obligation to turn over exculpatory evidence to the defense, they have a duty, under *Brady*, to turn over such evidence to the prosecutor); *Jones*, 856 F.2d at 993 (in § 1983 case, upholding jury verdict against defendant police officers on ground that jury could have found defendants concealed from prosecutors facts material to decision whether to prosecute plaintiff).

In the present case, Plaintiffs' Complaints do not allege that Larsen and Brown failed to turn over exculpatory information to the *prosecutors*.  Indeed, the Complaints repeatedly make clear the assertion that the prosecutors were present during much of the coercion of witnesses and fabrications of testimony, as well as that they were aware of every alleged unlawful activity performed by Larsen and Brown.  *See* Complaints (making numerous references to Richter and Hrvol being fully aware of every bad act alleged in the case.  For example:  "Richter and . . . Hrvol worked closely with Brown, Larsen and the rest of the Council Bluffs Police Department during the investigation of the Schweer murder.  Both participated in witness interviews before

any arrests were made."; "Richter and Hrvol had access to all the reports generated during the

Schweer murder investigation"; "the 1977 defendants [including Richter and Hrvol] knew that

Hughes was a liar.  But they were desperate to give the appearance of solving the Schweer case.

They 'worked with' Hughes to create a case. . ."; "Hrvol, Larsen and Brown went to . . .

interview Anthony Houston"; "Defendants [including Richter and Hrvol] knew they needed

other witnesses to 'corroborate' at least some of the false story they manufactured with Hughes";

"Defendants changed Hughes's story . . ."; "The 1977 Defendants knew their whole case against

Harrington and McGhee was the coerced and coached statement of Hughes . . ."; "the 1977

defendants resorted to a notorious source of false evidence . . ." ; "the 1977 Defendants

continued to conceal information . . .").

Plaintiffs have not identified a single case where, as here, the prosecutors were aware of

all exculpatory information, but police officers were nonetheless held liable for failing to turn

that material over to the criminal defendants.  Accordingly, the Court must conclude that

Plaintiffs have failed to assert the violation of a constitutional or statutory right (to have police

turn exculpatory evidence over to them).  Defendants Larsen and Brown are, therefore, entitled

to qualified immunity on Plaintiffs' claims that their rights were violated by the failure of Larsen

and Brown to turn over *Brady* evidence to them.  Likewise, any potential claim by Plaintiffs that

the police Defendants are liable for continuing to withhold *Brady* material after Plaintiffs were

convicted is without merit.  First, as already found, Larsen and Brown were never under a duty

to disclose any *Brady* materials to the Plaintiffs because the prosecutors knew of all of the

exculpatory evidence and it was the prosecutors' duty to turn it over to the Plaintiffs.  Thus,

Plaintiffs have not asserted a cognizable violation of a constitutional or statutory right.  Second,

to the extent that Brown and Larsen are claimed to have lied about the existence of exculpatory

evidence during Plaintiffs' post-conviction relief hearings, such testimony is shielded from

liability under the doctrine of absolute immunity.  *See Briscoe v. LaHue*, 460 U.S. 325, 345

(1983) (in context of whether police officer should be given immunity for trial testimony, the

Court found:  "[T]he principles [of prior cases in granting absolute immunity ] to protect judges

and . . . prosecutors also apply to witnesses."); *Conley v. Office of the Pub. Defender*, 653 F.2d

1241, 1242 (8th Cir. 1981) (witnesses are absolutely immune from section 1983 suit arising from

their testimony in judicial proceedings).

With regard to Plaintiffs' allegations that Larsen and Brown coerced witness testimony

and fabricated evidence, the Court must deny qualified immunity on the same basis it did so with

regard to prosecutors Richter and Hrvol.  Plaintiffs have adequately alleged that Larsen and

Brown actively coerced and coached witness testimony for the purpose of arresting them without

due process and for the purpose of denying them their rights to a fair trial.  The allegations are

sufficiently conscience-shocking to state a substantive due process violation that was clearly

established at the time the alleged violation occurred.

b.      *Section 1985 conspiracy claim.*

For the same reasons and to the same extent as Richter and Hrvol, the Court finds that

where no immunity, either absolute or qualified, exists for these defendants, liability may lie on

Plaintiffs' § 1985 claims.

3.      *Matthew Wilber.*

Because the Court has concluded that Wilber was, at all times, acting in his capacity as a

prosecutor, and is thus entitled to absolute immunity for all claims, save the defamation claim against him, the Court need not evaluate whether Wilber is entitled to qualified immunity.

      4.    *David Dawson.*

As with Wilber, the causes of action asserted against Dawson are claimed only by McGhee, and not by Harrington.  Dawson, at Wilber's request, was assigned to work full time on the reinvestigation of the Schweer murder in 2003, following the vacation of Harrington's sentence by the Iowa Supreme Court.  McGhee's Complaint makes the following allegations concerning Dawson.  Dawson interrogated Hughes on April 24, 2003, at Wilber's direction.  At that interview, Hughes, without *Miranda* warnings and fearing he would lose his job if he didn't return to work soon, claimed that he had lied at Harrington's 2000 post-conviction relief hearing when he said that his testimony at Plaintiffs' 1978 trials was false.  Plater told Dawson in an April 2003 interview that Plater denied that McGhee ever told him he was with Harrington when Schweer was killed.  Dawson reviewed the file for the 1963 murder for which Gates was a suspect, noting in his report that Omaha police had done a records check on Gates in connection to a 1963 murder, records which indicated "Safe Keeping in connection with Assault with Gun (Mental) dated 6-22-55."  Dawson taped a purportedly biased interview with Gates on April 25, 2003, wherein Gates admitted that he may have walked his dogs in the area of the murder, and denied ever wearing bib overalls.  Gates also failed to answer Dawson's question regarding where he was on the night of the murder.  Dawson did not personally reveal this information to counsel for Plaintiffs, though Wilber is alleged to have known all of these facts.

As the Court concluded *supra* in regards to Wilber, McGhee offers no evidence or law

that supports a causal link between Dawson's conduct and any constitutional deprivation

McGhee may have experienced.  *See Madewell*, 909 F.2d at 1208 ("Liability under § 1983

requires a causal link to, *and direct responsibility for*, the deprivation of rights" protected by the

Constitution) (emphasis added); *Gordon*, 168 F.3d at 1113 ("Section 1983 . . . requires a causal

relationship between a Defendants' conduct and a plaintiff's constitutional deprivation.  Absent

such a relationship, the defendant is entitled to dismissal.").   Between April 18 and September 2,

2003, the only cause of McGhee's incarceration was the fact of his 1978 conviction and life

sentence for the first-degree murder of John Schweer, matters in which Dawson was never

involved.  Regarding the time frame between the vacating of McGhee's conviction on September

2, 2003, and the entry of his plea on October 24, 2003, the record does not articulate any actions

by Dawson whatsoever.  Finally, any claim for damages alleged by McGhee to have arisen from

his October 2003 conviction are barred by the *Rooker-Feldman* doctrine.  Because there is no

causation between Dawson's actions and any deprivation suffered by McGhee, McGhee has

failed to state an actionable claim against Dawson.

Moreover, "[p]rosecutors and their assistants also enjoy immunity from section 1983

actions so long as the actions complained of appear to be within the scope of prosecutorial

duties."  *Keating v. Martin*, 638 F.2d 1121, 1122 (8th Cir. 1980).  "This immunity is equally

available to investigators for the state prosecutor for actions in connection with a criminal

prosecution."  *Lawyer v. Kernodle*, 721 F.2d 632, 636 (8th Cir. 1983) (citing *Keating*, 638 F.2d

at 1122); *see also Ireland v. Tunis*, 113 F.3d 1435, 1446 (6th Cir. 1997) ("[A] nonjudicial officer

who takes ministerial actions intimately related to the judicial process pursuant to the express

direction and control of a prosecutor, who is directing the activity in fulfillment of a quasi-

judicial responsibility, also has absolute immunity.") (quoting *Joseph v. Patterson*, 795 F.2d 549, 560 (6th Cir. 1986) (abrogated on a different issue)); *Gobel v. Maricopa County*, 867 F.2d 1201, 1203 n.5 (9th Cir. 1989) ("Investigators, employed by a prosecutor and performing investigative work in connection with a criminal prosecution, are entitled to the same degree of immunity as prosecutors.").  Because none of Dawson's actions are alleged by McGhee to have been made in any way other than by the direction of Wilber, Dawson is entitled to the same level of immunity as is Wilber, i.e., absolute immunity as to all of McGhee's claims.[20]

## C.  *Sovereign Immunity*

### 1.    *Richter and Hrvol.*

Richter and Hrvol assert that they are shielded from liability on Plaintiffs' state law claims under the Iowa Tort Claims Act ("ITCA").  Both Plaintiffs raise a claim of intentional infliction of emotional distress against Richter and Hrvol; McGhee asserts claims of false arrest and imprisonment against both Richter and Hrvol; and Harrington asserts a claim of loss of parental consortium, on behalf of his daughter, against both Richter and Hrvol.

"The doctrine of sovereign immunity dictates that a tort claim against the state or an employee acting within the scope of his office or employment with the state must be brought, if at all, pursuant to chapter 669."  *Dickerson v. Mertz*, 547 N.W.2d 208, 213 (Iowa 1996).  Iowa

---

[20]  Dawson would also be entitled to qualified immunity with regard to any claims of failure to turn over exculpatory evidence for the same reasons that Larsen and Brown are entitled to such immunity.  Additionally, McGhee's claims against the City of Council Bluffs, to the extent it is claimed liable for Dawson's actions on an indemnity theory, must also be dismissed as an extension Dawson's immunity.  *See Schenecker*, 107 F.3d at 664 (finding that prosecutorial immunity on a § 1983 claim extends to the county employer) (citing *Burr*, 286 N.W.2d at 396).

Code section 669.23 provides:  "Employees of the state are not personally liable for any claim which is exempted under [Iowa Code] section 669.14."  Section 669.14 provides that the State's waiver of sovereign immunity from tort claims in section 669.4 does not apply to certain types of claims (i.e., sovereign immunity is not waived), including:  "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."

Defendants cite the unpublished disposition of Judge Longstaff in *Anderson v. Larsen*, No. 1:00-cv-10012 (S.D. Iowa March 28, 2002) (Clerk's No. 44), in support of their claim that the ITCA bars Plaintiffs' state law claims.  In *Anderson*, the plaintiffs, a Shelby County attorney and his wife, sued three law enforcement officers and the Shelby County Attorney, alleging various § 1983 violations, and state law claims of false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress, amongst others.  *Anderson*, No. 1:00-cv-10012, at 1-7.  In finding that the limited waiver of sovereign immunity granted by the ITCA was inapplicable, and that the defendants were immune from being sued, Judge Longstaff stated:  "The gravamen of all of plaintiffs' remaining claims in this case are for false arrest, malicious prosecution and abuse of process.  This case is similar to *Hawkeye By-Products* where the gravamen of the plaintiffs' complaint was misrepresentation, and therefore excepted from the waiver of sovereign immunity."   *Id.* at 16 (citing *Hawkeye By-Prods. Inc. v. Iowa*, 419 N.W.2d 410 (Iowa 1988)).

Defendants argue that because all of Plaintiffs' state law claims against them are at their root claims for false arrest, false imprisonment, malicious prosecution, and abuse of process, the limited waiver of liability under the ITCA is inapplicable and Richter and Hrvol are immune

from prosecution on Plaintiffs' claims of false arrest, loss of parental consortium, and intentional infliction of emotional distress.  Plaintiffs urge that Defendants' argument suffers from one fatal flaw, that is, that the ITCA is not implicated in this case because Plaintiffs' claims are filed against municipalities and not against the State of Iowa.   Plaintiffs  also note that in Harrington's defamation action against Wilber, the current Pottawattamie County Attorney, Wilber argued that he was entitled to immunity under the Iowa Municipal Tort Claims Act ("IMTCA"), and not the ITCA.  Defendants counter that county attorneys should be considered state employees for purposes of the ITCA because "it would make no sense to insulate the Attorney General under the State Tort Claims Act and relegate a county attorney to the protections of the municipal tort claims act when they both act for the same entity in prosecuting the crime on behalf of the state of Iowa."  Defs.' Reply at 11.  Defendants cite *Iowa v. Gill*, 143 N.W.2d 331, 332 (Iowa 1966) ("It is the duty of the county attorney to appear for the state in the courts of his county when the state is a party."), in support of this proposition.

The issue is a difficult one, and not addressed by any existing Iowa case law.  Nonetheless, the Court is convinced that Iowa courts would find a prosecutor acting to uphold the state's criminal laws to be protected by the ITCA.  In upholding the State of Iowa's prohibition against murder, it is clear that a county attorney represents first and foremost the interests of the state, such that they could be deemed state actors under the ITCA.  This conclusion is supported by *Trobaugh v. Sondag*, 668 N.W.2d 577 (Iowa 2003).  In *Trobaugh*, a county attorney signed an initial complaint against a defendant.  That same county attorney then took a "position as an assistant public defender in the same county" and became the defendant's defense attorney.  *Trobaugh*, 668 N.W.2d at 579.  Ultimately, the Iowa Supreme Court

concluded that the ITCA did not bar relief because the claims alleged against the attorney (now the county's public defender) were not the functional equivalent of claims barred by the ITCA. *Id*. at 585.  Nowhere did the Court find that the county defender was not a state employee in the first instance.  Further, Iowa Code § 669.2 provides that, as used in the ITCA, an "employee of the state" includes:

> any one or more officers, agents, or employees of the state or any state agency, including members of the general assembly, *and persons acting on behalf of the state or any state agency in any official capacity*, temporarily or permanently in the service of the state of Iowa, whether with or without compensation, but does not include a contractor doing business with the state. Professional personnel, including physicians, osteopathic physicians and surgeons, osteopathic physicians, optometrists, dentists, nurses, physician assistants, and other medical personnel, who render services to patients or inmates of state institutions under the jurisdiction of the department of human services or the Iowa department of corrections, and employees of the department of veterans affairs, are to be considered employees of the state, whether the personnel are employed on a full-time basis or render services on a part-time basis on a fee schedule or other arrangement.  Criminal defendants while performing unpaid community service ordered by the district court, board of parole, or judicial district department of correctional services, or an inmate providing services pursuant to a chapter 28E agreement entered into pursuant to section 904.703, and persons supervising those inmates under and according to the terms of the chapter 28E agreement, are to be considered employees of the state.

Iowa Code § 669.2(4) (emphasis added).  The language of § 669.2(4) makes clear that being on the State of Iowa payroll is not a prerequisite to being an "employee of the state" for purposes of the ITCA.

Additionally, Iowa Code § 331.756 provides that a county attorney shall:

> 1. Diligently enforce or cause to be enforced in the county, *state laws* and county ordinances, *violations of which may be commenced or prosecuted in the name of the state*, county, or as county attorney, except as otherwise provided.
> 2. Appear *for the state* and the county in all cases and proceedings in the courts of the county *to which the state* or the county is a party, except actions or proceedings

resulting from a change of venue from another county, and appear in the appellate courts in all cases in which the county is a party, and appear in all actions or proceedings which are transferred on a change of venue to another county or which require the impaneling of a jury from another county and in which the county or the state is a party.

10. Make reports relating to the duties and the administration of the county attorney's office to the governor when requested by the governor.

11. Cooperate with the auditor of state to secure correction of a financial irregularity as provided in section 11.15.

17. Institute legal proceedings against persons who violate laws administered by the division of labor services of the department of workforce development as provided in section 91.11.

18. Investigate complaints and prosecute violations of child labor laws as provided in section 92.22.

19. Prosecute violations of employment security laws and rules as provided in section 96.17, subsection 2.

20. Assist, at the request of the director of revenue, in the enforcement of cigar and tobacco tax laws as provided in sections 453A.32 and 453A.49.

24. Prosecute, at the request of the director of the department of natural resources or an officer appointed by the director, violations of the state fish and game laws as provided in section 481A.35.

25. Assist the department of public safety in the enforcement of beer and liquor laws as provided in section 123.14.  The county attorney shall also prosecute nuisances, forfeitures of abatement bonds, and foreclosures of the bonds as provided in sections 123.62 and 123.86.

Iowa Code § 331.756 (selected entries only, emphasis added).  It appears, then, that State law,

outlined in § 331.756 anticipates that a County Attorney, though technically an employee of the

particular county for which he is elected or by which he is employed, will necessarily perform

many functions *on behalf of the state* or on *behalf of a state agency*.[21]   Such actions are parts of

---

[21]  Countless other duties are imposed on County Attorneys by state law, and demonstrate that County Attorneys will frequently act on behalf of the state or on behalf of a state agency. Further examples include:

29. At the request of the director of public health, commence legal action to enjoin the unlawful use of radiation-emitting equipment as provided in section 136C.5.

31. Prosecute violations of the Iowa veterinary practice Act as provided in section 169.19.

32. Assist the department of inspections and appeals in the enforcement of the Iowa food code and the Iowa hotel sanitation code as provided in sections 137F.19 and 137C.30.

33. Institute legal procedures on behalf of the state to prevent violations of chapter 9H or 202B.

34. Prosecute violations of the Iowa dairy industry laws as provided in section 179.11.

35. Prosecute persons who fail to file an annual or special report with the secretary of agriculture under the meat and poultry inspection Act as provided in section 189A.17.

36. Cooperate with the secretary of agriculture in the enforcement of label requirements for food packages as provided in section 191.7.

37. Prosecute violations of the Iowa commercial feed law as provided in section 198.13, subsection 3.

38. Cooperate with the secretary of agriculture in the enforcement of the agricultural seed laws as provided in section 199.14.

39. Prosecute violations of the Iowa fertilizer law as provided in section 200.18, subsection 5.

40. Prosecute violations of the Iowa drug, device, and cosmetic Act as requested by the board of pharmacy examiners as provided in section 126.7.

41. Provide the Iowa department of corrections with information relating to the background and criminal acts committed by each person sentenced to a state correctional institution from the county as provided in section 904.202.

45. Appear on behalf of the administrator of the division of mental health and disability services of the department of human services in support of an application to transfer a person with mental illness who becomes incorrigible and dangerous from a state hospital for persons with mental illness to the Iowa medical and classification center as provided in section 226.30.

49. Prosecute violations of law relating to the family investment program, medical assistance, and supplemental assistance as provided in sections 239B.15, 249.13, and 249A.14.

50. Commence legal proceedings to enforce the rights of children placed under foster care arrangements as provided in section 233A.11.

51. Commence legal proceedings, at the request of the superintendent of the Iowa juvenile home, to recover possession of a child as provided in section 233B.12.

52. Furnish, upon request of the governor, a copy of the minutes of evidence and other pertinent facts relating to an application for a pardon, reprieve, commutation, or remission of a fine or forfeiture as provided in section 914.5.

55. At the request of the state geologist, commence legal proceedings to obtain a copy of the map of a mine or mine extension as provided in section 456.12.

the County Attorney's *official functions*, as designated by Iowa law, and the Court believes that

the ITCA was designed to protect such functions performed for or on behalf of the State of Iowa.

*See* Iowa Code § 13A.1 (defining "prosecuting attorney" as including "county attorney . . . or

any attorney charged *with responsibility of prosecution of violation of state laws*") (emphasis

added); *see also* 27 C.J.S. *District and Prosecuting Attorneys* § 22 (2007) ("The prosecuting

attorney may act as either county or state officers.  The prosecuting attorney represents the state

in the realm of law enforcement, and when acting in his prosecutorial capacity to enforce state

penal law, the district attorney is an agent of the state, not of the county in which the criminal

case happens to be prosecuted."); *see also Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997)

("Texas law makes clear . . . that when acting in the prosecutorial capacity to enforce state penal

law, a district attorney is an agent of the state, not of the county in which the criminal case

happens to be prosecuted."); *Coleman v. Kaye*, 87 F.3d 1491, 1499 (3d Cir. 1996) (prosecutors

can have "a duel or hybrid status. . . .  [When] enforcing their sworn duties to enforce the law . .

., they act as agents of the state. . . ."); *Baez v. Hennessy*, 853 F.2d 73, 77 (2d. Cir. 1988) ("When

prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial

capacity, represents the State not the county.").

---

59. Assist, upon request, the department of transportation's general counsel in the prosecution of violations of common carrier laws and regulations as provided in section 327C.30.

66. Represent the state in litigation relating to the inheritance tax if requested by the department of revenue as provided in section 450.1.

71. Assist, as requested by the attorney general, with the enforcement of the Iowa competition law as provided in section 553.7.

Iowa Code § 331.756 (selected entries only).

Having concluded that Richter and Hrvol could be considered state employees under the ITCA for their prosecution of murder charges against Plaintiffs, the Court must now turn to evaluate to what extent the ITCA is applicable to Plaintiffs' state law claims in the first instance. A "claim" under the ITCA is defined as:

> a. Any claim against the state of Iowa for money only, on account of damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the state *while acting within the scope of the employee's office or employment*, under circumstances where the state, if a private person, would be liable to the claimant for such damage, loss, injury, or death.

> b. Any claim against an employee of the state for money only, on account of damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the state while acting within the scope of the employee's office or employment.

Iowa Code § 669.2(3)(a)-(b) (emphasis added).  The term "acting within the scope of the employee's office or employment" means "acting in the employee's line of duty as an employee of the state."  Iowa Code § 669.2(1).  While neither party discusses the import of these provisions of the ITCA, the Court believes they are important in the present case.  The ITCA does not apply to claims that a state employee "acted outside his official duties."  *See Lindaman v. Bode*, 478 N.W.2d 312, 316 (Iowa Ct. App. 1991).  Given that this Court has previously found that Richter and Hrvol were not acting in the scope of their duties as prosecutors when they arrested Plaintiffs without probable cause, or when they coerced and coached witnesses and fabricated evidence prior to the filing of the True Information, it is reasonable to conclude that those investigatory activities could arguably be deemed to have been taken outside the "scope of their employment" as prosecutors of state criminal violations.  Thus, liability may still be

imposed against Defendants on Plaintiffs' state law claims to the extent those claims arise from acts taken outside the scope of Defendants' activities as state employees, because the ITCA is not applicable.

To the extent, however, that Plaintiffs' seek liability on their state law claims for the Defendants' concealment of exculpatory evidence, the Court's prior holding that these actions were taken in the prosecutors' roles as advocates mandates a different conclusion, because these activities clearly were within the scope of their prosecutorial duties.   As noted previously, a citizen's right to sue a "an employee of the state" under the Iowa Tort Claims Act "is limited by conditions set forth by the legislature in chapter 669." *Drahaus v. State*, 584 N.W.2d 270, 272 (Iowa 1998).  Of particular importance here is the exception for "[a]ny claim *arising out of* assault, battery, *false imprisonment*, *false arrest*, *malicious prosecution*, *abuse of process*, libel, slander, misrepresentation, deceit, or interference with contract rights."  Iowa Code § 669.14(4) (emphasis added).  Clearly, under the plain language of the statute, Richter and Hrvol, as Iowa employees, are shielded from liability for McGhee's "false arrest and imprisonment" claim, to the extent it arises from their concealment of exculpatory evidence.  With regard to the intentional infliction of emotional distress claims and Harrington's consortium claim, however, the Court must look further than the plain language of the statute to determine whether the claims "aris[e] out of" false imprisonment, false arrest, malicious prosecution, or abuse of process, i.e., the Court must evaluate whether "[t]he gravamen of plaintiff's claim . . . is the functional equivalent" of one of the causes of action listed in § 669.14.  *See Greene v. Friend of Court*,  406 N.W.2d 433, 436 (Iowa 1987) (noting that § 669.14 "identifies excluded claims in terms of the type of wrong inflicted"); *see also Hawkeye By-Prods., Inc*., 419 N.W.2d at 411.

In his claim on behalf of his daughter, Nicole Antoinette Harrington, for loss of parental consortium, Harrington references all of the allegations previously made against Defendants and notes that were it not for those things, "there would not have been a scintilla of evidence of Harrington's culpability for Schweer's murder." Harrington Compl. at ¶ 387. Hence, without the bad acts of the Defendants, and without the "wanton disregard for the rights, needs, and feelings of Nicole Antoinette Harrington," Nicole Harrington would not have suffered the loss of her father's consortium for the period of his incarceration. *Id.* at ¶ 392. Likewise, both Plaintiffs claim that Defendants intentionally inflicted emotional distress on them via their outrageous conduct demonstrated through all of the allegations made previously against Defendants. The Court finds it difficult to fathom how these claims are not, at their core, claims "arising out of" false arrest, malicious prosecution, abuse of process, or false imprisonment. As in *Hawkeye By-Products* and *Anderson*, the gravamen of Plaintiffs' state law claims against the prosecutors is that they were falsely arrested, falsely imprisoned, and maliciously prosecuted, and that without Defendants abuse of process, no intentional infliction of emotional distress or loss of parental consortium would have occurred. These claims against the prosecutors, therefore, to the extent they arise from Hrvol and Richter's concealment of exculpatory evidence, are barred by the ITCA.[22] [23]

---

[22] Plaintiffs argue that Defendants "have talked out of both sides of their mouth" on the issue of whether Hrvol and Richter are protected by the ITCA or the IMTCA, by virtue of the fact that this Court previously analyzed Wilber's liability for defamation against Harrington under the IMTCA. They point out that it is "established as the law of this case . . . that when analyzing whether sovereign immunity precludes any of the Plaintiff's claims, we look to the statutory language of the Iowa Municipal Tort Claims Act, not the Iowa Tort Claims Act." Harrington's Resistance at 105. The question of whether a state law claim against a government agent is protected by the IMTCA or the ITCA is one of state law, however, and Plaintiffs offer no authority whatsoever for the proposition that because this Court previously evaluated *Wilber's*

D.  *Qualified Privilege (Regarding McGhee's Defamation Claim against Wilber)*

In Count 23 of his Complaint, McGhee alleges defamation against Matthew Wilber, for statements made by Wilber at a press conference on October 24, 2003.  The entire press release is reprinted *supra* in the Court's statement of facts, however, only the last portion relates to McGhee.  The allegedly defamatory portions of the statement are italicized:

> On a related note, Curtis McGhee, a co-defendant of Mr. Harrington's in this case, *pleaded no contest* today to a charge of Second Degree Murder for the death of John Schweer.  Mr. McGhee was sentenced to a term of imprisonment of

---

liability under the IMTCA, notably *because that is the issue that the parties submitted to the Court*, that the Court is somehow forever barred from considering the applicability of other provisions of state law.  Indeed, though the issue has not been argued, it is entirely possible that Defendants' prosecutorial duties are covered by the ITCA, but other duties and functions of the Defendants are covered instead by the IMTCA.

[23]  In Larsen and Brown's Motions for Partial Judgment on the Pleadings and Motion for Judgment as a Matter of Law, they argue with regard to Plaintiffs' state law tort claims:

> The District Court for the Southern District of Iowa has addressed this issue in a closely analogous case raising these same theories of recovery.  *See Anderson v. Larson*, No. 1-00-cv-10012, Doc. No. 44. . . .  Because the arguments advanced by Co-Defendants Hrvol, Richter, Wilber and Pottawattamie County concerning the application of the Order in the *Anderson* case apply with equal force to these Defendants, that portion of the Brief in support of Co-Defendants' summary judgment motion addressing this issue (pp. 25-27) is incorporated herewith by reference.

Motions at 8.  The Court first points out that Defendants' repeated "incorporation by reference" has constituted something of a nuisance in this case.  While there are many similarities between the claims against the various Defendants, the theories advanced to avoid liability necessarily require a different analysis concerning  the prosecutor Defendants, the police Defendants, and the municipal Defendants, respectively.  Yet the police and municipal defendants' incorporation by reference of a defense proffered by the prosecutor defendants is simply not helpful to the Court without some argument regarding how the prosecutor defense is applicable to the police or municipal Defendants.  Because Defendants Larsen and Brown have utterly failed to offer any evidence or argument indicating how the ITCA is applicable to them, the Court declines to review the matter further.

twenty-five years.  Since Curtis McGhee had already served more than twenty-five years in prison since his original conviction in 1978, he was credited with time served and left the courthouse late this morning.  Even though Mr. McGhee did not actually pull the trigger on the gun that killed John Schweer, *our case against him was stronger than against Terry Harrington.  Mr. McGhee had made admissions to at least three different people about being with Terry Harrington when Harrington shot a police officer in Council Bluffs*.  Those statements would likely not be admissible in a trial against Terry Harrington, but *would certainly have come into evidence at a trial against Mr. McGhee*.  Mr. McGhee was offered a chance to plead to Second Degree Murder back in 1978 and, had he taken that deal back then, he would probably have been paroled over ten years ago.

McGhee argues that these portions of Wilber's announcement are defamation per se because:  1) McGhee did not plead "no contest" to a charge of second degree murder, but rather took an *Alford* plea, during which he maintained his innocence; 2) Wilber knew that the case against McGhee was equally as weak as the case against Harrington; 3) Wilber knew that two of the three witnesses who claimed McGhee had confessed to being present at the Schweer murder had recanted their stories, and Wilber himself had found the third witness to be not credible; and 4) the statements of the two persons who claimed McGhee had confessed would not come into evidence at trial because those two people had recanted, and the third person's testimony could not reasonably come in at trial because Wilber did not find the witness credible.  McGhee argues that even viewing all of the evidence Wilber had available to him, there was nothing to support Wilber's claims that the case against McGhee was stronger than the case against Harrington, that McGhee had made admissions, or that such evidence would come into evidence in a retrial of McGhee.

Defendant does not argue that the statements on their face are not defamation per se.[24]

---

[24]  Defamation, which includes the twin torts of libel and slander, is the "'malicious publication, expressed either in printing or in writing [or orally in the case of slander], or by signs and

Rather he argues that he had a qualified privilege to make such statements, and that McGhee cannot demonstrate a genuine issue of material fact to show that Wilber in fact entertained serious doubts as to whether the statements were true.

There can be little doubt on the present facts, viewed in the light most favorable to the non-moving party, that McGhee has raised a genuine issue of material fact that all of the italicized statements of Wilber are libelous or slanderous per se.  Moreover, the question of whether the statements were truthful is sufficiently debatable to give rise to a jury question.  *See Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989) (noting that substantial truth is an absolute defense in a defamation action); *but see Kelly*, 372 N.W.2d at 295 (the truth or falsity of a statement does not affect the determination whether the statement is libelous per se).

Wilber argues first that his case against McGhee was, in fact, stronger than his case against Harrington.  This is true, Wilber claims, because McGhee admitted lying to police about his whereabouts on the night of the murder, he asked a friend to lie for him, and McGhee

---

pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business.'" *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115 (Iowa 1985) (quoting *Plendl v. Beuttler*, 111 N.W.2d 669, 670-71 (Iowa 1961)).   Certain statements may qualify as being libelous or slanderous per se.  This means:

> [The statements] are actionable in and of themselves without proof of malice, falsity or damage.  In actions based on language not libelous per se, all of these elements must be proved . . . before recovery can be had, but when a statement is libelous [or slanderous] per se they are presumed from the nature of the language used.

*Id.* at 115-16 (quoting *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968)).  Thus, words are defamation per se if it can be presumed as a matter of law that their conveyance will have a libelous or slanderous effect.

admitted that he was with Harrington the night of the murder.  Even assuming that these facts are

true, the Court cannot say that they make a "stronger case" for murder, particularly when they do

not place either McGhee or Harrington anywhere near the murder scene.  Indeed, reviewing all

the evidence known to Wilber, articulated *supra* in the Court's recitation of facts, a reasonable

jury could find that the statements were not substantially true.

With regard to the Wilber's claim that McGhee confessed to three witnesses that he was

involved in Schweer's homicide and his statement that such testimony would be admissible at

trial against McGhee, Wilber claims that the three witnesses did testify on at least one occasion

that McGhee was involved.  Wilber claims that even though two of the three witnesses recanted

their stories, and the third was viewed as incredible, the inculpatory statements had never been

excluded from evidence by a court.  Wilber's argument is without merit.  A reasonable jury

could view Wilber's statement as implying that, on the day of the press conference, those three

witnesses were ready to testify at trial that McGhee made inculpatory statements to them, when

in fact, that was not the case. [25]

This Court made extensive findings about the availability of the qualified privilege

defense in Harrington's companion case, Iowa Southern District #4:03-cv-90616 (Clerk's No.

29), published at *Harrington v. Wilber*, 353 F. Supp. 2d 1033 (S.D. Iowa 2005).  The court found

that the attachment of qualified privilege was appropriate, but that a genuine issue of material

fact had been raised as to whether the qualified privilege should be defeated on the basis that a

---

[25] With regard to Wilber's statement that McGhee pleaded "no contest," Defendant makes no argument that the statement is substantially true.

reasonable jury could find that the defamatory statements were made with actual malice.  *See Harrington v. Wilber*, 353 F. Supp. 2d 1033, 1045 (S.D. Iowa 2005) ("'A qualified privilege is a defeasible immunity from liability; that is, a qualified privilege may be defeated under certain circumstances.'  Such circumstances may arise when the privilege is abused or if the defamatory remarks were made with actual malice.") (quoting *Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004); and *citing New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  Just as in *Harrington*, there is ample evidence from which a jury could conclude that Wilber acted with a knowing or reckless disregard for the truth when he stated that McGhee pleaded "no contest"; stated that he had a stronger case against McGhee; stated that McGhee had confessed to three witnesses to his involvement in the Schweer murder; and stated that such evidence would be admissible at trial against McGhee.  And just as in *Harrington*, these issues are more than ample to raise a genuine issue of material fact as to whether Wilber acted with actual malice in his allegation that Harrington murdered John Schweer.   The Court finds no reason to sway from its holding in *Harrington*, and incorporates the reasoning contained therein by reference in denying Wilber's claim for summary judgment on McGhee's defamation claim.

E.  *Pottawattamie County's Request for Summary Judgment on the Claim of Failure to Supervise and Train Prosecutors*

In Harrington's Complaint in Counts 1, 2, and 3, and McGhee's Complaint in Counts 16 and 29, they assert § 1983 claims against Pottawattamie County for failing to train and supervise the prosecutors not to commit the alleged misdeeds forming the basis of their other § 1983 claims.  The Defendant County argues first that the State of Iowa is liable for the Plaintiffs' claims, and that the County cannot be held liable for the acts of the prosecutor in enforcing state

laws.  The Plaintiffs counter that it is the County that must answer for the improper conduct of

Hrvol and Richter in their handling of Plaintiffs' cases.

Plaintiffs have alleged that Pottawattamie County failed to train and supervise its

employees and that it is the policy or custom of the Pottawattamie County Attorney's Office to

arrest and prosecute persons without probable cause, to intimidate and coach witnesses to give

false testimony, and to conceal exculpatory evidence.  Plaintiffs have also alleged that the

County's policy or custom of discriminating against African Americans was a motivating force

in this unconstitutional misconduct.

In *Speer v. City of Wynne, Arkansas*, 276 F.3d 980, 985 (8th Cir. 2002), Speers filed a

claim against a city's mayor, its Deputy Prosecuting Attorney, and the city itself, alleging they

violated his § 1983 procedural due process rights.  *Speer*, 276 F.3d at 982.  The district court

entered judgment against the City, but found judgment in favor of the mayor.  *Id*. at 984.  On

appeal, the City argued that the district court erred in holding it liable for a violation of Speer's

due process rights on the theory that the district court made no underlying finding that the mayor

had violated Speer's constitutional rights.  *Id*. at 984.  The City claimed that under *Los Angeles*

*v. Heller*, 475 U.S. 796, a finding of liability must be made on an underlying city employee to

impose municipal liability.  *Id*. at 985.  The Eighth Circuit rejected the claim, holding:

> Our court has previously rejected the argument that *Heller* establishes a rule that
> there must be a finding that a municipal employee is liable in his individual capacity
> as a predicate to municipal liability. *See Praprotnik v. City of St. Louis*, 798 F.2d
> 1168, 1172-73 n.3 (8th Cir. 1986), *rev'd on other grounds*, 485 U.S. 112, 108 S. Ct.
> 915, 99 L. Ed. 2d 107 (1988); *see also Parrish v. Luckie*, 963 F.2d 201, 207 (8th Cir.
> 1992) ("A public entity or supervisory official may be liable under § 1983, even
> though no government individuals were personally liable.").  As our court noted in
> *Praprotnik*, a crucial fact underlying the Supreme Court's decision in *Heller* was that

the theory of municipal liability asserted was entirely dependent on the municipal defendants' responsibility for the officer's alleged unconstitutional acts. *See Praprotnik*, 798 F.2d at 1173 n.3. A favorable verdict for the individual officer, therefore, would have been entirely inconsistent with a finding that the municipal defendants were responsible for the unconstitutional behavior. *Heller* should not be read to require a plaintiff to show more than that a governmental policy or custom was the "moving force" that led to the deprivation of his constitutional rights, the foundation for municipal liability recognized by the Court in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L. Ed. 2d 611 (1978).

The appropriate question under *Heller* is whether a verdict or decision exonerating the individual governmental actors can be harmonized with a concomitant verdict or decision imposing liability on the municipal entity. The outcome of the inquiry depends on the nature of the constitutional violation alleged, the theory of municipal liability asserted by the plaintiff, and the defenses set forth by the individual actors. We do not suggest that municipal liability may be sustained where there has been no violation of the plaintiff's constitutional rights as a result of action by the municipality's officials or employees. *Cf. Trigalet v. City of Tulsa*, 239 F.3d 1150, 1156 (10th Cir. 2001) (concluding that a municipality may be held liable only if the conduct of its employees directly caused a violation of a plaintiff's constitutional rights); *Schulz v. Long*, 44 F.3d 643, 650 (8th Cir. 1995) ("It is the law in this circuit . . . that a municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located."). After all, a municipality can act only through its officials and employees. However, situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation. *See Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985); *see also De Feliciano v. De Jesus*, 873 F.2d 447, 450 (1st Cir. 1989) (recognizing that a jury's verdict exonerating individual defendants for unconstitutional termination of a plaintiff's employment may be reconcilable with a verdict holding the municipal entity liable for the violation), *cert. denied*, 493 U.S. 850, 110 S. Ct. 148, 107 L. Ed. 2d 107 (1989).

*Id.* at 984-86.

As the Court discussed in its analysis of the Iowa Tort Claims Act applicability to the present action, with regard to the concealment of exculpatory evidence, Defendants are not only absolutely immune, but can be said to have been acting as "employees of the state" because such actions were clearly within the scope of their duties as prosecutors *for the State*. Thus, the Court

-104-

cannot harmonize the lack of liability of Richter and Hrvol with a decision that the County could be liable for such acts.   On the other hand, the Court found that a jury could reasonably conclude that the Defendants were not acting within the scope of their duties as a representative of the state in undertaking to arrest Plaintiffs without probable cause and in fabricating/coercing evidence, thus taking them outside the scope of an "employee of the state" under the Iowa law. Since the County merely argues that Richter and Hrvol were acting as State employees rather than County employees, and does not address whether it could be liable in the face of a finding that they were not acting as State employees, the County has failed to meet its burden to demonstrate that summary judgment is proper.

To the extent that the County argues that Plaintiffs' claims of failure to train and supervise are akin to negligent supervision or retention, the Court also must disagree.  Such a cause of action has been repeatedly recognized as viable under *Monell* in this circuit.  *See*, *e.g.*, *Reasonover*, 447 F.3d at 584 ("To establish [a claim of failure to train or supervise under *Monell*, a plaintiff] must show [that the County's] failure to train or supervise 'amounts to deliberate indifference to the rights of persons with whom the [prosecutors] come into contact' and the failure is the 'moving force behind the constitutional violation.'").  The County has offered no evidence which would contradict Plaintiffs' allegations in this regard.  Thus, whether Plaintiffs will be able to present sufficient evidence to sustain this claim is a matter necessarily left for trial.

The County next argues that Plaintiffs' § 1983 claims against it, to the extent they state a claim under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), are barred.  "Congress intended to hold municipalities responsible under § 1983 only for the execution of official policies and

customs, and not for injuries inflicted solely by employees or agents." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125, n.2 (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978) and *Pembaur*, 475 U.S. at 478-480). Defendants assert that only those municipal officers who have "final policy making authority" can subject a local government to § 1983 liability. Defs.' Br. in Support of Mot. for Summ. J. at 34 (citing *Pembaur*, 475 U.S. at 478-80). "Whether an official had final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483. According to Defendants, that final policy making authority for Pottawattamie County, under state law, is the Board of Supervisors. Defs.' Brief in Support of Motion for Summ. J. at 35 (citing Iowa Code § 331.301(2) (the "power of a county is vested in the [Board of Supervisors] and a duty of a county shall be performed by or under the direction of the board except as otherwise provided by law")). Thus, Defendants argue that because Plaintiffs have alleged final decision making authority by the Prosecutors only, and have not alleged any action by the Pottawattamie County Board of Supervisors, they have failed to state a cause of action against the County under § 1983.

Plaintiffs urge that they have sued the County under § 1983 because the County Attorney (first Richter, and later Wilber) was the final policymaker for the County with respect to law enforcement matters. Indeed, Richter testified at deposition that the County Attorney was the chief law enforcement officer for the County. The Supreme Court has recognized that "state law will [not] always speak with perfect clarity" on the issue. *Praprotnik*, 485 U.S. at 125. Indeed, the Court recognized that "there will be cases in which policymaking responsibility is shared among more than one official or body." *Id*. at 126. Since Defendants have offered no evidence that the Pottawattamie County Board of Supervisors is the *only* policy making entity for the

County, or that the County Attorney lacks policymaking authority with respect to law enforcement decision in that County, the Court simply cannot conclude as a matter of law that Plaintiffs' § 1983 claim is barred as Defendants assert.[26]

### F.  *McGhee's Freestanding Indemnity Claims*

In Count 17 of McGhee's Complaint, he asserts an indemnity claim against the City of Council Bluffs, alleging that the City is obligated to indemnify Larsen and Brown on all claims against them except for punitive damages, pursuant to Iowa Code § 670.8.   McGhee asserts an identical claim against Pottawattamie County with regard to its obligation to indemnify Hrvol and Richter against all claims other than punitive damages.  Defendants urge that Iowa Code § 670.8 does not provide an independent theory of recovery.  The Court believes this complaint by Defendants is one of form rather than of substance.

Iowa Code § 670.8 provides that a governing body "shall save harmless and indemnify the officers and employees against any tort claim or demand . . . arising out of an alleged act or omission occurring within the scope of their employment or duties."  Iowa Code § 670.8.  The obligation to indemnify also applies to actions under § 1983, but does not extend to "punitive damages" or to "willful and wanton act[s] or omission[s]."  *Id*.   The duty to indemnify is a mandate under Iowa law, not subject to reasonable dispute.  Thus, if a jury finds that any of the

---

[26]  With respect to Plaintiff McGhee's § 1983 "policy or custom" claim against Pottawattamie County as it relates to Defendants Wilber and Dawson (Count 29), the Court finds that judgment in favor of the County is proper.  First, the Court cannot harmonize the lack of liability of Wilber and Dawson with a decision that the County could be liable on the asserted § 1983 claim. Second, the Court has concluded that Plaintiff McGhee has not stated a cognizable constitutional violation stemming from Wilber and Dawson's conduct.  *See Schulz*, 44 F.3d at 650 ("It is the law in this circuit . . . that a municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located.").

1977 Defendants are liable for non-wilful and wanton acts or omissions occurring within the

scope of their employment or duties, § 670.8 will require indemnity by the respective

municipality.  This Court does not provide Complaints to the jury during civil trials.  Thus, to the

extent that McGhee made any error in pleading indemnity under a separate count, rather than as

part of the allegations against individual defendants, the error is harmless.

## IV.  CONCLUSION

For the reasons stated herein, McGhee's Motion for Leave to File Surreply Brief on

County and Prosecutors' Motion for Summary Judgment (Clerk's No. 133) is GRANTED.  The

Motions for Summary Judgment (McGhee Clerk's No. 95; Harrington Clerk's No. 93) filed by

Pottawattamie County, Hrvol, Richter, and Wilber are GRANTED IN PART and DENIED IN

PART.  Larsen, Brown, and the City of Council Bluffs Motion for Partial Judgment on the

Pleadings (Clerk's No. 90) is GRANTED IN PART and DENIED IN PART.  Dawson and the

City of Council Bluff's Motion for Judgment on the Pleadings (Clerk's No. 99) is GRANTED.

Larsen, Brown, and the City of Council Bluffs' Motion for Judgment as a Matter of Law

(Clerk's No. 100) is GRANTED IN PART and DENIED IN PART.

With respect to the specific claims alleged, the Court finds the following:

\*        As to Harrington's Count 1, a § 1983 claim for fabricated and perjured testimony against
         Defendants Hrvol, Richter, Brown, and Larsen, the pending motions are granted to the
         extent that the fabricated or perjured testimony was actually used at trial or in judicial
         proceedings.  However, to the extent that the prosecutors fabricated and coerced evidence
         prior to the filing of the True Information, the pending motions are denied.  The
         prosecutors are not entitled to absolute immunity, and neither the prosecutors nor the
         police defendants are entitled to qualified immunity on such claims.

\*        As to Harrington's Count 2, a § 1983 claim for withheld *Brady* and *Giglio* evidence, the

pending motions are granted.  The prosecutors are entitled to absolute immunity and the police defendants are entitled to qualified immunity.

* As to Harrington's § 1985 conspiracy claim, the pending motions are granted to the extent that the alleged conspiracy arises from the withholding of exculpatory evidence, but denied to the extent the conspiracy is based on a lack of probable cause to arrest and on the fabrication/coercion of evidence.

* As to Harrington's state claims in Counts 4 (intentional infliction of emotional distress), 5 (malicious prosecution), and 6 (loss of parental consortium), the pending motions are granted with respect to the prosecutor Defendants to the extent the claims arise out of the withholding of exculpatory evidence.  The pending motions are denied to the extent the claims arise out of claims for arrest without probable cause and fabrication/coercion of evidence.  The pending motions by the police Defendants are denied.

* As to McGhee's § 1983 claims against Larsen, Brown, Hrvol, and Richter (Counts 1, 5, 9, and 12), the pending motions are granted to the extent that the § 1983 cause of action is based on the concealment of exculpatory evidence, as the prosecutors are entitled to absolute immunity and the police Defendants are entitled to qualified immunity.  To the extent the § 1983 claims arise from arrest without probable cause or fabrication of evidence, the pending motions are denied.  The pending motions are granted to the extent that the fabricated or perjured testimony was actually used at trial or in judicial proceedings.

* As to McGhee's state law claims against Brown, Larsen, Hrvol and Richter, for Malicious Prosecution (Counts 2 and 6), False Arrest and Imprisonment (Counts 3, 7, 10, and 13), Intentional Infliction of Emotional Distress (Counts 4, 8, 11, and 14), the pending motions are granted with respect to the prosecutor Defendants to the extent the claims arise out of the withholding of exculpatory evidence.  The pending motions are denied to the extent the claims arise out of claims for arrest without probable cause and fabrication/coercion of evidence.  The pending motions by the police Defendants are denied.

* As to McGhee's§ 1985 conspiracy claim (Count 15) against Brown, Larsen, Hrvol, and Richter, the pending motions are granted to the extent that the alleged conspiracy arises from the withholding of exculpatory evidence, but denied to the extent the conspiracy is based on a lack of probable cause to arrest and on the fabrication/coercion of evidence.

* As to both Harrington and McGhee's § 1983 claims against Pottawattamie County and

the City of Council Bluffs as it relates to the 1977 defendants (Harrington's Counts 1, 2, and 3; McGhee's Count 16 and 18), the pending motions are granted to the extent that the claims arise from the withholding of exculpatory evidence, but are denied in all other respects.

* As to McGhee's Indemnity claims against Pottawattamie County and the City of Council Bluffs (Counts 17 and 19) (for their duties to indemnify the 1977 defendants), the pending motions are denied.

* As to McGhee's Counts 20 (§ 1983), 21 (False arrest and imprisonment) and 22 (intentional infliction of emotional distress) as against Wilber, the pending motions are granted, as Wilber is entitled to absolute immunity.

* As to McGhee's Count 23 (defamation) as against Wilber, the pending motions are denied.

* As to McGhee's Counts 24 (§ 1983); 25 (malicious prosecution); 26 (false arrest and imprisonment); and 27 (intentional infliction of emotional distress) as against Dawson, the pending motions are granted, as Dawson is immune from liability.

* As to McGhee's claim of § 1985 conspiracy as against Wilber and Dawson (Count 28), the pending motions are granted, as the defendants are immune.

* As to McGhee's § 1983 policy or custom claim against Pottawattamie County (Count 29), the pending motions are granted as McGhee has failed to identify a cognizable underlying constitutional injury

* As to Mcghee's Indemnity claim (Count 30) against Pottawattamie County as it regards Dawson, the pending motions are granted, as the Court has found Dawson immune from McGhee's claims.

The Court finally notes that, as it prepared to file this Memorandum Opinion and Order, the United States Supreme Court, on February 21, 2007, decided the case of *Wallace v. Kato*, No. 05-1240, 2007 WL 517122.  The Court has not had adequate time to conduct a full analysis of the impact of *Wallace* on the remainder of the present case, if any.  In any event, the Court

believes that parties should be permitted to comment on *Wallace's* applicability or non-applicability to the present case.  Accordingly, should the parties have any statement on the matter, they shall submit briefs to the Court no later than March 2, 2007.

IT IS SO ORDERED

Dated this ___23rd___ day of February, 2007.


_____
ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT